# EXHIBIT A



## LUKOIL North America LLC
### A SUBSIDIARY OF LUKOIL OIL COMPANY

Site # 57254

DEALER ORIGINAL

# LUKOIL® Dealer PMPA Franchise Agreement

## LUKOIL BRANDED - LEASE/CONTRACT COVER SHEET

LESSEE..............................................................Kazmi Trading Corp.
CUSTOMER ACCOUNT NUMBER.................C57254001
SERVICE STATION...........................................57254
CLASS OF TRADE............................................30
EFFECTIVE DATE.....................................September 15, 2017
EXPIRATION DATE.........................................July 31, 2020

RETURN THE ATTACHED DOCUMENTS BY:   ASAP
After execution return to: Diane Sullivan, LUKOIL North America LLC, 302 Harper Drive,
Suite 303, Moorestown, NJ  08057, Attn: Contract Administration

ENCLOSED ARE THE FOLLOWING:

| | |
|---|---|
| X | PMPA FRANCHISE AGREEMENT |
| X | LESSEE DEALER LEASE PROVISIONS TO PMPA FRANCHISE AGREEMENT |
| X | UNDERGROUND STORAGE TANKS AGREEMENT |
| X | PURCHASE SCHEDULE |
| X | RENT SCHEDULE |
| X | LEASE SCHEDULE |
| X | MAINTENANCE AND INFORMATION SERVICES AGREEMENT FOR EPOS |
| X | MAINTENANCE SCHEDULE TO THE LEASE PROVISIONS |
| X | ORGANIZATION POLICY |
| X | KEY INDIVIDUAL GUARANTY |
| X | KEY PERSON PROVISIONS |
| X | ADDITIONAL C STORE PROVISIONS |
| X | TRANSFER & SURVIVORSHIP POLICY |
| X | W-9 |

**TABLE OF CONTENTS**
LUKOIL North America LLC
Site # 57254

RECITALS ..................................................................................................................................... 1

AGREEMENT ............................................................................................................................... 1

ARTICLE I ..................................................................................................................................... 1

GRANT .......................................................................................................................................... 1
1.1    PMPA Franchise Relationship ........................................................................................ 1
1.2    Rebranding ...................................................................................................................... 2
1.3    Other Businesses ............................................................................................................. 2
1.4    No Exclusive Marketing Rights ...................................................................................... 2
1.5    Term ................................................................................................................................ 2

ARTICLE II .................................................................................................................................... 2

PURCHASE AND DELIVERY OF PRODUCTS ......................................................................... 2
2.1    Purchase Obligation ........................................................................................................ 2
2.2    Prices .............................................................................................................................. 3
2.3    Terms of Payment ........................................................................................................... 3
2.4    Credit; Security .............................................................................................................. 3
2.5    Deliveries ........................................................................................................................ 4
2.6    Other Terms and Conditions of Sale ............................................................................... 4
2.7    Product Certification ....................................................................................................... 4
2.8    Franchise Dealer Product Control; Safeguards ............................................................... 4
2.9    Effect of Quality Violations; Samples ............................................................................ 5
2.10   Product Quality or Quantity Claims ................................................................................ 5

ARTICLE III ................................................................................................................................. 5

SERVICES BY LNA ...................................................................................................................... 5
3.1    LNA Services .................................................................................................................. 5
3.2    Changes; Third Parties; Fees .......................................................................................... 6

ARTICLE IV .................................................................................................................................. 6

PARTICIPATION/ORGANIZATIONAL FORM ......................................................................... 6
4.1    Organizational Form; Key Individual ............................................................................. 6
4.2    Participation in Business; Multi-Unit Operators ............................................................. 6
4.3    Corporation ..................................................................................................................... 7
4.4    Other Business Forms ..................................................................................................... 8
4.5    Disclosure of Ownership Interests .................................................................................. 9
4.6    Waiver ............................................................................................................................. 9

ARTICLE V ................................................................................................................................... 9

CONFIDENTIALITY .................................................................................................................... 9
5.1    Confidential Information ................................................................................................. 10
5.2    Examples of Confidential Information; Compelled Disclosures ...................................... 10
5.3    Use of Confidential Information ...................................................................................... 11
5.4    Remedy; Survival ........................................................................................................... 11

ARTICLE VI ....................................................................................................................................... 11

STANDARDS HANDBOOKS .............................................................................................................. 11
  6.1   Standards Handbook ................................................................................................................... 11
  6.2   Revisions .................................................................................................................................... 11
  6.3   Ownership ................................................................................................................................... 11
  6.4   Current Copy .............................................................................................................................. 11
  6.5   Minimum Acceptable Ratings ..................................................................................................... 11

ARTICLE VII ...................................................................................................................................... 12

PROPRIETARY MARKS ..................................................................................................................... 12
  7.1   Use of Proprietary Marks ........................................................................................................... 12
  7.2   Non-Exclusive Use ..................................................................................................................... 13
  7.3   Ownership of Proprietary Rights ................................................................................................ 13

ARTICLE VIII ..................................................................................................................................... 13

MANAGEMENT AND TRAINING ...................................................................................................... 13
  8.1   Franchise Dealer Management .................................................................................................... 13
  8.2   Franchise Management Training ................................................................................................. 13
  8.3   Employee Training ...................................................................................................................... 14
  8.4   Educational Meetings and Seminars ........................................................................................... 14
  8.5   Training Expenses ....................................................................................................................... 14

ARTICLE IX ........................................................................................................................................ 14

OPERATIONS ...................................................................................................................................... 14
  9.1   Importance of Operational Requirements .................................................................................... 14
  9.2   Operation of Businesses ............................................................................................................. 14
  9.3   Operating Hours ......................................................................................................................... 14
  9.4   Use of Marketing Premises ........................................................................................................ 15
  9.5   Installation of Additional Tanks ................................................................................................. 15
  9.6   Equipment, Fixtures, Signs ........................................................................................................ 15
  9.7   Customer Service ........................................................................................................................ 15
  9.8   Clean, Attractive and Functional Operations ............................................................................. 15
  9.9   Maintenance Obligations ............................................................................................................ 15
  9.10  Compliance with Laws, Covenants and Restrictions .................................................................. 15
  9.11  Safety Procedures ....................................................................................................................... 16
  9.12  Image and Trade Mark Standards; Promotion Programs ............................................................. 16
  9.13  Staffing ...................................................................................................................................... 16
  9.14  Conduct ...................................................................................................................................... 16
  9.15  Related Businesses ..................................................................................................................... 16
  9.16  System Modifications ................................................................................................................. 17
  9.17  Retail Credit and Debit Program ................................................................................................ 17
  9.18  Improvements and Investments in Marketing Premises .............................................................. 17
  9.19  Technological and Communication Updates ............................................................................... 17
  9.20  Inspection .................................................................................................................................. 18
  9.21  Pricing ....................................................................................................................................... 18
  9.22  Environmental Standards ........................................................................................................... 18
  9.23  Maintain Inventory .................................................................................................................... 18

ARTICLE X ......................................................................................................................................... 18

ADVERTISING, PROMOTION, AND MARKETING ..................................................................18
   10.1  General Advertising ..................................................................18
   10.2  Local Advertising Approval..................................................................18
   10.3  Advertising Contributions..................................................................18

ARTICLE XI ..................................................................19

INSURANCE ..................................................................19
   11.1  Types of Insurance Required..................................................................19
   11.2  Evidence of Insurance ..................................................................20
   11.3  Right to Place Insurance..................................................................20
   11.4  Insurance Proceeds..................................................................20

ARTICLE XII ..................................................................20

TRANSFER OF INTEREST; SURVIVORSHIP ..................................................................20
   12.1  Consent Requirements..................................................................20
   12.2  Consent to Transfer..................................................................21
   12.3  Conditions to Transfer..................................................................22
   12.4  Administrative Fees..................................................................22
   12.5  Survivorship ..................................................................22
   12.6  Waivers ..................................................................23
   12.7  Assignment by LNA..................................................................23
   12.8  Communications with Transferees..................................................................24

ARTICLE XIII ..................................................................24

RIGHT OF FIRST REFUSAL ..................................................................24
   13.1  Right of First Refusal..................................................................24
   13.2  Transfers to Immediate Family..................................................................25

ARTICLE XIV ..................................................................26

DEFAULT AND TERMINATION..................................................................26
   14.1  Termination or Nonrenewal of Agreement and Franchise Relationship ..................................................................26
   14.2  Right of Termination Due to Governmental Action..................................................................26
   14.3  Accrued Rights..................................................................27
   14.4  Remedies of LNA..................................................................27

ARTICLE XV ..................................................................27

OBLIGATIONS UPON TERMINATION OR EXPIRATION..................................................................27
   15.1  Termination of Business Operation..................................................................27

ARTICLE XVI ..................................................................27

TAXES, PERMITS, INDEBTEDNESS..................................................................27
   16.1  Tax, Duty, Fee Due LNA..................................................................27
   16.2  Local, State, Federal Taxes and General Indebtedness ..................................................................28
   16.3  Indebtedness Dispute..................................................................28
   16.4  Permits and Licenses..................................................................28
   16.5  Notices..................................................................28

ARTICLE XVII ............................................................................................................................28

INDEPENDENT CONTRACTOR .................................................................................................28
 17.1 Relationship of the Parties...............................................................................................28
 17.2 Public Notification ...........................................................................................................28
 17.3 Other Franchise Dealer Obligations ...............................................................................28

ARTICLE XVIII...........................................................................................................................29

INDEMNIFICATION ....................................................................................................................29
 18.1 Definition of Losses ........................................................................................................29
 18.2 Indemnity .........................................................................................................................29
 18.3 Notices; Choice of Counsel.............................................................................................30
 18.4 Remedies..........................................................................................................................30
 18.5 Defenses...........................................................................................................................30
 18.6 Recovery Obligations......................................................................................................30
 18.7 Claims against LNA .........................................................................................................30

ARTICLE XIX ..............................................................................................................................30

ALLOCATION OF RISK ..............................................................................................................30
 19.1 General Contingencies; Force Majeure ...........................................................................30
 19.2 Allocation ........................................................................................................................30

ARTICLE XX ...............................................................................................................................31

MISCELLANEOUS ......................................................................................................................31
 20.1 Significance of Terms and Conditions ............................................................................31
 20.2 Approvals and Consents...................................................................................................31
 20.3 Strict Compliance ............................................................................................................31
 20.4 Notices.............................................................................................................................32
 20.5 LNA's Legal Fees and Costs............................................................................................32
 20.6 Claims .............................................................................................................................32
 20.7 Limitation of Liability.....................................................................................................32
 20.8 Entire Agreement; Modifications....................................................................................32
 20.9 Severability and Construction .........................................................................................33
 20.10 Third Party Rights ..........................................................................................................33
 20.11 Headings.........................................................................................................................33
 20.12 Joint and Several Obligations.........................................................................................33
 20.13 Right of Entry.................................................................................................................33
 20.14 LNA Approval.................................................................................................................33
 20.15 Terms on Renewal ..........................................................................................................33

ARTICLE XXI ..............................................................................................................................33

ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES .....................33
 21.1 Business Risks..................................................................................................................33
 21.2 Representations ................................................................................................................33
 21.3 Receipt of Attachments and Disclosures .........................................................................34
 21.4 Understanding of Agreements..........................................................................................34

## PMPA FRANCHISE AGREEMENT

This PMPA Franchise Agreement ("Agreement") dated **March 17, 2017** ("Contract Date") between LUKOIL North America LLC ("LNA"), having its principal office at 505 Fifth Avenue, Ninth Floor, New York, NY 10017 and **Kazmi Trading Corp.** ("Franchise Dealer"), having a place of business at **1497 Prospect Street, Trenton, New Jersey 08638** ("Marketing Premises"), takes effect on the date specified in Section 1.5.

### DEFINITIONS

A glossary of the terms used in this Agreement is contained in the attachment entitled "Definitions" which is incorporated into and made a part of this Agreement by this reference.

### RECITALS

A.   As the result of the substantial expenditure of time, skill, effort and money, LNA and its Affiliates have licensed, adapted and developed a unique and distinctive system (the "System") for the sale of LUKOIL®-branded products at LUKOIL®-branded Retail Outlets.  For purposes of this Agreement, a "Retail Outlet" means: (1) a LUKOIL-branded retail motor-fuels outlet operated under the System ("Lukoil Outlet") by: (a) LNA or a LNA Affiliate or (b) another person who is subject to an agreement with LNA, a LNA Affiliate or a LNA-authorized person, allowing the operator of the outlet to sell LUKOIL motor fuels and LUKOIL-branded products; or (2) a branded retail motor-fuels outlet operated under another brand and distinctive system ("Other System"), as may be specified by LNA from time to time ("Other  Outlet").

B.   LNA has the right to license and use the LUKOIL trademarks and service marks and other marketing indicia of PJSC Lukoil Oil Company ("Lukoil") for the promotion and sale of motor fuels and certain related services in the United States (the "Lukoil License"). LNA is authorized by the Lukoil License to identify the System, by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to the name and mark LUKOIL®, LUKOIL® (with teardrop) together with the associated logos, trade dress and package appearance (collectively, the "Lukoil Marks"), and such other names, marks, logos, emblems and indicia as Lukoil, directly or through its Affiliate, may from time to time authorize LNA to use, all of which are identified by customers as being standards of excellence for Lukoil Outlets and products bearing Lukoil Marks.

The term "Proprietary Marks" includes the Lukoil Marks and such other trade names, service marks, trademarks, logos, emblems and indicia or origin as LNA may from time to time authorize the Franchise Dealer to use in connection with the sale of motor fuel and the operation of the Marketing Premises.

C.   The distinguishing characteristics of the System include: (1) supply of LUKOIL-branded products; (2) certain procedures and methods of LUKOIL-branded product sales; (3) distinctive appearance, decor, design, trademark and uniform standards; (4) unique and specialized training, management, marketing techniques and materials and social responsibility programs; and (5) advertising and promotional programs - all of which are integral and important to Franchise Dealer, LNA and other Lukoil Outlets.

D.   LNA relies upon the personal qualifications of the Franchise Dealer (if Franchise Dealer is an individual), or the personal qualifications of the Key Individual (if Franchise Dealer is not an individual), in entering into this Agreement with Franchise Dealer.

E.   Upon the following terms and conditions and consistent with the System, LNA and the Franchise Dealer desire to enter into this Agreement for the retail sale of the Products (defined below) and for the conduct of the Businesses (defined below) at the Marketing Premises.

### AGREEMENT

The Parties, therefore, agree as follows:

### ARTICLE I
### GRANT

1.1   PMPA Franchise Relationship.  By this Agreement, LNA and Franchise Dealer establish a "Franchise" and a "Franchise Relationship" as defined by the Petroleum Marketing Practices Act, 15 U.S.C. Sections 2801, et seq. (the 'PMPA').  Subject to the terms and conditions of this Agreement:

(a)   LNA grants Franchise Dealer the right to use those Proprietary Marks specified by LNA from time to time for use in connection with the sale of the Products at the Marketing Premises;

(b)     Franchise Dealer shall purchase the Products from LNA for retail sale at the Marketing Premises; and

(c)     LNA grants Franchise Dealer the right to operate at the Marketing Premises a retail motor-fuels business under the System and such Other System as LNA may from time to time authorize and direct Franchise Dealer to use (the "Motor Fuels Business").

1.2     Rebranding. LNA reserves the right, at its sole discretion and upon thirty (30) days written notice to Franchise Dealer, to change the brand and Proprietary Marks under which Products, including motor fuel, are authorized to be sold at the Marketing Premises, without affecting other rights or obligations of LNA and Franchise Dealer under this Agreement.

1.3     Other Businesses. Subject to the terms and conditions of this Agreement:

(a)     LNA may grant Franchise Dealer the right to operate at the Marketing Premises additional business(es) (the "Related Businesses") and to use in connection with the Related Businesses, the Proprietary Marks specified by LNA and required from time to time for use in connection with the Related Businesses.

(b)     In the event LNA and Franchise Dealer agree to the operation of Related Businesses at the Marketing Premises during the Term, Franchise Dealer shall operate the Related Businesses at the Marketing Premises under the System or such Other System as LNA may require, and shall not operate any other businesses or activities at the Marketing Premises unless agreed in writing by the Parties. During the Term and except as expressly otherwise provided in this Agreement, the Parties may change, delete or add a Related Business only by written agreement of both Parties, which agreement shall be appended to and made a part hereof.

The Motor-Fuels Business and the Related Businesses that are approved by LNA and Franchise Dealer will collectively be referred to as the "Businesses".

1.4     No Exclusive Marketing Rights. This Agreement and the Franchise Relationship created by this Agreement do not give Franchise Dealer an exclusive right in any market or geographic area to sell the Products or conduct any of the Businesses. At LNA's sole discretion, it may compete with Franchise Dealer by:

(a)     establishing or continuing at locations of its choice the Businesses, other Lukoil Outlets, Retail Outlets, franchises, enterprises and other businesses; or

(b)     directly selling Products or operating retail service stations, convenience stores, automotive repair and other services, and other businesses, at locations of its choice.

1.5     Term. The term of this Agreement is for a fixed period of years, beginning on **September 15, 2017** and ending on **July 31, 2020,** unless terminated earlier under the provisions of this Agreement (the "Term"). Except as may be required under any applicable law, this Agreement shall not be self-renewing and expires automatically on the date set forth above without the necessity of notice. Franchise Dealer acknowledges that LNA has made no representation as to the continuation or renewal of this Agreement beyond the Term to Franchise Dealer or its representative.

## ARTICLE II
## PURCHASE AND DELIVERY OF PRODUCTS

2.1     Purchase Obligation.

(a)     Franchise Dealer shall use good-faith and best efforts to maximize the sale at the Marketing Premises of the Products. "Products" means motor fuel which is:

(i)      sold by LNA with authorization for resale as a Lukoil-branded product or under such other brand as LNA may specify;

(ii)     sold consistent with that authorization; and

(iii)    specified in the schedule entitled "Purchase Schedule" attached and incorporated into this Agreement (the "Purchase Schedule").

(b)     Without limiting the general requirement that Franchise Dealer maximize Product sales and subject to the terms and conditions of this Agreement, during the Term of this Agreement, Franchise Dealer shall purchase Products only from LNA directly and for delivery at the Marketing Premises, and shall purchase not less than seventy percent (70%) of the monthly and contract-year quantities of the Products specified in the Purchase Schedule (the "Contract Volumes"). The Contract Volumes and the percentage of the Contract Volumes that Franchise Dealer is obligated to purchase are subject to modification as provided in the Lessee Dealer Lease Provisions (the "Lessee Dealer Lease Provisions"), or the Reseller Additional Provisions to PMPA Franchise Agreement (the "Reseller Additional Provisions"), whichever is applicable, attached and hereby incorporated into this Agreement.

(c)     LNA, in its sole discretion, may sell more than the Contract Volumes to Franchise Dealer, but is not obligated to do so. If the first or last month of the Term is not a full calendar month, the Contract Volume for that month is the Contract Volume specified in the Purchase Schedule for the corresponding month, prorated for the number of days in the partial month. All Product sales above the Contract Volume are subject to the terms and conditions of this Agreement.

(d)     Franchise Dealer shall use good-faith and best efforts to maximize the sale of LUKOIL branded motor oil at the Marketing Premises.

2.2     Prices. For each type or grade of Products purchased under this Agreement, Franchise Dealer shall pay LNA the price that is in effect at the time and place of delivery for that type or grade of Products sold and delivered to Franchise Dealer's Marketing Premises at the time the Product is loaded into the truck at LNA'S terminal or bulk plant for delivery to the Marketing Premises. Unless otherwise specified by LNA in writing, prices are prior to taxes and are subject to change by LNA at any time and without notice.

2.3     Terms of Payment. Except to the extent LNA extends credit to Franchise Dealer under Section 2.4, Franchise Dealer shall:

(a)     pay all amounts due LNA under this Agreement in U.S. currency in the manner specified by LNA; and

(b)     pay for Products prior to delivery and pay for any services prior to provision of services.

The method of payment specified by LNA may include LNA'S Electronic Settlement Program, Automated Direct Debit System, certified check, bank or other financial-institution check or any other method as LNA may designate from time to time. LNA may charge, and Franchise Dealer shall pay, fees as LNA may from time to time specify and as are permitted by Law, for any checks or bank or other financial-institution debits that are not honored by Franchise Dealer's bank or other financial institution or are otherwise returned or reversed by Franchise Dealer's bank or financial institution. If, as a result of any un-honored checks or debits, LNA revokes or does not extend credit to Franchise Dealer, LNA may also charge, and Franchise Dealer shall pay, fees as LNA may from time to time specify and as are permitted by Law, which fees are determined by LNA to recoup its costs and expenses in administering Franchise Dealer's payments under this Agreement. Cash discounts, if any, do not apply to taxes, freight charges or container charges. LNA may withhold setoff or recoup any amount due and owing Franchise Dealer or held by LNA on behalf of Franchise Dealer under this Agreement, any related or supplemental agreement or any other agreement between the Parties from or against any amount owed by Franchise Dealer to LNA.

2.4     Credit; Security.

(a)     In its sole discretion, LNA may extend credit to Franchise Dealer on terms and conditions as specified by LNA, and LNA may modify the terms and conditions of credit, or revoke credit, at any time or from time to time. If requested by LNA, Franchise Dealer shall provide to LNA and maintain security sufficient to secure payment for one or more loads of Product in such amounts and forms as LNA may specify in its sole discretion ("Product Security"), including a letter of credit or cash deposit.

(b)     LNA may use, without prior notice or demand, any or all of the Product Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to LNA including indebtedness arising from purchases under this Agreement. If LNA uses any Product Security to satisfy all or any part of any indebtedness or obligation, Franchise Dealer immediately shall provide LNA with additional security, as directed by LNA, to replace the Product Security used by LNA. Following nonrenewal or termination of the Franchise Relationship between LNA and Franchise Dealer, LNA shall return to Franchise Dealer, in accordance with LNA'S procedures then in effect, any remaining portion of the Product Security not required to satisfy all or any part of any indebtedness or other

obligation of Franchise Dealer to LNA.

(c)     At LNA'S request at any time during the Term, Franchise Dealer shall sign and deliver to LNA a Security Agreement, Financing Statement, Mortgage, Deed of Trust or other documentation, as LNA may reasonably specify, to establish or perfect LNA'S security interest in the Product Security. By written notice to LNA and payment of any outstanding sums, Franchise Dealer may elect to reduce or discontinue any credit extended to it under this Section 2.4. Upon such election and payment or if LNA reduces or revokes credit, Franchise Dealer's obligation to furnish LNA with Product Security or documentation to establish or perfect Product Security will be reduced to the extent that any Product Security exceeds any continuing credit extended by LNA and any outstanding sums owed to LNA.

(d)     If Franchise Dealer defaults in the payment of any obligation or indebtedness to LNA (including any indebtedness arising from purchases under this Agreement) or otherwise fails to comply with any credit terms specified by LNA, LNA may without notice or demand, in addition to any other rights it may have (including termination or nonrenewal of this Agreement and the Franchise Relationship):

(i)     immediately suspend deliveries of all Products; and
(ii)    apply any Product Security which Franchise Dealer may have given to LNA to the payment of the indebtedness or obligation.

2.5     Deliveries. LNA will deliver Products at the Marketing Premises on terms and conditions as specified by LNA at its sole discretion from time to time. Franchise Dealer shall take all actions necessary to facilitate the prompt receipt of deliveries, including prompt removal of snow and ice from all fill cap areas. LNA may, but is not obligated to, make single deliveries of Product of less than its standard delivery quantity as specified by LNA from time to time. Franchise Dealer shall take all action necessary to participate in and comply with LNA Product delivery programs and policies in effect from time to time including LNA'S inventory management system. If Franchise Dealer fails to comply with or participate in LNA'S delivery program or policy, without limiting any other remedies available to LNA, Franchise Dealer shall pay to LNA a reasonable charge imposed in accordance with LNA'S delivery policy or program to recover administrative or delivery costs resulting from Franchise Dealer's noncompliance with the program or policy. Franchise Dealer shall accept delivery of Product whether or not Franchise Dealer or anyone else representing Franchise Dealer is on the Marketing Premises to receive the delivery. Franchise Dealer shall pay for all Product delivered.

2.6     Other Terms and Conditions of Sale. Franchise Dealer shall use dispensing and storage facilities that are owned by LNA or bear the Lukoil Marks or Proprietary Marks only for the storage or sale of the Products. Franchise Dealer shall purchase and resell those Products, grades and specifications, and use those Proprietary Marks, brand names and packaging that are marketed and used by LNA for similar Retail Outlets in Franchise Dealer's area, all as determined by LNA from time to time. LNA may, at any time, add new products or change the grade, specifications, characteristics or delivery package, brand name or other distinctive designation of any Product sold by LNA under this Agreement, and the Products so added or changed are subject to this Agreement. LNA may discontinue the sale of any Product without affecting other rights or obligations of LNA and Franchise Dealer under this Agreement, including Franchise Dealer's obligation to purchase the Minimum Volumes for other Products. Only LNA has the right to determine what products will be offered under the System or the Other System at any time.

2.7     Product Certification. LNA certifies that, at the time of delivery, the Products delivered by it will comply with the following:

(a)     all fuel requirements under applicable Laws in effect at the time of delivery in the area of the Marketing Premises including requirements relating to octane, oxygen content, Reid Vapor Pressure, cetane rating, sulfur content, aromatic content, dye content, benzene content, emission reduction percentages for volatile organic compounds or nitrogen oxides and other regulated components or characteristics of a motor fuel or motor-fuel additive ("Fuel Requirements"); and

(b)     if delivered as unleaded gasoline, all federal requirements in effect at the time of delivery relating to unleaded gasoline ("Unleaded Gasoline Requirements").

2.8     Franchise Dealer Product Control; Safeguards. Franchise Dealer shall exercise the highest degree of care and diligence in handling, storing, selling and using Products delivered to the Marketing Premises. Franchise Dealer shall not cause or allow any contamination, mixing or adulteration of any Products. Franchise Dealer shall not sell, or offer for sale, from the Marketing Premises, Products which are contaminated or adulterated or fail to meet the Fuel Requirements or Unleaded Gasoline Requirements. LNA may refuse to make Product deliveries into any tank until in LNA'S judgment quality problems are corrected. Franchise Dealer also shall:

(a)     protect Product from adulteration, mixing or contamination by water or other substances;

(b)     comply with the provisions in the Lessee Dealer Lease Provisions or Reseller Additional Provisions, whichever is applicable, and the environmental Standards;

(c)    inspect all storage tanks daily for water accumulation;

(d)    comply with any procedures developed by LNA from time to time to safeguard the integrity of unleaded gasoline;

(e)    comply with all Fuel Requirements and Unleaded Gasoline Requirements;

(f)    immediately notify LNA by telephone at a number specified by LNA from time to time, confirmed in writing, of:

    (i)    any suspicion that any Product is contaminated, mixed or adulterated or fails to meet the Fuel Requirements or the Unleaded Gasoline Requirements, or if water exceeds 3/4 inch depth in any tank,

    (ii)    any governmental testing or sampling of Products at the Marketing Premises, or

    (iii)    any suspicion that any Product has been released to the environment from any tank, line or other source at the Marketing Premises;

(g)    at LNA'S request, provide LNA with the results of any test of Product conducted by or for the Franchise Dealer and permit LNA to conduct tests as LNA may determine; and

(h)    upon any suspicion of adulteration, mixing, contamination or noncompliance with Fuel Requirements or Unleaded Gasoline Requirements, take such action as LNA may direct.

2.9    <u>Effect of Quality Violations; Samples</u>.  Franchise Dealer acknowledges that the sale of quality products the customer can trust is one of Franchise Dealer's fundamental commitments and obligations under this Agreement and is material to the Franchise Relationship.  Franchise Dealer's failure to comply with the obligations under Section 2.8 constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship.  Franchise Dealer permits LNA, its employees, agents and contractors to enter the Marketing Premises at all reasonable times to obtain Product samples and review all Franchise Dealer's documents and records relating to compliance with Section 2.8.

2.10    <u>Product Quality or Quantity Claims</u>.  LNA is not liable to Franchise Dealer for any defect in quality (including failure to meet the requirements under Section 2.7), or shortage in quantity, of any Products delivered, unless:

(a)    Franchise Dealer gives LNA notice of Franchise Dealer's claim within:

    (i)    96 hours after delivery for shortages in quantity of Products, or

    (ii)    96 hours after delivery (or discovery in the case of any latent defect) for quality deficiencies; and

(b)    Franchise Dealer provides LNA with reasonable opportunity to inspect the Products and take test samples.

## ARTICLE III
## SERVICES BY LNA

3.1    <u>LNA Services</u>.  LNA shall make available to Franchise Dealer, or assist Franchise Dealer in obtaining, the following:

(a)    Standard plans, specifications, equipment, decor and signs identified with Retail Outlets as LNA makes available to all franchise dealers from time to time.

(b)    Initial franchise-management training and ongoing training in the System as LNA makes available to all franchise dealers from time to time (including training on standards, methods, procedures and techniques) at times and places designated by LNA.

(c)    Standards Handbook, as LNA makes available to all franchise dealers from time to time.

(d)    Periodic individual or group advice, consultation and assistance, rendered by personal visit, telephone, voicemail, facsimile, newsletter, bulletin or other means of communication, made available from time to time as LNA may deem necessary or appropriate.

(e)    Merchandising, marketing and other data and advice as LNA may from time to time develop for distribution to all franchise dealers and determine in its sole discretion to be helpful in the operation of the Marketing Premises.

(f)    Other services as LNA may develop and offer to all franchise dealers.

3.2    Changes; Third Parties; Fees.  At any time or from time to time, LNA may add, discontinue or change any services under Section 3.1 and may impose conditions or criteria for the availability to Franchise Dealer of any services.  LNA may have all or a portion of any services provided by persons designated by LNA.  From time to time, LNA may charge Franchise Dealer fees, or require Franchise Dealer to pay fees to LNA'S designees, to recover costs and expenses incurred in furnishing services.  Franchise Dealer shall pay the fees in the manner and to the person or persons as specified by LNA.  Fees under this Section 3.2 are for specific services only and LNA may not impose these fees, directly or indirectly, for the right to participate in the Motor-Fuels Business.  No such fee shall be construed as or considered a franchise fee.   Unless required pursuant to another provision of this Agreement or pursuant to a separate written agreement between LNA and Franchise Dealer, Franchise Dealer is obligated to pay fees only for services voluntarily accepted by Franchise Dealer.

## ARTICLE IV
## PARTICIPATION/ORGANIZATIONAL FORM

4.1    Organizational Form; Key Individual.

(a)    Except as provided in Section 4.4(a), Franchise Dealer must be in the form of an individual, or a corporation meeting the requirements of Section 4.3, and may not, without LNA'S prior written consent which shall not be unreasonably withheld, take any other form including a partnership, trust or limited liability company.

(b)    If Franchise Dealer is organized in a form other than an individual, Franchise Dealer shall comply with the requirements of Sections 4.3 or 4.4, whichever is applicable, and shall designate an individual as the key individual (the "Key Individual") who must:

(i)    be reasonably acceptable to LNA and have received LNA'S prior written approval;

(ii)    meet the standards and requirements of a key individual under this Article IV;

(iii)    meet all of LNA'S standards and requirements for a Key Individual as may be in effect from time to time including LNA'S standards and requirements for a franchise dealer under Section 12.3(a); and

(iv)    satisfactorily attend and complete all training programs required from time to time by LNA for franchise dealers or key individuals.  The Parties shall designate the Key Individual on the signature page of this Agreement or by separate written agreement.

4.2    Participation in Business; Multi-Unit Operators.

(a)    Franchise Dealer acknowledges that LNA has entered into this Agreement with Franchise Dealer in reliance on Franchise Dealer's personal qualifications and commitment to the System (if Franchise Dealer is an individual) or in reliance on the Key Individual's personal qualifications and commitment to the System (if Franchise Dealer is not an individual).

(b)    Franchise Dealer may own or operate more than one Retail Outlet only if the Franchise Dealer is authorized by LNA in writing under any applicable Multi-Unit Policy as may be in effect from time to time.  If Franchise Dealer is not an individual, the Key Individual may be a key individual or franchise dealer with respect to more than one Retail Outlet only if authorized under any applicable Multi-Unit Policy as may be in effect from time to time.  A Franchise Dealer is a "Multi-Unit Operator" if the Franchise Dealer or the Key Individual, separately or collectively, with respect to more than one Retail Outlet:

(i)    owns or operates a Retail Outlet;

(ii)    is the franchise dealer for a Retail Outlet; or

(iii)    is the key individual for a Retail Outlet.

(c)    If Franchise Dealer is not a Multi-Unit Operator, the following applies:

      (i)    If Franchise Dealer is an individual, Franchise Dealer shall devote good-faith and best efforts to the day-to-day operation and management of the Businesses.

      (ii)    If Franchise Dealer is not an individual, the Key Individual must devote good-faith and best efforts to the day-to-day operation and management of the Businesses.

   (d)    If Franchise Dealer is a Multi-Unit Operator, the following applies:

      (i)    If Franchise Dealer is an individual, Franchise Dealer shall devote good-faith and best efforts to the day-to-day operations and management of the Businesses at all of the Retail Outlets where he or she is the franchise dealer, the key individual or the owner or operator.

      (ii)    If Franchise Dealer is not an individual, the Key Individual must devote good-faith and best efforts to the day-to-day operation and management of the Businesses at all of the Retail Outlets where he or she is the key individual, the franchise dealer or the owner or operator.

4.3    Corporation.  If Franchise Dealer is a corporation, the Franchise Dealer must comply at all times with the following standards and requirements:

   (a)    The Key Individual must meet the following standards and requirements:

      (i)    if Franchise Dealer is a Lessee Dealer, have legal and beneficial ownership of at least 51% of the outstanding voting stock or other ownership interests in the Franchise Dealer, unless:

         (A)    LNA consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time, and

         (B)    Franchise Dealer and the Key Individual comply with all standards and requirements and conditions under that policy;

      (ii)    be the officer of the Franchise Dealer with authority and responsibility for the operation and management of the Businesses; and

      (iii)    be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

      Franchise Dealer represents and warrants that the Key Individual has, and at all times will have, the ownership, responsibility and authority required in this Section 4.3(a) and, upon request by LNA from time to time, shall furnish to LNA supporting documentation reasonably satisfactory to LNA.

   (b)    Franchise Dealer shall confine its activities to the establishment and operation of the Businesses or, if Franchise Dealer is a Multi-Unit Operator, Franchise Dealer shall confine its activities to the establishment and operation of the Businesses at all its Retail Outlets, unless:

      (i)    LNA consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

      (ii)    Franchise Dealer complies with all standards and requirements and conditions under that policy.

   (c)    Franchise Dealer shall furnish LNA, at LNA'S request from time to time, documentation as specified by LNA in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.3.  Without limiting the immediately preceding sentence, LNA may request, and Franchise Dealer shall furnish LNA with, copies of Franchise Dealer's Articles of Incorporation, Bylaws and other governing documents, and any other documents LNA may reasonably request (including shareholder agreements relating to the Franchise Dealer).  Franchise Dealer shall promptly notify LNA of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with any provision of this Section 4.3.

   (d)    The transfer of any voting stock or other ownership interests in Franchise Dealer is subject to Articles XII and XIII.

   (e)    The Key Individual must provide LNA, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to LNA.  If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, LNA may require additional personal guarantees to be furnished LNA by one or

more individuals who:

    (i)     are specified by LNA; and

    (ii)    directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

(f)    LNA'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY SHAREHOLDER OF A CORPORATE FRANCHISE DEALER.

4.4    Other Business Forms.

(a)    Franchise Dealer must be an individual, or a corporation meeting the requirements of Section 4.3, and may not take any other form including a partnership, trust or limited liability company unless:

    (i)     this Agreement is the renewal of a Franchise Relationship under which Franchise Dealer was in a form other than an individual, or a corporation meeting the requirements of Section 4.3, and Franchise Dealer has not changed its original form and constitution; or

    (ii)    LNA permits another form under an applicable written policy as may be in effect from time to time and Franchise Dealer complies with all standards and requirements and conditions under that policy.

(b)    Without limiting Section 4.4(a), if Franchise Dealer is authorized under Section 4.4(a) to be in a form other than an individual, or a corporation meeting the requirements of Section 4.3, the following applies:

    (i)     At all times, the Key Individual must meet the following requirements:

        (A)    if Franchise Dealer is a Lessee Dealer, have legal and beneficial ownership of at least 51% of the ownership interests in the Franchise Dealer, unless:

            (1)    LNA consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time; and

            (2)    Franchise Dealer and the Key Individual comply with all standards and requirements and conditions under that policy.

        (B)    be Franchise Dealer's manager, managing partner or other person with authority and responsibility for the operation and management of the Businesses; and

        (C)    be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

Franchise Dealer represents and warrants that the Key Individual has, and at all times the Key Individual will have, the ownership, responsibility and authority required in this Section 4.4(b)(i) and, upon request by LNA from time to time, shall furnish to LNA supporting documentation reasonably satisfactory to LNA.

    (ii)    Franchise Dealer shall furnish LNA, at LNA'S request from time to time, documentation as specified by LNA in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.4. Without limiting the immediately preceding sentence, LNA may request, and Franchise Dealer shall furnish LNA with, copies of its partnership agreement, trust agreement and other documents as LNA may request relating to Franchise Dealer's ownership, operation and organization. Franchise Dealer shall promptly notify LNA of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with the provisions of this Section 4.4.

    (iii)    Franchise Dealer shall maintain a current list of all shareholders, general and limited partners, beneficiaries or other legal and beneficial owners of Franchise Dealer and shall furnish the list to LNA. Without limiting Section 4.4(b)(i), Franchise Dealer shall promptly notify LNA of any changes in ownership and furnish LNA with information relating to any owners as LNA may reasonably request.

    (iv)    Franchise Dealer shall confine its activities to the establishment and operation of the

Businesses or, if Franchise Dealer owns or operates more than one Retail Outlet, Franchise Dealer shall confine its activities to the establishment and operation of the Businesses at all its Retail Outlets; unless:

(A) LNA consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

(B) Franchise Dealer complies with all standards and requirements and conditions under that policy.

(v) The Key Individual must provide LNA, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to LNA.  If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, LNA may require additional personal guarantees to be furnished to LNA by one or more individuals who:

(A) are specified by LNA; and

(B) directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

(vi) The transfer of any ownership interest in Franchise Dealer is subject to Articles XII and XIII.

(vii) LNA'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING CONTAINED IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY OTHER PERSON HAVING AN OWNERSHIP INTEREST IN FRANCHISE DEALER.   IF FRANCHISE DEALER IS A PARTNERSHIP, THE FRANCHISE   RELATIONSHIP   IS   ONLY   WITH   THE   PARTNERSHIP   AS CONSTITUTED ON THE DATE OF THE ORIGINAL FRANCHISE RELATIONSHIP WITH LNA.

(c) This Article IV does not prevent Franchise Dealer, if an individual, from entering into a partnership, forming a corporation or using another business form that does not comply with Section 4.3 or 4.4 and is solely established to assist Franchise Dealer in managing and operating the Businesses, but:

(i) the Franchise Dealer remains the sole franchisee under this Agreement and is responsible for all obligations of Franchise Dealer under this Agreement; and

(ii) the partnership, corporation or other business form has no rights under this Agreement including any Franchise or Franchise Relationship with LNA.

4.5 Disclosure of Ownership Interests.   Franchise Dealer represents and warrants that Franchise Dealer has disclosed to LNA in writing all information pertaining to any direct or indirect ownership interest Franchise Dealer or the Key Individual may have in the franchise, business or operation of any Retail Outlet or any other motor-fuel outlet or convenience-store business ("Ownership Interest") including location of the site(s), business name(s), brand of motor fuels and the extent and nature of the Ownership Interest.  Franchise Dealer's obligation of disclosure under this Section 4.5 continues during the Term.  Upon acquisition of an Ownership Interest, Franchise Dealer shall promptly disclose in writing to LNA information relating to the Ownership Interest.  For purposes of this Section 4.5, an Ownership Interest includes:

(a) the direct or indirect ownership by Franchise Dealer or the Key Individual of a beneficial interest in a Retail Outlet, other motor-fuel outlet or convenience-store business, where legal title is held in the name of another person or entity; and

(b) direct or indirect ownership by Franchise Dealer or the Key Individual of shares in a corporation where that corporation or any Affiliate of that corporation has a legal or beneficial interest in a Retail Outlet, other motor-fuel outlet or convenience-store business.

4.6 Waiver.  LNA'S receipt of any documentation or information will not be a waiver by LNA of any standards and requirements under this Article IV or of its right at any time to require full compliance with these standards and requirements.

**ARTICLE V**
**CONFIDENTIALITY**

5.1  Confidential Information.  Franchise Dealer acknowledges that LNA, its Affiliates and their respective employees, contractors and agents will be disclosing and transmitting to Franchise Dealer certain confidential and proprietary information ("Confidential Information") in connection with the System and the operation of the Businesses.  Accordingly, during and after the Term, Franchise Dealer shall:

  (a)  treat and maintain Confidential Information as confidential;

  (b)  subject to Section 5.3, use Confidential Information only for the operation of the Businesses under this Agreement; and

  (c)  restrict disclosure of Confidential Information to only those of its employees, contractors or agents who are directly connected with the performance of work requiring knowledge of the Confidential Information and to other franchise dealers who have agreed in writing to maintain the confidentiality of the Confidential Information. Franchise Dealer shall use reasonable efforts to require Franchise Dealer's nonmanagement employees to comply with the provisions of Section 5.1(a) and to require Franchise Dealer's Key Individual, Managers, management employees, contractors and agents to comply with all of the provisions of this Article V.

5.2  Examples of Confidential Information; Compelled Disclosures.

  (a)  Confidential Information includes:

    (i)  all information, knowledge, techniques, and know-how in any form relating to the System or the Businesses including the Standards Handbook;

    (ii)  all records and copies of information, knowledge, techniques and know-how relating to the System in any form;

    (iii)  all LNA training materials and materials relating to the recruiting and management of employees and contractors;

    (iv)  all LNA marketing strategies, technologies and programs;

    (v)  all LNA policies, procedures and methods of doing business;

    (vi)  all information relating to LNA, its Affiliates or their respective franchisees, contractors and vendors;

    (vii)  any information which LNA designates in writing from time to time as confidential or proprietary;

    (viii)  any information relating to Product or additive formulation; and

    (ix)  any information described in this Section 5.2(a) disclosed by LNA on the Internet, including without limitation LNA'S website, or by any other electronic-transmission or data-communications system.

  (b)  Confidential Information does not include information which:

    (i)  Franchise Dealer can demonstrate came to its attention before disclosure and was not:

      (A)  acquired directly or indirectly from LNA or its Affiliates, or

      (B)  subject to confidentiality obligations on the part of the source that provided the information;

    (ii)  at the time of disclosure was a part of the public domain; or

    (iii)  after the time of disclosure becomes a part of the public domain through publication or communication by a person (other than Franchise Dealer, its officers, directors, owners, employees, contractors or agents) who is not subject to a confidentiality obligation.

  (c)  Confidential Information is not excluded under Section 5.2(b) merely because it is embraced by more general information in the public domain or in Franchise Dealer's possession.  Information consisting of a combination of features or information is not excluded under Section 5.2(b) merely because individual features or information are in the public domain or in Franchise Dealer's possession, but only if the combination is in the public domain or in Franchise Dealer's possession.

(d)     Franchise Dealer may disclose Confidential Information to the extent required by a legally binding order or governmental directive if Franchise Dealer has given LNA:

    (i)     prompt notice of the order or directive; and

    (ii)    reasonable opportunity to challenge the order or directive or protect the confidentiality of any disclosed Confidential Information.

5.3     Use of Confidential Information.  During the Term and for a period of two (2) years after the expiration or termination of this Agreement or any extension or renewal of this Agreement or the Franchise Relationship, Franchise Dealer may not, either directly or indirectly, for itself, or on behalf of or in conjunction with any other person, partnership or corporation, use any Confidential Information for purposes other than operating the Businesses under this Agreement.  Nothing contained in this Section 5.3 may be construed to limit Franchise Dealer's obligations under Sections 5.1(a) and (c).

5.4     Remedy; Survival.  Franchise Dealer acknowledges that any failure to comply with the requirements of this Article V will cause LNA irreparable injury.  The provisions of this Article V will survive the termination or expiration of this Agreement and apply to all Confidential Information disclosed or transmitted to Franchise Dealer during the Franchise Relationship, whether prior to, during or after the Term.

## ARTICLE VI
## STANDARDS HANDBOOKS

6.1     Standards Handbook.  For the reasons acknowledged by Franchise Dealer under Section 9.1, Franchise Dealer shall conduct the Businesses in accordance with the standards (the "Standards") contained in Lukoil Retailing Standards Handbook (the "Standards Handbook") or such other standards as LNA may require.  Franchise Dealer acknowledges that:

(a)     compliance with the Standards, and any revisions under Section 6.2, may require the expenditure of reasonable sums of money by Franchise Dealer;

(b)     the Standards are in addition to other obligations and requirements of Franchise Dealer under this Agreement; and

(c)     compliance with the Standards does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

6.2     Revisions.  LNA may, from time to time, revise the contents of any Standards Handbook.  The revision may include implementing new or modified requirements for the System or any Business.  Franchise Dealer shall comply with requirements as revised. The revisions to the Standards Handbook are effective upon written notice to Franchise Dealer, unless a later date is specified by LNA.

6.3     Ownership.  The Standards Handbook at all times is the sole property of LNA'S. Franchise Dealer's use of the Standards Handbook derives solely from this Agreement and the Lukoil License.    Franchise Dealer shall keep the Standards in a secure place at the Marketing Premises, and shall return them and all copies promptly to LNA if either of the following occurs:

(a)     this Agreement is terminated or expires and the Franchise Relationship is not renewed; or

(b)     the Franchise Dealer stops operating the respective Business at the Marketing Premises.

6.4     Current Copy.  Franchise Dealer acknowledges receipt of the Standards Handbook and shall at all times ensure that its copies of the Standards Handbook are kept current and up to date.

6.5     Minimum Acceptable Ratings.

(a)     LNA may, but is not obligated to, establish from time to time by written policy minimum acceptable ratings ("Minimum Acceptable Ratings") for all or any of the Standards or categories or groups of Standards contained in the Standards Handbook.

(b)     If LNA establishes Minimum Acceptable Ratings, Franchise Dealer shall conduct the Businesses to achieve the Minimum Acceptable Ratings including those established for each category or group of Standards. The method for determining and measuring compliance with the Standards and calculating any ratings will be as determined by LNA and set out in the Standards Handbook or other written materials furnished by LNA from time to time.  LNA may add, delete or change Minimum Acceptable Ratings at any time or from time to time upon not less than 90 days' prior notice to Franchise Dealer.

(c)     Franchise Dealer acknowledges that:

(i)     Franchise Dealer's failure to achieve the Minimum Acceptable Rating for any Standard or group or category of Standards constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship;

(ii)    over time the Standards and any Minimum Acceptable Ratings may be raised to further any of the reasons stated in Section 9.1; and

(iii)   while it is critical that Franchise Dealer achieve the Minimum Acceptable Ratings in each category or group of Standards, achievement of the Minimum Acceptable Ratings does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

(d)     Nothing contained in this Section 6.5 prevents or limits LNA from:

(i)     later requiring full compliance with any Standard or group or category of Standards for which LNA has established a Minimum Acceptable Rating,

(ii)    lowering or raising the Minimum Acceptable Rating for any Standard or group or category of Standards, or

(iii)   taking any action or imposing any requirements that LNA determines necessary or appropriate to protect the Proprietary Marks.

### ARTICLE VII
### PROPRIETARY MARKS

7.1     Use of Proprietary Marks.  In using the Proprietary Marks, Franchise Dealer shall:

(a)     Use only the LUKOIL mark and/or such other Proprietary Marks as are designated in writing by LNA for Franchise Dealer's use, and use them only in the manner authorized and permitted by LNA from time to time.

(b)     Use the Proprietary Marks only for the operation of the Motor-Fuels Business and the Related Businesses and only at the Marketing Premises and only in advertising for the Motor-Fuels Business and the Related Businesses conducted at the Marketing Premises, and not use the Proprietary Marks for any other purpose.

(c)     Use the Proprietary Marks to identify and advertise the Products and not use the Proprietary Marks and signs for any other purposes, or in any manner which may confuse or deceive the public.

(d)     Not mix any other products with the Products or contaminate or adulterate the Products in any way, and not use the Proprietary Marks or Lukoil signs in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products.

(e)     Keep legible and visible all Proprietary Marks on the pumps, containers and equipment at any time located on the Marketing Premises, and use those pumps, containers and equipment solely for the Products.

(f)     Except as may be permitted by express written LNA policy from time to time, not use the Proprietary Marks as part of its corporate, trade or other name.

(g)     On the effective date of the termination or nonrenewal of the Franchise Relationship, stop any use of the Proprietary Marks authorized under Section 7.1(f).

(h)     Comply with LNA'S instructions in filing and maintaining requisite trade name or fictitious name registrations.

(i)     Sign and deliver to LNA any documents deemed necessary by LNA, Lukoil or their legal counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(j)     On the effective date of the termination or nonrenewal of the Franchise Relationship immediately stop using the Proprietary Marks and any color scheme, trade dress, service marks, logos, slogans and advertising and promptly return to LNA all advertising and promotional materials in Franchise Dealer's possession.

(k)     If LNA requires Franchise Dealer to stop, or Franchise Dealer otherwise stops, operating any Related Business, Franchise Dealer shall immediately stop using the Proprietary Marks and color scheme, trade dress, service marks, logos, slogans and advertising relating to the affected Related Business and promptly return to LNA all advertising and promotional materials relating to that Related Business in Franchise Dealer's possession.

7.2     Non-Exclusive Use.   Franchise Dealer's right to use the Proprietary Marks under this Agreement is non-exclusive.  Without limiting the immediately preceding sentence, LNA may:

(a)     grant other rights and franchises for the Proprietary Marks;

(b)     use the Proprietary Marks for any purpose; and

(c)     develop and establish other system for the same or similar Proprietary Marks, or any other proprietary marks, and grant rights or franchises relating to any marks without providing Franchise Dealer any rights to those marks.

7.3     Ownership of Proprietary Rights.  Franchise Dealer acknowledges that Lukoil is the sole and exclusive owner of the Lukoil Marks and no LNA act or failure to act will give Franchise Dealer any ownership interest or right in the Lukoil Marks.  All goodwill resulting from the use of the Proprietary Marks by Franchise Dealer inures to the benefit, and is the property, of Lukoil and LNA as may be permitted under the Lukoil License or such other agreement.  LNA may, at any time or from time to time, change any Proprietary Marks and color schemes, trade dress, service marks, logos, slogans and advertising used in connection with the Products or any Business and substitute any trademark, service mark, trade name or service name for use in connection with the System or Other System.  In case of any change, Franchise Dealer shall use the Proprietary Marks, color schemes, trade dress, service marks, logos, slogans and advertising as changed. Nothing contained in this Section 7.3 obligates Franchise Dealer to pay to LNA any compensation received by Franchise Dealer for goodwill in connection with the Franchise Dealer's Transfer of an Interest in the Franchise in compliance with Articles XII and XIII.

## ARTICLE VIII
## MANAGEMENT AND TRAINING

8.1     Franchise Dealer Management.

(a)     Franchise Dealer shall exercise, and cause the Key Individual to exercise, sound business practices by using a total quality management approach in managing the Businesses and shall maintain high standards of retail service-station operations as provided in Article IX.

(b)     Unless otherwise provided by applicable LNA'S written policy as may be in effect from time to time, Franchise Dealer shall employ at least one manager (the "Manager") to assist in the management of Franchise Dealer's Retail Outlets for each Retail Outlet in excess of two Retail Outlets for which Franchise Dealer or the Key Individual, separately or collectively is the:

(i)      owner or operator;

(ii)     franchise dealer; or

(iii)    key individual.

For example, if Franchise Dealer operates five Retail Outlets, Franchise Dealer shall employ at least three Managers.

Each Manager must be qualified and experienced in operating the Businesses located at the Retail Outlets, must attend initial and ongoing training as required by LNA from time to time, must have authority to act on behalf of Franchise Dealer in the conduct of day-to-day business at the Retail Outlets and must meet other reasonable qualifications as established by LNA from time to time. Franchise Dealer shall furnish LNA with written notice specifying each Manager and the Retail Outlets for which the Manager has authority and responsibility and shall notify LNA in writing of any change in Managers or in their respective responsibilities or authority.

8.2     Franchise Management Training.  Prior to Franchise Dealer's commencement of operation of the Businesses, the following persons must attend and complete, to LNA'S satisfaction, an initial franchise management training program as required by LNA from time to time:

(a)     if Franchise Dealer is an individual, Franchise Dealer;

(b)     if Franchise Dealer is not an individual, the Key Individual; and

(c)     each Manager and any other owner, contractor or employee of Franchise Dealer who is, or subsequently becomes, actively involved in the management of the Motor-Fuels Business.

8.3     Employee Training. Franchise Dealer shall cause its sales associates and other non-management employees and contractors to satisfactorily complete all training including basic and advanced training, refresher courses, and technical or business seminars, as LNA may require from time to time. Training may include written, computer-based and home-study courses.

8.4     Educational Meetings and Seminars. Franchise Dealer acknowledges that, in order to continue to meet customer needs and preferences and customer expectations of excellence for Retail Outlets and Lukoil-branded products, it is critical for Franchise Dealer, any Key Individual, any Manager and Franchise Dealer's management employees and contractors to keep abreast of current System developments and new procedures or programs which LNA deems, in its reasonable judgment, to be of major importance to the operation of the Businesses. Franchise Dealer shall attend and participate in, and shall cause any Key Individual, any Manager and any person described in Section 8.2(c) to attend and participate in, all local, regional or national educational meetings and seminars that LNA may conduct from time to time.

8.5     Training Expenses. Franchise Dealer shall pay, or cause its employees, contractors or any Key Individual to pay, all expenses incurred by Franchise Dealer, its employees, contractors or a Key Individual in connection with Franchise Dealer's fulfilling its obligations under Sections 8.2, 8.3 and 8.4 including costs and expenses of transportation, lodging, meals, wages and employee benefits. Franchise Dealer shall also pay to LNA or any LNA-designated third party reasonable fees or charges that LNA may impose from time to time to recover costs and expenses incurred by LNA or the third party relating to any training or meetings under this Article VIII including the cost of materials, production cost of videos, audio tapes, diskettes or manuals and costs relating to staff and meeting space.

## ARTICLE IX
## OPERATIONS

9.1     Importance of Operational Requirements. Franchise Dealer acknowledges that operation of the Marketing Premises and the Businesses in accordance with this Article IX and in compliance with the Standards is:

(a)     reasonable and of material significance to the Franchise and Franchise Relationship; and

(b)     of critical importance to Franchise Dealer, LNA and other Retail Outlets in order to:

    (i)     meet customer needs and preferences and customer expectations of excellence for the System or Other system, Retail Outlets, Lukoil-branded products or other branded products,

    (ii)     maintain high and uniform operating standards,

    (iii)     increase demand for, and customer loyalty to, the services and products sold at all Retail Outlets, and

    (iv)     protect the reputation and goodwill associated with the Proprietary Marks.

9.2     Operation of Businesses. Franchise Dealer shall operate the Businesses in strict conformity with the methods, procedures, standards and specifications as LNA may prescribe from time to time in writing including the Standards. Without limiting the general requirements of the immediately preceding sentence, the specific requirements of this Article IX also apply.

9.3     Operating Hours.

(a)     In accordance with LNA's Hours of Operation Policy as in effect from time to time and subject to applicable Laws, Franchise Dealer shall keep the Marketing Premises open for the retail sale of the Products not less than the following hours as indicated:

    (i)     __     24 hours, 7 days per week; or

    (ii)     X     Other as specified below:

       Monday - Friday:     5:00 a.m. to 12:00 midnight
       Saturday:     5:00 a.m. to 12:00 midnight.
       Sunday & Holidays:     5:00 a.m. to 12:00 midnight.

(b)     Subject to applicable Laws, Franchise Dealer shall prominently and clearly post the operating hours at

the Marketing Premises.  During the Term, operating hours may be modified only by written agreement of the Parties.  Upon any renewal of this Agreement or the Franchise Relationship, operating hours will be determined in accordance with LNA'S Hours of Operation Policy in effect at that time.

9.4 <u>Use of Marketing Premises</u>.  Franchise Dealer shall:

(a)   use the Marketing Premises solely for the operation of the Businesses;

(b)   keep the Motor-Fuels Business open and in normal operation for the periods specified in Section 9.3;

(c)   refrain from using, or permitting the use of, the Marketing Premises for any other purpose or activity at any time; and

(d)   not allow the use of the Marketing Premises in connection with any purpose prohibited by Law, covenant, condition or restriction.

9.5 <u>Installation of Additional Tanks</u>.  Subject to applicable Laws, Franchise Dealer may install on the Marketing Premises additional tanks, dispensers or equipment for storing, selling or dispensing motor fuel other than Lukoil Products only with LNA'S express written approval, after written application by Franchise Dealer to LNA, which approval may not be unreasonably withheld.  Upon receipt of Franchise Dealer's application, LNA shall provide Franchise Dealer with a written statement of the procedures, requirements, conditions and limitations governing Franchise Dealer's installation and use of the additional tanks and equipment.  This statement may impose requirements which are necessary or appropriate in LNA'S sole discretion to address the following:

(a)   protect the integrity of Proprietary Marks, image, System or Other System;

(b)   provide for appropriate customer safety and access to facilities;

(c)   maintain an appropriate appearance of the Marketing Premises; and

(d)   provide safeguards for environmental protection and acceptable means to respond to potential environmental or other liability or costs.

If, after review of the statement, Franchise Dealer elects to go forward with the installation and LNA consents to the proposed installation, Franchise Dealer shall sign and deliver to LNA, prior to beginning any construction or other activities related to the installation, a written agreement (in form and substance acceptable to LNA) incorporating LNA'S procedures, requirements, conditions and limitations.  Dealer shall bear all installation costs including any environmental remediation and disposal costs incurred during or as a result of the installation and operation of the additional tanks, dispensers and equipment and any costs incurred in modifying or improving the Marketing Premises.

9.6 <u>Equipment, Fixtures, Signs</u>.  Franchise Dealer shall install and use in and about the Marketing Premises only such equipment, fixtures, furnishings, interior and exterior signs and other items as strictly conform to the Standards and specifications in the Standards Handbook or are otherwise permitted by LNA in writing from time to time.

9.7 <u>Customer Service</u>.  Franchise Dealer shall provide, and ensure that Franchise Dealer's employees and contractors provide, prompt, fair, courteous and efficient service to customers.  Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the customer-service Standards.  If applicable Laws prohibit self-serve and mini-serve operations, Franchise Dealer also shall provide the services normally associated with a full-serve service station including voluntarily washing windshields and checking oil levels.  If applicable Laws allow, these services may be limited or avoided where and to the extent they unreasonably interfere with the efficient sales of the Products.

9.8 <u>Clean, Attractive and Functional Operations</u>.  Franchise Dealer shall maintain the Marketing Premises and all adjacent areas in clean, attractive and functional condition at all times.  Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the Standards governing clean, attractive and functional operations.

9.9 <u>Maintenance Obligations</u>.  Subject to the provisions of the Lessee Dealer Lease Provisions or Reseller Additional Provisions, as applicable, Franchise Dealer shall undertake, at its expense, all maintenance and make all repairs, replacements, alterations and additions as may be required to maintain the Marketing Premises in good repair and condition including periodic cleaning, landscaping, repainting and repairs, replacing obsolete signs, equipment and fixtures, and complying with the Standards.

9.10 <u>Compliance with Laws; Covenants and Restrictions</u>.  Franchise Dealer shall operate and maintain the Marketing

Premises and the Businesses in compliance with all applicable Laws including those concerning the environment, hazardous substances or waste, toxic substances, right to know and occupational safety and health. Franchise Dealer shall comply with all applicable covenants, conditions or restrictions applicable to the operation and maintenance of the Marketing Premises and the Businesses.

9.11  <u>Safety Procedures</u>.   Without limiting Franchise Dealer's status and obligations as an independent businessperson under Article XVII, Franchise Dealer shall implement and maintain procedures for safe operation of the Marketing Premises and the Businesses including safe cash handling and employee training. LNA and Franchise Dealer expressly acknowledge that Franchise Dealer has sole responsibility for the safety and security of all persons at the Marketing Premises including Franchise Dealer's customers, contractors and employees at the Marketing Premises.  Nothing contained in this Agreement is to be construed as:

(a)     an assumption by LNA of any duty owed by Franchise Dealer to any person including any customer, contractor or employee of Franchise Dealer; or

(b)     giving LNA the right to control Franchise Dealer's provision of safety and security measures employed by Franchise Dealer at the Marketing Premises.

9.12  <u>Image and Trade Mark Standards; Promotion Programs</u>.   Franchise Dealer shall use and display sales, marketing and promotional materials provided by LNA from time to time, in the manner and for the time periods designated by LNA.  Franchise Dealer shall ensure that all stationery, signage and other printed materials used in connection with the Businesses bear the Proprietary Marks in the form, colors, location and manner prescribed by LNA.  Subject to applicable Laws, Franchise Dealer shall participate fully in all LNA promotional programs including point-of-purchase programs.  Without limiting the preceding provisions of this Section 9.12, Franchise Dealer shall comply with the image and trademark Standards.

9.13  <u>Staffing</u>.  Franchise Dealer shall hire and maintain a competent, conscientious and trained staff (including a Manager if required under this Agreement) and shall take all steps necessary to ensure that Franchise Dealer's employees preserve good customer relations and comply with LNA'S requirements for dress and appearance as LNA may prescribe from time to time in writing.  Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with all personnel and customer-contact Standards.

9.14  <u>Conduct</u>.

(a)     Franchise Dealer shall not engage or cooperate, and shall ensure that its employees, contractors and agents do not engage or cooperate, in any conduct that:

(i)     reflects unfavorably on the reputation of Franchise Dealer, LNA, Lukoil, the System or Other System;

(ii)    impairs the goodwill associated with the Proprietary Marks including conduct which jeopardizes Franchise Dealer's good relations with customers and creditors of the Businesses or LNA'S relationship with its contractors or vendors; or

(iii)   constitutes a deceptive or unfair trade practice under applicable Laws.

(b)     Franchise Dealer shall cooperate, and shall ensure that its employees, vendors, contractors and agents cooperate, fully with LNA and its employees, vendors and contractors in the performance of Franchise Dealer's obligations or the exercise of LNA'S rights under this Agreement and any related or supplemental agreements.  Franchise Dealer shall not permit on the Marketing Premises:

(i)     any consumption of intoxicating beverages;

(ii)    the sale or use of illegal drugs or drug paraphernalia; or

(iii)   the sale of any pornographic material or other material that LNA in its judgment determines may be offensive to the general public.

9.15  <u>Related Businesses</u>.   Franchise Dealer acknowledges that the customer views all of the Businesses at the Marketing Premises as part of the same buying experience under the System and expects the same high standards in all of Franchise Dealer's operations.  In connection with the Related Businesses, Franchise Dealer shall comply with:

(a)     the provisions of this Agreement and any related or supplemental agreements including any attachment to this Agreement relating to the Related Businesses;

(b)     the Standards and any specifications and requirements in writings furnished by LNA from time to time; and

(c)    the provisions of any other agreements governing the Related Businesses.

9.16    <u>System Modifications</u>. Franchise Dealer acknowledges and agrees that LNA, in its sole discretion, may modify or vary aspects of the System with respect to any Franchise Dealer or Lukoil Outlet or group of Franchise Dealers or Lukoil Outlets based on conditions or circumstances that LNA determines appropriate including local site conditions, state or local Laws, property use restrictions, sales potential, demographics, local economic conditions, competition and local business practices. Franchise Dealer further acknowledges that LNA has no obligation to disclose or offer the same or similar modifications or variances to Franchise Dealer.

9.17    <u>Retail Credit and Debit Program</u>. For so long as LNA offers to Franchise Dealer the opportunity to participate in Lukoil's Retail Credit or Debit Program ("Program"), Franchise Dealer shall comply with the Program, as it may be amended by LNA from time to time. Franchise Dealer shall cooperate fully with LNA, its contractors and vendors in preventing sales to persons not authorized to use the credit or debit card presented for payment. Franchise Dealer acknowledges receipt of a copy of the Credit Card Instructions Manual relating to the Program (the "Instructions"), and that Franchise Dealer has read them and is familiar with them. Franchise Dealer shall ensure that Franchise Dealer's employees, contractors and agents read and become familiar with the Instructions and shall maintain a current copy of the Instructions on the Marketing Premises for reference by Franchise Dealer and Franchise Dealer's employees, contractors and agents. Franchise Dealer is responsible for the acts of Franchise Dealer's employees, contractors and agents with regard to the Instructions. LNA may terminate, or otherwise limit, Franchise Dealer's participation in the Program at any time upon notice. As part of Franchise Dealer's participation in the Program, Franchise Dealer shall also participate in LNA'S Point of Sale ("POS") Program. Franchise Dealer shall execute LNA'S POS Participation Agreement and its Maintenance and System Access Agreement for Electronic Point of Sale Terminals. The following also applies to the Franchise Dealer's use of the Program:

(a)    For all sales made by Franchise Dealer in accordance with the Program, LNA shall pay Franchise Dealer, or credit to Franchise Dealer's account, at LNA'S discretion, the face amount of each credit or debit sales ticket delivered or electronically sent to LNA, less such charges as LNA may establish for participation in the Program. LNA'S payment obligation with respect to any sale is subject to Franchise Dealer making manual or electronic delivery of the credit or debit sales ticket within the time specified by LNA, but not later than 15 days after sale.

(b)    If Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals including the requirement that Franchise Dealer take reasonable precautions to prevent sales to unauthorized persons, LNA may, in addition to any other remedy that may be available to it including termination or nonrenewal of this Agreement and the Franchise Relationship, take any one or more of the following actions as it deems necessary or appropriate in its sole discretion:

(i)    charge back to Franchise Dealer's account the amount of any credit or debit transaction and any Losses incurred by LNA;

(ii)    on notice to Franchise Dealer, impose special terms and procedures on Franchise Dealer's participation in the Program; or

(iii)    on notice to Franchise Dealer, exclude Franchise Dealer from participation in the Program.

(c)    Franchise Dealer is in default of this Agreement if:

(i)    Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals; or

(ii)    Franchise Dealer fails to pay promptly any charge to Franchise Dealer's account resulting from non-compliance.

Franchise Dealer shall, upon LNA'S request, immediately return to LNA any manual credit card imprinter and electronic credit card point of sale terminal leased to Franchise Dealer by LNA.

9.18    <u>Improvements and Investments in Marketing Premises</u>. If Franchise Dealer is a Reseller, Franchise Dealer shall make improvements and investments in the Marketing Premises as required in the Reseller Additional Provisions.

9.19    <u>Technological and Communication Updates</u>. Franchise Dealer acknowledges that the use of current technology and communications systems in the operation of the Businesses is of critical importance in meeting customer needs and preferences and adjusting to competitive conditions. Franchise Dealer further acknowledges that

- 17 -

technology and communications systems are expected to change over time requiring periodic addition, replacement or updating of equipment or systems used in the Businesses.  Accordingly, Franchise Dealer shall:

(a)    as required by LNA in Franchise Dealer's marketing area, install and maintain in good operating condition, at Franchise Dealer's expense:

    (i)    a facsimile machine for sending and receiving written communications, and

    (ii)    equipment that allows access to the Internet or other electronic- transmission or data-communications system designated by LNA;

(b)    as required by LNA in Franchise Dealer's marketing area, subscribe at Franchise Dealer's expense to a voicemail system for transmitting and receiving telephonic communications, as designated by LNA from time to time; and

(c)    make other expenditures or investments as may be reasonably required in writing by LNA from time to time to update equipment, technology and communications systems at the Marketing Premises including the addition, replacement or updating of point of purchase equipment, pump dispensing technology, credit and cash processing equipment and software.  LNA will provide Franchise Dealer with reasonable notice specifying the required expenditures or investment and any specifications or requirements necessary to assure uniformity and compatibility with the System.

9.20    <u>Inspection</u>.  At all reasonable times, Franchise Dealer shall permit LNA, Lukoil, or their respective contractors, employees and agents to enter and inspect the Marketing Premises and the Business operations to determine compliance with this Agreement.  Franchise Dealer shall cooperate fully with LNA, Lukoil, and their respective contractors, employees and agents in conducting any inspection and shall render assistance as may be reasonably requested.  Upon notice from LNA of any deficiencies detected in an inspection, Franchise Dealer promptly shall take such steps as may be necessary to correct the deficiencies including the temporary closing of the Marketing Premises if so directed by LNA.

9.21    <u>Pricing</u>.  Franchise Dealer shall determine its own prices, pricing policies and discounting policies in accordance with applicable Laws. LNA may, from time to time, communicate with Franchise Dealer about prices and periodically may counsel Franchise Dealer on suggested pricing.  Franchise Dealer is not required to accept any pricing suggestions of LNA.

9.22    <u>Environmental Standards</u>.  Franchise Dealer shall comply with all environmental Laws and shall conduct the Businesses in an environmentally conscientious manner with due regard for the health and safety of the surrounding community.  Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Article II and the environmental Standards.

9.23    <u>Maintain Inventory</u>.  Franchise Dealer shall maintain an inventory of Products sufficient to serve customers during the hours specified in Section 9.3.

## ARTICLE X
## ADVERTISING, PROMOTION, AND MARKETING

10.1    <u>General Advertising</u>.  Franchise Dealer shall comply with the requirements of all LNA advertising, promotional and marketing programs including requirements relating to graphics, concepts, materials, placement and media.  Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Standards in the Standards Handbook relating to advertising, promotional and marketing programs.

10.2    <u>Local Advertising Approval</u>.  Franchise Dealer shall obtain LNA'S prior approval of all advertising, promotional and marketing activities by Franchise Dealer in its local market area.  Franchise Dealer shall submit to LNA for its prior approval (except with respect to prices to be charged) Franchise Dealer's proposal for all local advertising, promotional and marketing plans and samples of all local advertising materials not prepared or previously approved by LNA or its designated contractors or agents.  If LNA does not furnish Franchise Dealer with notice withholding approval within 30 business days after the date of receipt of the proposal by LNA, the proposal will be deemed approved.  If any plans or materials previously approved by LNA are later disapproved, Franchise Dealer shall discontinue their use promptly upon notice from LNA.

10.3    <u>Advertising Contributions</u>.  Subject to applicable Laws, LNA may, in good faith and the normal course of business, establish a regionally-focused media advertising contribution program to fund regional advertising incremental to LNA'S approved advertising levels for promoting the Lukoil brand in one or more Key Markets

(the "Contribution Program").

If LNA establishes a Contribution Program, it will be developed in consultation with LNA'S Lukoil-branded Dealer and Distributor Advisory Councils.  Upon consultation with a regional advertising steering committee consisting of Lukoil-designated franchisees and LNA personnel, LNA will control and direct all advertising under the Contribution Program, including location, media, content and extent of any advertising under the Contribution Program.

Franchisees' contributions will be collected in Key Markets and allocated for advertising in those markets.  All contributions under the Contribution Program may be collected by LNA and paid to one or more LNA-designated third parties who will administer the program.  Franchise Dealer's contributions will be nonrefundable.  The Contribution Program will not create a trust or fiduciary relationship.  The contributions may be spent in the year of contribution or any subsequent year and may be applied against any costs or expenses associated with the Contribution Program including administrative costs.

**ARTICLE XI**
**INSURANCE**

11.1   Types of Insurance Required.

(a)     Franchise Dealer shall acquire and maintain, at its own expense and at all times during the Term, insurance with an insurance company authorized to do business within the state in which the Marketing Premises are located, and which carries a rating of A or better. Franchise Dealer shall pay all premiums and assessments charged for the insurance when due. Each insurance policy must have a provision requiring that LNA be given at least 30 days' prior written notice before any termination, cancellation or material change becomes effective. If a policy is terminated, canceled or materially changed, Franchise Dealer shall promptly, prior to the expiration or change of that policy, procure a new or substitute policy containing at least the same coverage as the previous policy. The new policy must begin coverage prior to the expiration of the previous policy or prior to the effective date of the material change, as applicable.

(b)     Franchise Dealer shall comply with all policy terms and conditions and the directions of the insurance carrier, its ratings bureau and the National Fire Protection Association. All insurance maintained by Franchise Dealer must be primary if similar or complementary insurance is also maintained by LNA. Franchise Dealer shall bear all claims, losses or damages that are not recoverable from Franchise Dealer's insurers due to the application of a deductible clause or to Franchise Dealer's failure to observe the terms and conditions of the insurance coverage. Franchise Dealer shall indemnify and defend LNA for all these unrecoverable claims, losses or damages. Without limiting the general requirements of the preceding provisions of this Section 11.1, LNA may reject any policies which contain deductibility clauses, conditions or exclusions, or that are underwritten by insurance companies, that are unacceptable in LNA's sole determination. Upon rejection of a policy, Franchise Dealer promptly shall procure a policy with provisions and by an underwriter acceptable to LNA. LNA's receipt or acceptance of any policy or evidence of insurance is not a waiver by LNA of any requirement under this Article XI or of its right to reject the policy as unacceptable and does not affect Franchise Dealer's liability for claims, losses or damages that are or would have been covered by Franchise Dealer's full compliance with this Article XI.

(c)     Insurance coverage must:

(i)     be acceptable to LNA;

(ii)    name **"LUKOIL North America LLC and its parents, subsidiaries, affiliates, successors and assigns, and owner(s) and lessors of the property"** as additional insureds and, except with respect to the limits of insurance provided in this Article XI, which will apply in the aggregate but not separately to all insureds, provide that the liability coverage afforded applies separately to each insured against whom claim is brought as though a separate policy had been issued to each insured;

(iii)   provide coverage as may be specified by LNA from time to time in the Standards Handbook or otherwise in writing.  Unless otherwise specified by LNA, coverage must include the following minimum insurance:

(A)     garagekeeper's legal liability insurance with minimum limits of $50,000 per occurrence (if the Marketing Premises have no service bays or car wash,

garagekeeper's legal liability insurance is not required by this Agreement);

    (B)    general liability insurance with minimum limits of $1,000,000 per occurrence, which includes coverage for:

        (1)    contractual liability;

        (2)    the sale of food and beverages (if no sales of food or beverages are made at the Marketing Premises, food and beverage coverage is not required); and

        (3)    vehicles owned or operated in the course of the Businesses;

    (C)    workers' compensation insurance to provide full coverage for any statutory benefits required by all Laws applicable to Franchise Dealer's employees;

    (D)    employer's liability insurance with minimum limits of $100,000 per accident;

    (E) liquor liability insurance with minimum limits of $500,000 per occurrence (if no sales of alcoholic beverages are made at the Marketing Premises, liquor liability insurance is not required) to the extent such insurance is reasonably available as determined solely by LNA; and

    (iv)    be primary to any similar or complementary insurance that may be maintained by LNA.

LNA is entitled to the full coverage of any insurance procured by Franchise Dealer or LNA under this Article XI to the same extent as Franchise Dealer, but in no event less than the minimum coverage required by Section 11.1(c)(iii). The minimum limits specified in Section 11.1(c)(iii) do not limit or affect LNA'S right to full insurance coverage or LNA'S rights under Article XVIII.

11.2    Evidence of Insurance. Upon LNA'S request, Franchise Dealer shall furnish LNA with binders of coverage evidencing insurance required by this Agreement no later than the commencement of the Term and shall furnish LNA with certificates evidencing the insurance no later than 60 days after the effective date of the policy or renewal policy. Upon LNA'S request, Franchise Dealer also shall furnish LNA with complete copies of all policies.

11.3    Right to Place Insurance. If Franchise Dealer, for any reason, fails to procure and maintain required insurance satisfactory to LNA, LNA may, at LNA'S election and upon notice to Franchise Dealer, immediately procure the required insurance. Upon LNA'S request, Franchise Dealer promptly shall furnish LNA with all information relating to Franchise Dealer or Franchise Dealer's businesses requested by LNA in connection with the procurement of any required insurance. Upon written demand, Franchise Dealer shall immediately reimburse LNA for the costs of procuring the insurance. LNA'S right to procure insurance under this Section 11.3 may not be construed as an obligation by LNA to procure insurance and does not preclude LNA from exercising other rights or remedies it may have under this Agreement including termination or nonrenewal of this Agreement and the Franchise Relationship.

11.4    Insurance Proceeds. In the event that Franchise Dealer is paid insurance proceeds that are for the loss, replacement, or repair of equipment or property that is either (a) the responsibility of LNA to replace or repair or (b) that LNA has in fact replaced or repaired, then Franchise Dealer shall forward such proceeds to LNA promptly upon receipt thereof.

## ARTICLE XII
## TRANSFER OF INTEREST; SURVIVORSHIP

12.1    Consent Requirements. Franchise Dealer acknowledges that the rights and duties of Franchise Dealer are personal to Franchise Dealer, and that LNA has granted this Franchise in reliance on the qualifications, business skills, financial capacity and personal character of Franchise Dealer or, if Franchise Dealer is not an individual, of the Key Individual. Accordingly, Franchise Dealer shall obtain LNA'S express prior written consent as a condition precedent to the sale, assignment, transfer, conveyance, gift, lease, pledge, mortgage, encumbrance or hypothecation (collectively, the "Transfer") of any of the following (collectively, an "Interest"):

    (a)    any direct or indirect interest in this Agreement and any supplemental or related agreements, the Franchise, the Franchise Relationship and any lease, right or license granted under this Agreement or any supplemental or related agreements;

    (b)    any direct or indirect ownership interest of the Key Individual or any other person in Franchise Dealer; or

(c)    all or substantially all of the assets of any of the Businesses.

Except as specifically provided in this Article XII, any purported Transfer, by operation of Law or otherwise, not having the express prior written consent of LNA is null and void and constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant requirement of this Agreement and the Franchise Relationship. Any Transfer of an Interest is also subject to LNA'S rights under Article XIII.

If Franchise Dealer, the Key Individual or any other person with an Interest in Franchise Dealer (the "Transferor") intends to Transfer an Interest, the Franchise Dealer shall furnish LNA with written notice of the Transferor's intent, which notice must be at least 90 days prior to any proposed Transfer. Franchise Dealer shall furnish to LNA all information and take all actions, and cause the Transferor and any proposed transferee to furnish to LNA all information and take all actions, as may be reasonably required by LNA to review the proposed Transfer including all documents and actions referred to in this Article XII. LNA is not obligated to review or respond to any Transfer until:

    (i)    all required information is received by LNA; and

    (ii)   all required actions are taken by Franchise Dealer or the Transferor.

12.2   Consent to Transfer. LNA may not unreasonably withhold its consent to a Transfer of an Interest, except that LNA may, in its sole discretion, require any or all of the following as conditions of its consent:

(a)    Franchise Dealer shall pay:

    (i)    all indebtedness, monetary obligations and all other outstanding obligations to LNA, its Affiliates or any financial institutions or other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which LNA or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement. Without limiting the preceding general requirements of this Section 12.2(a), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under LNA-backed loan programs, direct LNA loans or LNA reimbursement agreements applicable to Lukoil branded dealers; and

    (ii)   all indebtedness to contractors or vendors that have furnished services or goods to the Marketing Premises.

(b)    If the Interest is that of the Key Individual, the proposed transferee must be designated as the Key Individual, must meet the requirements of Sections 12.2(e)(ii) and (e)(iii) and must furnish a guarantee pursuant to Article IV.

(c)    Unless prohibited by any applicable laws, the Transferor must sign and deliver to LNA a general release in form and substance satisfactory to LNA, of any and all claims against LNA and its Affiliates and their respective officers, directors, shareholders, employees, and agents, in their corporate and individual capacities, including claims arising under applicable Laws.

(d)    Franchise Dealer may not Transfer less than all Interest in this Agreement, all supplemental and related agreements, the Businesses and assets relating to the Businesses. A Key Individual may not Transfer less than 51% of the total ownership interest in the Franchise Dealer unless:

    (i)    LNA expressly allows the Transfer under an applicable written policy as may be in effect from time to time; and

    (ii)   the Key Individual and the Franchise Dealer comply with all requirements and conditions under that policy.

(e)    Franchise Dealer may not Transfer an Interest to any person except to an individual, a corporation meeting the requirements of Section 4.3 or to another business form permitted under and meeting the requirements of Section 4.4. If a Transfer of an Interest in Franchise Dealer is to a corporation meeting the requirements of Section 4.3 or is the Transfer of an Interest in Franchise Dealer that is another business form permitted under Section 4.4, the following applies:

    (i)    If Franchise Dealer is another business form permitted under Section 4.4(a)(i), the Transfer may only be to a person holding, and known by LNA at the time of formation of the original Franchise Relationship to have held, an ownership interest in the other business form.

    (ii)   A new Key Individual must be designated on the signature page of the assignment agreement or other document reasonably requested by LNA. The Franchise Dealer, transferee and new Key Individual must comply with Article IV.

(iii) The new Key Individual must be reasonably acceptable to LNA, meet the requirements of Article IV and meet all of LNA'S standards and requirements for a Key Individual as may be in effect from time to time including LNA'S standards and requirements for a franchise dealer under Section 12.3(a).

(iv) If Franchise Dealer is not an individual, the term "Transfer" shall also include any change in ownership of an Interest in Franchise Dealer:

 (A) by will, bequest or applicable Laws governing descent;

 (B) by merger, consolidation or operation of Law; or

 (C) by the foreclosure, attachment, execution or sale of any Interest that is used as collateral or security for financing, but does not include any pledging, mortgaging, hypothecating, granting of a security interest or encumbering of such property in order to secure bona fide financing from a financial institution if:

  (1) the pledging, mortgaging, hypothecating, granting of a security interest or encumbering does not:

   (I) result in the foreclosure, attachment, execution or sale of such property,
   (II) cover any property of LNA including any interest of LNA in equipment, fixtures or improvements, and
   (III) if Franchise Dealer is a Lessee Dealer, cover the Marketing Premises, and

  (2) Franchise Dealer furnishes LNA prior written notice of such pledging, mortgaging, hypothecating, granting of a security interest or encumbering.

12.3 <u>Conditions to Transfer</u>.  If a Transfer, alone or together with other previous, simultaneous or proposed Transfers, would have the effect of transferring financial or management control of Franchise Dealer or the Franchise, LNA may require, in its sole discretion and in addition to any other conditions, any or all of the following as conditions of its approval:

(a) The transferee must demonstrate to LNA'S satisfaction that the transferee meets LNA'S then-current requirements for new franchise dealers under the System; including requirements relating to credit, financial capability, business and personal qualifications, business experience and training.

(b) The transferee must sign and deliver to LNA an agreement, in form and substance acceptable to LNA, to assume all obligations of the Franchise Dealer under this Agreement and all supplemental and related agreements.

(c) The transferee must complete, and cause its Managers and management and non-management employees to complete, to LNA'S satisfaction, such initial and refresher training as LNA may require.

(d) Franchise Dealer must not be in default of this Agreement or any supplemental or related agreement.

12.4 <u>Administrative Fees</u>.  Prior to any Transfer, Dealer or the transferee of any Interest shall pay to LNA a non-refundable administrative fee in connection with each Transfer in an amount to be specified by LNA from time to time which LNA determines compensates LNA for costs and expenses incurred with Transfers.  Without limiting LNA'S right to change the fee from time to time, Franchise Dealer acknowledges that the fee in effect on the effective date of this Agreement is $7,500.00.  Franchise Dealer shall also pay to LNA administrative fees from time to time imposed by LNA which are in connection with changes in Franchise Dealer's operations, name or business structure, result in administrative costs or expenses to LNA and are in an amount determined by LNA to recoup those costs and expenses.

12.5 <u>Survivorship</u>.

(a) If Franchise Dealer is an individual, the provisions of this Section 12.5 apply.  Franchise Dealer may, by written notice to LNA, designate his or her qualified spouse or adult child to succeed Franchise Dealer as franchisee upon Franchise Dealer's death.  Franchise Dealer also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies.  If Franchise Dealer has no living spouse or adult children, Franchise Dealer may designate another qualified individual as successor.  Franchise Dealer shall comply with all applicable Laws governing survivorship or succession.  A designated successor must:

(i)     meet all LNA'S requirements for a franchise dealer that are in effect at the time of succession and are applicable to the Businesses;

(ii)     attend and complete all training requirements applicable to a franchise dealer at the time of succession; and

(iii)     must sign and deliver to LNA a written agreement or agreements, in form and substance acceptable to LNA, assuming all obligations and liabilities of the Franchise Dealer under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses.

(b)     If Franchise Dealer is a corporation meeting the requirements of Section 4.3 and the Key Individual has legal and beneficial ownership of at least 51% of the outstanding voting shares or other ownership interests in the Franchise Dealer, the provisions of this Section 12.5(b) apply. The Key Individual of a Franchise Dealer covered by this Section 12.5(b) may, by written notice to LNA, designate his or her qualified spouse or adult child to succeed the Key Individual upon the Key Individual's death. That Key Individual also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies. If that Key Individual has no living spouse or adult children, the Key Individual may designate another qualified individual as successor. That Key Individual shall comply with all applicable laws governing survivorship succession. A designated successor must:

(i)     meet all of LNA'S requirements for a Key Individual that are in effect at the time of succession and are applicable to the Businesses;

(ii)     attend and complete all training requirements applicable to a Key Individual at the time of succession;

(iii)     furnish to LNA a personal guarantee pursuant to Section 4.3(g); and

(iv)     cause Franchise Dealer to comply with all obligations under Section 4.3 including furnishing to LNA any documentation requested by LNA under Section 4.3(d).

(c)     By express written policy, LNA may, but is not obligated to, allow Franchise Dealer or the Key Individual to designate persons as successors in addition to those specified in Sections 12.5(a) and (b). Designation of any additional persons will be subject to those terms and conditions as may be specified in that policy.

12.6    Waivers.

(a)     LNA does not waive any claims or rights under this Agreement or any related or supplemental agreements, including any right to demand strict compliance with any terms of those agreements by any Transferor or transferee or any rights in connection with any future Transfers, if:

(i)     LNA consents to any proposed Transfer; or

(ii)     LNA fails to exercise its right to purchase any Interest of a Transferor under Article XIII.

(b)     LNA does not consent to any Transfer by:

(i)     acceptance of any money;

(ii)     any course of dealing; or

(iii)     any interviews, counseling, correspondence or other communications with any proposed transferee including communications under Section 12.8.

(c)     No Transfer of an Interest or consent to a Transfer may be construed as releasing or discharging:

(i)     any Franchise Dealer from any obligation or liability arising out of this Agreement or any supplemental or related agreement; or

(ii)     a Key Individual from his or her obligations under any guarantee.

12.7    Assignment by LNA. This Agreement shall inure to the benefit of LNA, its successors, and assigns. LNA may transfer or assign all or part of its rights or interest in this Agreement, or delegate all or part of its duties or obligations under this Agreement, without restriction, to any person or entity. Upon any assignment or delegation by LNA, LNA'S assignee or delegatee will be substituted for LNA with respect to all assigned rights or interests and to all delegated duties and obligations and LNA will be released from any delegated duties and

obligations.

Franchise Dealer acknowledges that:

(a)    an assignment or delegation by LNA may impact Franchise Dealer's rights and obligations under this Agreement to the extent that an assignee or delegatee has policies or programs that differ from LNA'S policies and programs;

(b)    this impact is contemplated by the Parties under this Agreement; and

(c)    Franchise Dealer, the Key Individual and any other person with an Interest in Franchise Dealer may not rely on or otherwise claim the impact as grounds for constructive termination or claim for damages.

12.8   <u>Communications with Transferees</u>.  LNA may communicate directly with any prospective transferee.  Franchise Dealer expressly consents to LNA, its Affiliates, contractors or vendors disclosing to the prospective transferee any information or projections requested by the prospective transferee including information relating to the Marketing Premises, the Businesses, this Agreement or any related or supplemental agreements.  Franchise Dealer releases LNA, its Affiliates, contractors and vendors, and their respective directors, officers, employees and agents from any claims, losses or liability of Franchise Dealer resulting from any disclosure made by LNA in good faith.  Nothing contained in this Section 12.8 is intended to obligate LNA to provide any information or projections to a prospective franchisee.

**ARTICLE XIII**
**<u>RIGHT OF FIRST REFUSAL</u>**

13.1   <u>Right of First Refusal</u>.

(a)    In connection with the proposed Transfer of an Interest, LNA shall have the right to meet the offer of any transferee which offer is acceptable to the Transferor of the Interest and acquire the Interest on the same terms and conditions as those contained in the transferee's offer.  If the offer relates to an Interest in Franchise Dealer and Franchise Dealer owns property or businesses unrelated to this Agreement and the Businesses, Franchise Dealer shall offer to sell to LNA only that property (including any interest in the Marketing Premises and property related to the Businesses) and those businesses (including the Businesses) which are related to this Agreement or any supplemental or related agreements (the "Covered Interests").  The offer must be at fair-market value, but not more than the value of that consideration attributed to the Covered Interests in the proposed transferee's offer.

(b)    No later than 90 days before the proposed sale or closing date, Franchise Dealer or other Transferor must furnish to LNA:

(i)    if the proposed transferee's offer relates to an Interest in Franchise Dealer and if Franchise Dealer owns property or businesses other than the Covered Interests, a written offer to sell LNA the Covered Interests in accordance with Section 13.1(a), or

(ii)   if Section 13.1(b)(i) does not apply, a copy of the proposed transferee's offer,

which will be a binding offer (the "Offer") by the Transferor or Franchise Dealer to LNA on the terms and conditions of the Offer.  The Offer must be bona fide, in writing and contain all terms and conditions of the proposed Transfer.  Franchise Dealer also shall furnish LNA with such additional information relating to the Interest, the Transferor, the proposed Transfer, the proposed transferee, the Interest and the Covered Interests, as LNA may reasonably request in order to evaluate the offer or review the proposed Transfer under Article XII and ensure compliance with this Article XIII.

(c)    Upon receipt of the Offer and all requested information, LNA will have 60 days within which to evaluate the Offer, and to advise in writing Franchise Dealer or any other Transferor whether LNA exercises its right to acquire the Interest or the Covered Interests, whichever is applicable.  An Offer that includes the exchange of other property interests for any Interest or Covered Interests may be accepted by LNA by substituting for that other property payment of an amount equal to the fair-market value of that other property but not more than the value attributed to that other property in the Offer.  Franchise Dealer shall provide LNA with full access to Franchise Dealer's books and records if the Offer:

(i)    includes an exchange of property; or

(ii)   is an offer by Franchise Dealer to sell the Covered Interests at fair-market value as required under Section 13.1(a).

(d)     If LNA chooses to exercise its right of first refusal under this Article XIII, closing and the effective date of any termination of this Agreement as provided below in this Section 13.1(d) will be the proposed sale or closing date:

    (i)     specified in the proposed transferee's offer if the Offer is that of a proposed transferee; or

    (ii)     as agreed by LNA and Franchise Dealer if the Offer is an offer by Franchise Dealer to sell the Covered Interests at fair-market value as required under Section 13.1(a).  The closing will take place at LNA'S offices.  At closing, Franchise Dealer shall deliver to LNA documentation satisfactory to LNA conveying good, marketable and clear title to all property subject only to reasonable liens and conditions expressly provided in the Offer.  If the Interest or Covered Interests subject to the offer includes Franchise Dealer's Interests in this Agreement and the Franchise Relationship, this Agreement and all related and supplemental Agreements will terminate on the sale or closing date, subject to any obligations or liability of Franchise Dealer
or the Key Individual to LNA accrued prior to termination or which survive termination, and Franchise Dealer shall sign and deliver to LNA, at least 7 business days prior to the sale or closing date, a binding mutual termination agreement in form and substance acceptable to LNA.

(e)     If LNA does not exercise its right under this Section 13.1 with respect to any Interest, LNA shall:

    (i)     notify Franchise Dealer in writing of its decision;

    (ii)     review the proposed Transfer in accordance with Article XII; and

    (iii)     notify Franchise Dealer as to whether LNA consents to the Transfer and as to which conditions will apply to the Transfer.

(f)     If LNA notifies Franchise Dealer that LNA consents to the Transfer, the Franchise Dealer or other Transferor of the Interest may proceed with the Transfer of the Interest only in accordance with the terms and conditions in the proposed transferee's offer constituting, or giving rise to, the Offer.  Franchise Dealer shall provide LNA with documentation satisfactory to LNA that the Transfer was completed in accordance with the proposed transferee's offer.

(g)     LNA'S rights under this Article XIII will apply to each offer by a transferee to Transfer an Interest and include any material renegotiations or material modifications of all or any part of an offer.  Each offer (including any material renegotiation or modification of any offer) is a separate offer entitling LNA to its rights under this Section 13.1.

(h)     If any transferee fails to meet any requirements or conditions under Article XII including LNA'S then-current standards and requirements for new franchise dealers, LNA, in addition to withholding its consent to the Transfer and in lieu of exercising its rights under this Section 13.1 may, consistent with applicable Laws, substitute another transferee who meets those requirements and conditions and who accepts and is able to meet the terms and conditions of the Offer.

(i)     LNA'S failure to exercise its purchase rights under this Section 13.1 on one or more occasions:

    (i)     does not affect LNA'S rights under this Section 13.1 on other occasions whether or not involving the same Interest;

    (ii)     does not constitute LNA'S consent to the Transfer of an Interest; and

    (iii)     does not preclude LNA'S right to substitute a transferee under Section 13.1(h).

13.2     <u>Transfers to Immediate Family</u>.  LNA'S purchase rights under Section 13.1 do not apply to the following Transfers:

(a)     if Franchise Dealer is an individual, Franchise Dealer's Transfer of all Franchise Dealer's Interests under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses, to:

    (i)     Franchise Dealer's qualified spouse or adult child; or

    (ii)     a corporation with respect to which the Franchise Dealer or the Franchise Dealer's spouse or adult child qualifies as the Key Individual.

(b)     if Franchise Dealer is a corporation and the Key Individual holds legal and beneficial ownership of at

least 51% of the outstanding voting stock and other ownership interests in the Franchise Dealer, a Transfer by the Key Individual of all the Key Individual's Interests in Franchise Dealer to a spouse or adult child who qualifies as a Key Individual.

The Transfers referred to in this Section 13.2 are subject to all other provisions of this Agreement including the provisions of Articles IV and XII.  This Section 13.2 does not authorize any Transfer that is merely a means or device to Transfer an Interest to a person other than as described in this Section 13.2.

### ARTICLE XIV
### DEFAULT AND TERMINATION

14.1     <u>Termination or Nonrenewal of Agreement and Franchise Relationship</u>.  LNA may terminate or nonrenew this Agreement, the Franchise and the Franchise Relationship between LNA and Franchise Dealer as follows:

    (a)     in accordance with the applicable provisions of the PMPA if the PMPA then applies to this Agreement; or

    (b)     if the PMPA no longer applies to this Agreement:

        (i)     for breach of any provision of this Agreement, or

        (ii)     upon any grounds provided by the PMPA as in effect on the beginning date of this Agreement under Section 1.4; or

    (c)     if Franchise Dealer is not an individual, also:

        (i)     upon the occurrence of an event with respect to the Key Individual that would be grounds for termination or nonrenewal under the PMPA if the event had instead occurred to an individual Franchise Dealer including:

            (A)     death of the Key Individual,

            (B)     fraud or criminal misconduct of the Key Individual relevant to the operation of the Marketing Premises,

            (C)     continuing severe physical or mental disability of the Key Individual of at least three months' duration which renders the Key Individual unable to contribute to the proper operation of the Marketing Premises,

            (D)     conviction of the Key Individual for any felony involving moral turpitude, and

            (E)     declaration of bankruptcy or a judicial determination of insolvency of any guarantor referred to in Sections 4.3(e) or 4.4(b)(v).

            (F)     knowing failure of the Key Individual to comply with any Laws relevant to the operation of the Marketing Premises;

        (ii)     dissolution or winding-up of Franchise Dealer,

        (iii)     upon the withdrawal or change of interest of any partner, if a partnership, or

        (iv)     upon loss of Franchise Dealer's rights under applicable Law to conduct the Businesses.

Upon any termination or nonrenewal, Franchise Dealer shall comply with the provisions of Article XV and with LNA'S normal post-termination procedures as furnished in writing to Franchise Dealer from time to time.

14.2     <u>Right of Termination Due to Governmental Action</u>.  Either Party may terminate this Agreement upon not less than 180 days' prior written notice to the other Party if any federal, state or local governmental action results in the adoption or imposition of Laws that:

    (a)     significantly alter the reasonable expectations of the Parties at the time of entering into this Agreement including the expectation that Franchise Dealer will be obligated to pay rent as specified in the Lessee Dealer Lease Provisions (if Franchise Dealer leases the Marketing Premises from LNA) or purchase the Products from LNA in accordance with Section 2.1;

    (b)     result in the imposition of an obligation upon LNA to install or construct equipment, facilities or

improvements on the Marketing Premises and, in LNA'S sole judgment, the cost of such installation would be uneconomical to LNA; or

(c)     modify in any way the present relationship of LNA'S or LNA"S Affiliate's refinery production, supply, transportation, refining or marketing functions.

14.3     <u>Accrued Rights</u>.  Any termination or nonrenewal is subject to LNA'S accrued rights.

14.4     <u>Remedies of LNA</u>.  If Franchise Dealer defaults on any obligation contained in this Agreement or any related or supplemental agreement, LNA may, but is not obligated to, exercise any or all of the following remedies, whether or not LNA exercises its right to terminate or nonrenew:

(a)     suspend all deliveries of Products to Franchise Dealer until the default is corrected or remedied; or

(b)     apply any sums or security (including the Product Security) furnished by Franchise Dealer to LNA under this Agreement or any related or supplemental agreement to the payment of any indebtedness. Franchise Dealer immediately shall provide additional security, as directed by LNA, to replace the sums or security applied by LNA.

LNA'S rights and remedies under this Agreement are distinct, separate and cumulative, and no one of them, whether or not exercised by LNA, is in exclusion of any others under this Agreement or any related or supplemental agreement, or at Law or in equity.

**ARTICLE XV**
**OBLIGATIONS UPON TERMINATION OR EXPIRATION**

15.1     <u>Termination of Business Operation</u>.  Upon the termination or nonrenewal of this Agreement, the Franchise and the Franchise Relationship, Franchise Dealer's rights under this Agreement and all related and supplemental agreements terminate, and Franchise Dealer shall stop all operation of the Motor-Fuels Business and the Related Businesses and all use of the Proprietary Marks and the System.  In particular, and without limiting the general requirements of the preceding provisions of this Section 15.1, Franchise Dealer shall:

(a)     Immediately stop operating the Motor-Fuels Business and the Related Businesses.

(b)     Immediately and permanently stop using, in any manner whatsoever, any Confidential Information, the LUKOIL names, or such other names as may be designated by LNA from time to time, and all signs, advertising, materials, displays, stationery and forms containing the Proprietary Marks.

(c)     Promptly pay:

(i)     all sums owing to LNA and its Affiliates and to all financial institutions and other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which LNA or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement.  Without limiting the preceding general requirements of this Section 15.1(c), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under LNA-backed loan programs, direct LNA loans and LNA reimbursement agreements; and

(ii)     if Franchise Dealer leases the Marketing Premises from LNA, all indebtedness to contractors or vendors that have furnished goods or services to the Marketing Premises.

(d)     Comply with all provisions of this Agreement that expressly or by reasonable implication apply to Franchise Dealer's conduct after termination or nonrenewal.

(e)     Immediately return to LNA all LUKOIL signs and other personal property and equipment of LNA. Franchise Dealer grants, and shall cause any other person in possession of the Marketing Premises to grant, to LNA a non-revocable license to enter the Marketing Premises to remove LNA's signs, property and equipment.  Franchise Dealer shall bear all removal, site-restoration and transportation costs relating to the removal of LNA's signs, property and equipment under this Section 15.1(e).

**ARTICLE XVI**
**TAXES, PERMITS, INDEBTEDNESS**

16.1     <u>Tax, Duty, Fee Due LNA</u>.  Franchise Dealer shall pay to LNA any present or future governmental charges imposed on LNA (including any tax, duty, fee or other charge imposed by governmental authority) and calculated on any basis, including by volume, cost or receipts, which is on or measured by (1) this Agreement or

any related or supplemental agreement; (2) the Products; (3) the raw materials or constituent materials from which the Products are derived; or (4) the importation, refining, manufacture, sale, use, possession, transportation, handling or disposal of any raw or constituent materials, or the Products. Franchise Dealer shall pay all governmental charges to LNA unless they are included by LNA in the price of the Products or unless Franchise Dealer pays the charge directly to the applicable governmental authority.

16.2    Local, State, Federal Taxes and General Indebtedness.  Franchise Dealer shall pay when due all governmental charges imposed on Franchise Dealer (including withholding, unemployment and sales taxes, fees and other charges imposed by governmental authority), and all accounts and indebtedness incurred by Franchise Dealer in the conduct of the Businesses.

16.3    Indebtedness Dispute.  Notwithstanding any dispute by Franchise Dealer of its liability to pay any governmental charges under Section 16.2, Franchise Dealer shall not permit a tax sale, foreclosure or seizure by levy or execution or similar writ or warrant, or any attachment, lien or encumbrance by a creditor or governmental authority, of or on the Marketing Premises, any Business or any improvements, equipment or fixtures on the Marketing Premises.

16.4    Permits and Licenses.  Franchise Dealer shall timely obtain and comply with all permits, certificates or licenses necessary for the full and proper conduct of the Businesses, including licenses to do business, fictitious name registration, underground storage tank permits and licenses, sales tax permits and fire clearances.  Franchise Dealer shall pay all fees or charges relating to these permits, certificates and licenses.

16.5    Notices.  Franchise Dealer shall notify LNA in writing as soon as practicable and in no event later than within 5 days of:

(a)    the commencement of any action, suit or proceeding,

(b)    the issuance of any writ, injunction or award or of a decree of any court, agency, or other governmental authority, or

(c)    any indebtedness, event or occurrence,

which may adversely affect the operation or financial condition of the Businesses, the Franchise Dealer, the Key Individual or the Marketing Premises.

**ARTICLE XVII**
**INDEPENDENT CONTRACTOR**

17.1    Relationship of the Parties.  The relationship of the Parties is as follows:

(a)    this Agreement governs the Franchise and Franchise Relationship between them;

(b)    neither Party has a fiduciary relationship with the other;

(c)    Franchise Dealer is an independent business person with responsibility for and control over the manner and means of the day-to-day operations of the Businesses including Product deliveries, on-going Product inventory monitoring, Product leak or release detection, Product leak or release reporting and compliance with all Laws;

(d)    neither Party is an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose; and

(e)    no person performing work for Franchise Dealer at the Marketing Premises or in connection with the Businesses is an agent, legal representative, joint venturer, partner, employee or servant of LNA or its Affiliates.  Franchise Dealer has exclusive control and direction over the duties, supervision, compensation, hiring and firing of its employees, contractors and agents.

17.2    Public Notification.  Franchise Dealer shall represent Franchise Dealer to the public as an independent and local business person operating the Motor-Fuels Business under a franchise from LNA.  Franchise Dealer shall take necessary action to effect this representation, including placing a notice of Franchise Dealer's status in a conspicuous place on the Marketing Premises and on stationery and written or graphic materials, the content, placement and form of which LNA may specify from time to time.

17.3    Other Franchise Dealer Obligations.  Franchise Dealer shall not:

(a)    make any contract, agreement, warranty or representation on behalf of LNA or its Affiliates;

(b)     incur any debt or obligation in the name of LNA or its Affiliates; or

(c)     by act or omission, cause LNA or its Affiliates to be liable, or be found to have assumed liability, for any activities of Franchise Dealer at the Marketing Premises or relating to the Businesses including any claim or judgment arising from Franchise Dealer's act or omission.

**ARTICLE XVIII**
**INDEMNIFICATION**

18.1     Definition of Losses.  "Losses" includes all losses, compensatory, exemplary or punitive damages, fines, penalties, charges, costs, lost profits, legal fees and costs, accountants' fees, expenses (including expenses for environmental personnel), settlement amounts, judgments, compensation for damages to LNA'S reputation and goodwill and any other amounts incurred in connection with the matters described.

18.2     Indemnity.  To the fullest extent permitted by Law, Franchise Dealer shall, at all times, defend and indemnify LNA, its Affiliates, successors and assigns and their respective directors, officers, employees, agents and representatives (collectively, the "Indemnitees") from all Losses incurred in connection with any action, suit, proceeding, claim, demand, or any formal or informal investigation or inquiry ("Proceeding"), or any settlement (whether or not a formal Proceeding or action has been instituted) that arises out of or is based upon any of the following (whether or not caused in part by LNA'S negligence, but not if caused by LNA'S sole negligence):

(a)     the violation or asserted violation, by Franchise Dealer or any operator of any Co-Brand or Non-Lukoil Offering or any invitee, employee, officer, director, agent, servant, contractor, partner, affiliate, shareholder, owner or representative of Franchise Dealer or of the operator of any Co-Brand or Non-Lukoil Offering ("Related Party") of any Laws;

(b)     Franchise Dealer's breach or asserted breach of any contract;

(c)     libel, slander or any other form of defamation by Franchise Dealer or any Related Party;

(d)     Franchise Dealer's violation or breach of any warranty, representation or obligation of this Agreement or any related or supplemental agreement;

(e)     acts, errors or omissions, whether or not negligent, of Franchise Dealer or any Related Party;

(f)     any environmental contamination or occurrence as follows:

    (i)     unless Section 18.2(f)(ii) applies, any environmental contamination or occurrence in whole or in part arising out of the operation of the Marketing Premises during any period when Franchise Dealer was or is in possession of the Marketing Premises or arising out of any act or omission of Franchise Dealer or any Related Party, or

    (ii)     if Franchise Dealer is a Lessee Dealer and Franchise Dealer and all Related Parties have no interest in the storage tanks, lines or dispensing equipment located at the Marketing Premises and have no interest in the underlying estate of the Marketing Premises (excluding only a lease from LNA in accordance with the Lessee Dealer Lease Provisions), any environmental contamination or occurrence in whole or in part arising out of any act or omission of Franchise Dealer or any Related Party;

(g)     any failure by Franchise Dealer to comply with Franchise Dealer's maintenance obligations under this Agreement or any related or supplemental agreement including any agreement relating to a Related Business ("failure" shall include any unreasonable delay);

(h)     death, personal injury, property damage or any other Losses arising out of the action or omission, whether or not negligent, of Franchise Dealer or any Related Party in the use, occupancy, operation or maintenance of the Marketing Premises, including adjacent sidewalks, drives and curbs;

(i)     Franchise Dealer's operation of the Businesses;

(j)     activities of third parties acting on behalf of or pursuant to any joint venture, partnership, co-branding arrangement, sublease, license or other agreement with, Franchise Dealer with respect to the Marketing Premises, management of the Franchise or conduct of the Businesses;

(k)     any claims by creditors of Franchise Dealer or any Related Party;

(l)     any failure by Franchise Dealer to obtain or keep current the amounts and types of insurance required by this Agreement or to comply with the terms and conditions of the insurance obtained; or

(m)    any claim against LNA by Franchise Dealer or any Related Party not disclosed to LNA as required by Section 18.7.

18.3    Notices; Choice of Counsel.  Franchise Dealer shall promptly notify LNA of any Proceeding.  If LNA is or may be named as a party in the Proceeding, LNA may elect (but is not obligated) to undertake the defense or settlement of the Proceeding with counsel of LNA'S choice.  If LNA does not elect to undertake the defense or settlement of the Proceeding, Franchise Dealer shall use counsel acceptable to LNA.  If Franchise Dealer fails to use counsel acceptable to LNA or if LNA, in its discretion, determines that a conflict of interest exists between LNA and Franchise Dealer in the defense of the Proceeding, LNA may engage counsel of its choice to separately represent it in the Proceeding.  No undertaking or separate representation of counsel by LNA under this Section 18.3 in any manner limits or waives Franchise Dealer's obligation to indemnify and defend, or pay for the defense of, LNA.

18.4    Remedies.  With respect to any Proceeding, LNA may, at any time and without notice, in order to protect persons or property or the reputation or goodwill of LNA or others, consent or agree to any settlement or remedial or corrective action as LNA deems expedient, if, in LNA'S sole judgment, there are reasonable grounds to believe that:

(a)    any of the acts or circumstances enumerated in Section 18.2 have occurred; or

(b)    any act or omission of Franchise Dealer or any Related Party may result directly or indirectly in future damage, injury or harm to any person or any property.

18.5    Defenses.  All Losses incurred under this Article XVIII shall be chargeable to and paid by Franchise Dealer, regardless of any actions, activities or defenses undertaken by the Indemnitees, or subsequent success or failure of any actions, activities or defenses.

18.6    Recovery Obligations.  Under no circumstances will Indemnitees be obligated to seek recovery from third parties or mitigate their Losses in order to maintain a claim against Franchise Dealer.  Any Indemnitee's failure to pursue a recovery or mitigate a Loss will in no way reduce the amounts recoverable by that Indemnitee from Franchise Dealer.

18.7    Claims against LNA.  Franchise Dealer represents and warrants that Franchise Dealer has no knowledge of any claim by Franchise Dealer or any Related Party against the Indemnitees on the date of this Agreement except for any claims disclosed by Franchise Dealer in a written schedule initialed by the Parties and attached to this Agreement.  Franchise Dealer's obligation to disclose claims includes the disclosure of claims of which Franchise Dealer would have acquired knowledge upon reasonable inquiry or the exercise of due diligence.

## ARTICLE XIX
## ALLOCATION OF RISK

19.1    General Contingencies; Force Majeure.

(a)    LNA is not liable for any consequences to Franchise Dealer, including loss, damage or demurrage due to any delay or failure in performance, arising out of any cause that LNA determines is beyond its reasonable control including:

(i)    Governmental Action:  compliance with any action, order, direction, request or control of any governmental authority or person purporting to act for any governmental authority; or

(ii)    Force Majeure:  interruption, unavailability or inadequacy of the supply of the Products or of any facility of production, manufacture, storage, transportation, distribution or delivery, for any reason, including wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, or weather conditions.

(b)    LNA shall not be required to remove any cause or replace the affected source of supply or facility if LNA determines the action would involve additional expense or a departure from its normal practices.

(c)    Franchise Dealer is not liable for failure to receive Products if Franchise Dealer is prevented from receiving and using them in Franchise Dealer's customary manner by any cause beyond Franchise Dealer's reasonable control.

19.2    Allocation.

(a)    If there is, or LNA determines there may be, a shortage of supplies, for whatever reason, so that LNA is or may be unable to meet the demands of some or all of its customers, LNA may allocate to and

among its retail dealers those quantities of Product that LNA determines it has available for distribution to that class of trade, or subgroup within that class of trade, from any specific terminal or point of supply.  LNA'S plan of allocation must not unreasonably discriminate between Franchise Dealer and LNA'S other retail dealers that are in Franchise Dealer's class of trade or subgroup within that class of trade and are supplied by the same terminal or point of supply.  LNA is not required to make up any deliveries or quantities omitted as a result of any cause or allocation under this Article XIX including deliveries or quantities omitted by LNA in allocating Products among its retail dealers under this Section 19.2, and LNA is not liable for any damages or losses in connection with those omitted deliveries or quantities.

(b)     If any allocation occurs, the Contract Volumes will be adjusted to reflect the allocation.  In all situations of perceived or actual supply shortages, LNA may join or comply with any voluntary or non-mandatory price, supply, allocation or delivery restriction systems or programs designed or supported by any governmental authority.  Any decision or determination made by LNA under this Article XIX will be made in LNA'S sole discretion when acting in good faith in the ordinary course of business.

## ARTICLE XX
## MISCELLANEOUS

20.1     Significance of Terms and Conditions.

(a)     FRANCHISE DEALER ACKNOWLEDGES THE SIGNIFICANCE OF EACH TERM AND CONDITION AND THAT ANY BREACH OF THE TERMS AND CONDITIONS IS SUBSTANTIAL.   THE PARTIES ALSO ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO THE PMPA, AND NOTHING CONTAINED HEREIN IS INTENDED TO REDUCE THE RIGHTS OF EITHER PARTY UNDER THAT LAW.

(b)     Franchise Dealer has expressly acknowledged in this Agreement that the failure to meet certain obligations constitutes a failure to comply with a reasonable and materially significant provision of this Agreement or the Franchise Relationship.  These acknowledgments may not be construed as intending that other provisions, which are not so acknowledged, are not reasonable and materially significant provisions of this Agreement and the Franchise Relationship.

20.2     Approvals and Consents.  If this Agreement requires the prior approval or consent of LNA, Franchise Dealer shall make a timely written request to LNA for its approval or consent, and any approval or consent must be obtained in writing.  LNA makes no warranties or assurances upon which Franchise Dealer may rely, and assumes no liability or obligation to Franchise Dealer by:

(a)     providing any waiver, approval, consent, or suggestion to Franchise Dealer in connection with any approval or consent; or

(b)     reason of any neglect, delay or denial of any request.

20.3     Strict Compliance.  Subject to the PMPA, LNA'S rights at any time to:

(a)     demand strict compliance with any obligation or condition under this Agreement or any related or supplemental agreement, or

(b)     exercise any rights or remedies in connection with Franchise Dealer's default under this Agreement or any related or supplemental agreement,

are not waived or impaired by:

(i)     LNA'S failure to exercise any right under this Agreement or any supplemental or related agreement,

(ii)     LNA'S failure to insist upon strict compliance by Franchise Dealer with any obligation or condition in this Agreement or any supplemental or related agreement,

(iii)     any course of dealing of the parties or any trade practice or practice of the Parties at variance with this Agreement or any related or supplemental agreement,

(iv)     LNA'S waiver of any prior default, whether or not similar, or

(v)     LNA'S delay, forbearance or failure to exercise any power or right arising out of default by Franchise Dealer under this Agreement or any related or supplemental agreement.

20.4   Notices.  Unless otherwise expressly provided in this Agreement, all notices, communications and delivery of information must be in writing and must be:

    (a)   if to LNA posted by registered or certified mail, return receipt requested, to the following address and directed to the attention of:

> LUKOIL North America LLC
> 302 Harper Drive
> Moorestown, NJ  08057
> Attn: Contract Administration

    (b)   if to Franchise Dealer

        (i)   delivered to the Marketing Premises; or

        (ii)   posted by registered or certified mail, return receipt requested, to the address specified in the preamble to this Agreement.

Where commercially reasonable, LNA may also communicate or deliver information to Franchise Dealer by electronic or telephonic means including those means of communication specified in Section 9.19

LNA may change the address for delivery of notices to it by furnishing written notice pursuant to this Section 20.4. Notice is deemed furnished on the first to occur of the following:

    (a)   if made by personal delivery, the date the notice is personally delivered;

    (b)   if made by registered or certified mail, three (3) business days after the date the notice is deposited in the United States mail, postage prepaid, and properly addressed; or

    (c)   if made by LNA using electronic or telephonic communications, upon receipt by Franchise Dealer.

20.5   LNA'S Legal Fees and Costs.  Franchise Dealer shall pay LNA'S legal fees and costs if:

    (a)   LNA successfully enforces any provision of this Agreement or any related or supplemental agreement including a suit to recover damages or to obtain specific performance or an injunction; or

    (b)   LNA successfully defends any litigation or other proceeding by Franchise Dealer alleging:

        (i)   LNA'S breach of any obligation to Franchise Dealer under this Agreement or any related or supplemental agreement, or

        (ii)   LNA'S noncompliance with any Laws including the PMPA.

20.6   Claims.  All claims by Franchise Dealer against LNA of any kind, whether or not arising out of this Agreement, are barred unless Franchise Dealer gives LNA notice within 90 days after the event, act or omission to which such claim relates.  Even if Franchise Dealer provides timely notice of a claim, any claim by Franchise Dealer is barred unless asserted by the commencement of a lawsuit naming LNA as a defendant in a court of competent jurisdiction within 12 months after the event, act or omission to which the claim relates.

20.7   Limitation of Liability.  LNA is not liable to Franchise Dealer or any other person for:

    (a)   prospective profits or special, incidental, indirect, punitive or consequential damages in any circumstances arising out of the subject matter of this Agreement or LNA'S acts or omissions relating to that subject matter; or

    (b)   claims under Section 2.10 in excess of Franchise Dealer's purchase price of the Products to which the claims relate.

20.8   Entire Agreement; Modifications.  This Agreement, the documents referred to in this Agreement and the schedules and attachments to this Agreement constitute the entire, full and complete agreement between LNA and Franchise Dealer concerning the covered subject matter, and supersede all prior agreements relating to that subject matter.  Except for those permitted to be made unilaterally by LNA under this Agreement, no amendment, change or variance from this Agreement is binding on either Party unless agreed in writing by the Franchise Dealer and LNA'S authorized representative.

20.9   Severability and Construction.  Except as otherwise expressly provided in this Agreement, each provision, and portion of any provision, of this Agreement is severable.  If, for any reason, a provision or portion of any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the invalidity or unenforceability will not affect the validity or enforceability of any other provision or portion of a provision.  The unaffected provisions, and portions of provisions, will remain in full force and effect.

20.10   Third Party Rights.  Except as otherwise expressly provided in this Agreement, no person or entity not a party to this Agreement has any rights or remedies under this Agreement.

20.11   Headings.  All headings in this Agreement are intended solely for convenience and do not affect the meaning or construction of any provision of this Agreement.

20.12   Joint and Several Obligations.  All acknowledgments, representations, warranties and obligations of Franchise Dealer under this Agreement are made by, and binding on, all those signing this Agreement jointly and severally as Franchise Dealer.

20.13   Right of Entry.  In addition to LNA'S rights under Sections 2.9, 9.20 and 15.1, Franchise Dealer permits LNA, its Affiliates and their respective employees, agents, vendors, contractors and representatives to enter the Marketing Premises to enforce LNA'S rights and remedies under this Agreement including taking action to preserve the integrity of Proprietary Marks, the System and/or Other System, and determining Franchise Dealer's compliance with the Standards.  LNA is not liable to Franchise Dealer for any interference with Franchise Dealer's business as a result of LNA'S entry on the Marketing Premises.

20.14   LNA Approval.  This Agreement is not binding on LNA until approved and signed on LNA'S behalf by LNA'S authorized representative.

20.15   Terms on Renewal.  Nothing in this Agreement is to be construed as preventing LNA, upon expiration of this Agreement and renewal of the Franchise Relationship, from offering Franchise Dealer terms and conditions in good faith and the normal course of business which differ from or are in addition to those in this Agreement, including terms and conditions relating to the Related Businesses or other businesses which may be operated at the Marketing Premises.

**ARTICLE XXI**
**ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES**

21.1   Business Risks.  Franchise Dealer represents and warrants that it has conducted an independent investigation of the System and recognizes that the Businesses involve business risks and that its success will be largely dependent upon the ability of Franchise Dealer as an independent businessperson.  LNA expressly disclaims the making of, and Franchise Dealer represents that it has not received, any representation, warranty or guarantee, express or implied, as to the potential volume, profits or success of the Businesses covered by this Agreement.

21.2   Representations.  As an inducement to enter into this Agreement, Franchise Dealer represents and warrants that it has no knowledge of any representation or warranty by LNA or any LNA Affiliate or their respective officers, directors, shareholders, employees, agents or contractors concerning the Businesses that is contrary to the terms of this Agreement or the documents referred to in this Agreement.  Franchise Dealer represents and warrants that:

   (a)   LNA has made no representation or warranty to Franchise Dealer that Franchise Dealer will earn or is likely to earn a positive return on any investment made by Franchise Dealer;

   (b)   the Franchise includes no right of exclusivity;

   (c)   LNA has made no representation or warranty that it will buy back or otherwise accept from Franchise Dealer any Products, supplies or equipment purchased or leased by Franchise Dealer in connection with the Businesses;

   (d)   Franchise Dealer has made no misrepresentation in applying for the Franchise or entering into this Agreement; and

   (e)   if Franchise Dealer is a corporation:

      (i)   Franchise Dealer is duly organized and validly existing,

      (ii)   Franchise Dealer is authorized to do business and in good standing under the laws of the state of its incorporation and under the laws of any state in which this Agreement is to be performed,

(iii)    Franchise Dealer has the corporate power and authority to enter into this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, and

(iv)    Franchise Dealer's signing, delivery and performance of this Agreement has been duly authorized by all required corporate action.

21.3    Receipt of Attachments and Disclosures.  Franchise Dealer represents and warrants that it received a copy of the complete Agreement, the schedules and attachments to the Agreement, and any supplemental and related disclosures required by applicable Law.

21.4    Understanding of Agreements.  Franchise Dealer represents and warrants that it has read and understands this Agreement, any schedules and attachments, and any related or supplemental agreements, and that LNA has accorded Franchise Dealer ample time and opportunity to consult with advisers of Franchise Dealer's own choosing about the potential benefits and risks of entering into this Agreement.  Franchise Dealer represents and warrants that Franchise Dealer understands and shall operate the Businesses and the Marketing Premises in a manner so as to meet the commitments to the System.

Signed by the Parties.

Witness:

_____

Witness:

_____
John Pindynski, TSM

LUKOIL NORTH AMERICA LLC

By: _____
        Robert Ferluga
Title:   Chief Executive Officer

DEALER:  Kazmi Trading Corp.

By: _____
        Syed Munir Kazmi
Title:    President

(For Franchise Dealers that are corporations or other permitted business forms) Franchise Dealer designates the following person as the Key Individual:

_____Syed Munir Kazmi_____
Print Name

**ATTACHMENT TO**
**PMPA FRANCHISE AGREEMENT**

**DEFINITIONS**

| | |
|---|---|
| "Affiliate" | means a corporation or another type of corporate entity that controls, is controlled by or under common control with, the subject corporation or entity. |
| "Agreement" | has the meaning indicated in the preamble and includes all schedules, attachments, definitions and recitals to this Agreement. |
| "authorized representative of LNA" | means the Director of the LNA business unit responsible for Franchise Dealer's geographic area or an authorized LNA representative of higher authority. |
| "Business" | has the meaning indicated in Section 1.3. |
| "business day" | means any day, except weekends and LNA-recognized holidays. |
| "Co-Brand or Non-Lukoil Offering" | means the types of Related Businesses that may be specified under Section 1.3and under the Additional Co-Branding/Non-LNA Offering Provisions to the Agreement. |
| "Confidential Information" | has the meaning indicated in Article V. |
| "Contract Volumes" | has the meaning indicated in Section 2.1. |
| "Contribution Program" | has the meaning indicated in Section 10.3. |
| "Covered Interests" | has the meaning indicated in Section 13.1(a). |
| "day" | means calendar day. |
| "failure" | has the meaning indicated in Section 18.2(g). |
| "Fuel Requirements" | has the meaning indicated in Section 2.7(a). |
| "Franchise" | has the meaning indicated in Section 1.1. |
| "Franchise Dealer" | has the meaning indicated in the preamble. |
| "franchise dealer" | means a person that operates a Retail Outlet under a franchise agreement with LNA. |
| "Franchise Relationship" | has the meaning indicated in Section 1.1. |
| "includes" | means "includes, but is not limited to,". |
| "including" | means "including, but not limited to," |
| "Indemnitees" | has the meaning indicated in Section 18.2. |
| "individual" | means a single natural person. |
| "Instructions" | has the meaning indicated in Section 9.17. |
| "Interest" | has the meaning indicated in Section 12.1. |
| "Key Individual" | has the meaning indicated in Section 4.1(b). |
| "key individual" | means an individual, with respect to a franchise dealer, who meets the definition of the Key Individual. |
| "Key Market" | means a geographic area designated by LNA from time to time as a key market for the retail sale of the Products. |
| "Laws" | means laws, case law, rules, regulations and orders of governmental authority, whether federal, state or local, with jurisdiction over the Parties, property or this Agreement. |
| "legal fees and costs" | includes court costs, expert and attorneys' fees and disbursements (including reasonable allocated costs of in-house counsel and staff) whether or not incurred pursuant to litigation. |

| | |
|---|---|
| "Lessee Dealer" | means for purposes of this Agreement, Franchise Dealer, if LNA owns, leases or otherwise has the right to grant the use or possession of the Marketing Premises and LNA leases, or offers to lease, the Marketing Premises to Franchise Dealer in accordance with the Lessee Dealer Lease Provisions. |
| "Lessee Dealer Lease Provisions" | has the meaning indicated in Section 2.1 (c). |
| "Losses" | has the meaning indicated in Section 18.1. |
| "Lukoil Outlet" | has the meaning indicated in Recital A. |
| "Manager" | has the meaning indicated in Section 8.1(b). |
| "Minimum Acceptable Rating" | has the meaning indicated in Section 6.5. |
| "Motor-Fuels Business" | has the meaning indicated in Section 1.1(c). |
| "Multi-Unit Operator" | has the meaning indicated in Section 4.2. |
| "Offer" | has the meaning indicated in Section 13.1(b). |
| "Other System" | has the meaning indicated in Recital A. |
| "Ownership Interest" | has the meaning indicated in Section 4.5. |
| "Party" | means LNA or Franchise Dealer and their successors and assigns as permitted by this Agreement. |
| "person" | means any natural person or any corporation, company, partnership, joint venture or other form of organization. |
| "PMPA" | has the meaning indicated in Section 1.1. |
| "POS" | has the meaning indicated in Section 9.17. |
| "Proceeding" | has the meaning indicated in Section 18.2. |
| "Product Security" | has the meaning indicated in Section 2.4. |
| "Products" | has the meaning indicated in Section 2.1. |
| "Program" | has the meaning indicated in Section 9.17. |
| "Proprietary Marks" | has the meaning indicated in Recital B. |
| "Purchase Schedule" | has the meaning indicated in Section 2.1 (a)(iii). |
| "Related Business" | has the meaning indicated in Section 1.3 (a). |
| "Related Party" | has the meaning indicated in Section 18.2 (a). |
| "Reseller" | means Franchise Dealer, if Franchise Dealer is not a Lessee Dealer for purposes of the Agreement. |
| "Reseller Additional Provisions" | has the meaning indicated in Section 2.1 (b). |
| "Retail Outlet" | has the meaning indicated in Recital A. |
| "Standards" | has the meaning indicated in Section 6.1. |
| "Standards Handbook" | has the meaning indicated in Section 6.1. |
| "System" | has the meaning indicated in Recital A. |
| "Term" | has the meaning indicated in Section 1.5. |
| "Transfer" | has the meaning indicated in Section 12.1. |
| "Transferor" | has the meaning indicated in Section 12.1. |
| "Unleaded Gasoline Requirements" | has the meaning indicated in Section 2.7 (b). |

All references in this Agreement to the masculine, neuter or singular are to be construed to include the masculine, feminine, neuter or plural, where applicable.

## PETROLEUM MARKETING PRACTICES ACT (PMPA)

AN ACT To provide for the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competitor in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Petroleum Marketing Practices Act".*

### TABLE OF CONTENTS

### TITLE I-FRANCHISE PROTECTION

Sec. 2801. Definitions.
Sec. 2802. Franchise relationship; termination and nonrenewal.
Sec. 2803. Trial franchises and interim franchises; nonrenewal.
Sec. 2804. Notification of termination or nonrenewal.
Sec. 2805. Enforcement.
Sec. 2806. Relationship of this title to State law.

### TITLE 1-FRANCHISE PROTECTION

DEFINITIONS

Sec. 2801.  Definitions

As used in this subchapter:

(1)   (A) The term "**franchise**" means any contract-

       (i) between a refiner and a distributor,

       (ii) between a refiner and a retailer,

       (iii) between a distributor and another distributor, or

       (iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

    (B) The term "**franchise**" includes-

       (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

       (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-

       (I) under a trademark owned or controlled by a refiner; or

       (II) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2)   The term "**franchise relationship**" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3)   The term "**franchisor**" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4)   The term "**franchisee**" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5)   The term "**refiner**" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6)   The term "**distributor**" means any person, including any affiliate of such person, who-

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7)   The term "**retailer**" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8)   The term "**marketing premises**" means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

(9)   The term "**leased marketing premises**" means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment or distribution of motor fuel.

(10) The term "**contract**" means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term "**trademark**" means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term "**motor fuel**" means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term "**failure**" does not include-

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C)   any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14) The term "**fail to renew**" and "**nonrenewal**" mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship-

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15) The term "**affiliate**" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16) The term "**relevant geographic market area**" includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

(17) The term "**termination**" includes cancellation.

(18) The term "**commerce**" means any trade, traffic, transportation, exchange, or other commerce-

(A) between any State and any place outside of such State; or

(B) which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

(19) The term "**State**" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

## FRANCHISE RELATIONSHIP; TERMINATION AND NONRENEWAL

Sec. 2802.  Franchise relationship

(a)   General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may-

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b)   Precondition and grounds for termination or nonrenewal

(l) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if-

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if-

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) in this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) in this title.

(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if-

(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if-

(i) such determination-

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises-

(I) the franchisor, during the 180-day period after notification was given pursuant to section 2804 in this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor' interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3) For purposes of this subsection, the following are grounds for **nonrenewal** of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if-

(i) such charges or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if-

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if-

(i) such determination is-

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this section, either-

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c)   Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee;

(3) continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if-

(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

(i) of the duration of the underlying lease; and

(ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

(B) during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchise any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of-

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for-

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; or

(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title-

(i) made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

(ii) if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

(5) condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

(7) destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9) failure by the franchisee to operate the marketing premises for-

    (A) 7 consecutive days, or

    (B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

(11) knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises; and

(12) conviction of the franchisee of any felony involving moral turpitude.

(d)   Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)-

(1) if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

(2) if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.

TRIAL FRANCHISES AND INTERIM FRANCHISES; NONRENEWAL

Section 2803. Trial and interim franchises

(a)   Nonapplicability of statutory nonrenewal provisions

The provisions of section 2802 of this title shall not apply to the nonrenewal of any franchise relationship-

(1) under a trial franchise; or

(2) under an interim franchise.

(b)   Definitions

For purposes of this section-

(1) The term "**trial franchise**" means any franchise-

    (A) which is entered into on or after June 19, 1978;

(B) the franchisee of which has not previously been a party to a franchise with the franchisor;

(C) the initial term of which is for a period of not more than 1 year; and

(D) which is in writing and states clearly and conspicuously-

(i) that the franchise is a trial franchise;

(ii) the duration of the initial term of the franchise;

(iii) that the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of section 2804 of this title, of the franchisor's intention not to renew the franchise relationship; and

(iv) that the provisions of section 2802 of this title, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise.

(2) The term "**trial franchise**" does not include any unexpired period of any term of any franchise (other than a trial franchise, as defined by paragraph (1)) which was transferred or assigned by a franchisee to the extent authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to which provision of the franchise.

(3) The term "**interim franchise**" means any franchise-

(A) which is entered into on or after the date of June 19, 1978;

(B) the term of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years;

(C) the effective date of which occurs immediately after the expiration of a prior franchise, applicable to the marketing premises, which was not renewed if such nonrenewal-

(i) was based upon a determination described in section 2802(b)(2)(E) of this title, and

(ii) the requirements of section 2802(b)(2)(E) of this title were satisfied; and

(D) which is in writing and states clearly and conspicuously-

(i) that the franchise is an interim franchise;

(ii) the duration of the franchise; and

(iii) that the franchisor may fail to renew the franchise at the conclusion of the term stated in the franchise based upon a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located if the requirements of section 2802(b)(2)(E) (ii) and (iii) of this title are satisfied.

(c)   Nonrenewal upon meeting statutory notification requirements

If the notification requirements of section 2804 of this title are met, any franchisor may fail to renew any franchise relationship-

(1) under any trial franchise, at the conclusion of the initial term of such trial franchise; and

(2) under any interim franchise, at the conclusion of the term of such interim franchise, if-
(A) such nonrenewal is based upon a determination described in section 2802(b)(2)(E) of this title; and

(B) the requirements of section 2802((b)(2)(E) (ii) and (iii) of this title are satisfied.

NOTIFICATION OF TERMINATION OR NONRENEWAL

Sec. 2804. Notification of termination or nonrenewal of franchise relationship

(a)   General requirements applicable to franchisor

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship-

(1) in the manner described in subsection (c) of this section; and

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)   Additional requirements applicable to franchisor

(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section-

(A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

(B) in the case of leased marketing premises, such franchisor -

(i) may not establish a new franchise relationship with respect to such premises before the expiration of the 30 day period which begins-

(I) on the date notification was posted or personally delivered, or

(II) if later, on the date on which such termination or nonrenewal takes effect; and

(ii) may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

(2) In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall-

(A) furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

(B) promptly provide a copy to such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

(c)   Manner and form of notification

Notification under this section-

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain-

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor,

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

(d)   Preparation, publication, etc., of statutory summaries

(l) Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

(2) In the case of summaries required to be furnished under the provisions of section 2802((b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.


ENFORCEMENT

Sec. 2805. Enforcement provisions

(a)   Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchise may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of-

(1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

(2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

(b)   Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

(1) In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 or 2803 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

(2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if-

(A) the franchisee shows-

(i) the franchise of which he is a party has been terminated or the franchise relationship to which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

(3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

(4) In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced-

(A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

(B) more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

(C) more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c)   Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d)   Actual and exemplary damages and attorney and expert witness fees to franchisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

(1) If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled-

(A) consistent with the Federal Rules of Civil Procedure, to actual damages;

(B) in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

(C) to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

(2) The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

(3) In any action under subsection (a) of this section, the court may, in its discretion direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e)   Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franchisee to actual damages and attorney and expert witness fees unaffected

(1) In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that-

(A) the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business-

(i) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(ii) to materially alter, add to, or replace such premises,

(iii) to sell such premises,

(iv) to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

(v) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

(B) the requirements of section 2804 of this title have been complied with.

(2) The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f)   Release or waiver of rights

(1)   No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive-

(A) any right that the franchisee has under this subchapter or other Federal law; or

(B) any right that the franchisee may have under any valid and applicable State law.

(2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

## RELATIONSHIP OF THIS TITLE TO STATE LAW

Sec. 2806. Relationship of statutory provisions to State and local laws

(a)   Termination or nonrenewal of franchise

(1) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing to notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

(2) No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise of nonrenewal of a franchise relationship authorized by this subchapter.

(b)   Transfer or assignment of franchise

(1) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.

### LESSEE DEALER LEASE PROVISIONS
### TO
### PMPA FRANCHISE AGREEMENT

### LNA Site # 57254

This Indenture of Lease and Lessee Dealer Lease Provisions (collectively, "Lease") are a part of, and incorporated into, the PMPA Franchise Agreement ("Agreement") between LUKOIL North America LLC ("LNA") and **Kazmi Trading Corp.** ("Franchise Dealer") with a Term beginning on **September 15, 2017** (the "Effective Date").

### ARTICLE I
### LEASE OF MARKETING PREMISES

1.1     Lease.  Subject to the terms and conditions of this Lease and the Agreement, LNA leases to Franchise Dealer, and Franchise Dealer leases from LNA, the following marketing premises (the "Marketing Premises"):

**1497 Prospect Park, Trenton, NJ  08638**

which includes the improvements, now or at any time during the Term, located on the Marketing Premises and all equipment listed on the attachment entitled "Lease Schedule" which attachment is incorporated into this Lease.  The Lease Schedule may be amended in writing by the Parties from time to time or by LNA as provided in this Lease.

1.2     Underlying Lease.

(a)     Franchise Dealer acknowledges:

(i)      that Franchise Dealer has received notice in writing prior to the commencement of the Term that this Lease, the Agreement and all or a material portion of the Marketing Premises are subject to one or more underlying leases held by LNA which expire as follows:

Expiration Date:  N/A

and

(ii)     that any underlying lease or leases might expire and not be renewed.

(b)     If any underlying lease expires or is terminated during the Term or any extension of the Term, LNA may terminate or nonrenew this Lease, the Agreement and the Franchise Relationship 30 days prior to the date of expiration or termination of the underlying lease.  LNA is under no obligation to renew any underlying lease or to exercise any options including any option to renew or purchase, nor is LNA under any obligation to seek an extension for any such renewal or for exercise of any option.

This Section 1.2 may not be construed as a waiver of any other right of termination or nonrenewal which LNA may have.

1.3     Exclusions; Reservations.  This Lease:

1

(a)    is subject to:

    (i)    any state of facts that an accurate survey might show,

    (ii)    existing or future easements, encumbrances, covenants, restrictions and reservations, if any,

    (iii)    existing or future mortgages or deeds of trust,

    (iv)    any underlying lease or leases,

    (v)    the right of LNA, its Affiliates, LNA's landlord, if any, and their respective employees, vendors, contractors and representatives to enter the Marketing Premises under this Lease, the Agreement or any related or supplemental agreement, and

    (vi)    building restrictions and zoning;

(b)    excludes from the Marketing Premises any prior lease or grant by LNA;

(c)    reserves to LNA the rights to use, or grant to other persons the use of, the following portions of the Marketing Premises (the "Perimeter"):

    (i)    a 10-foot wide strip along the perimeter of the Marketing Premises, or

    (ii)    other area or areas, as determined necessary or appropriate by LNA, for any reasonable use including:

    (A)    erecting and maintaining signs and billboards,

    (B)    installing and maintaining any utilities or storm-water drainage systems,

    (C)    providing access for vehicles and pedestrians,

    (D)    conducting construction and maintenance activities, and

    (E)    performing investigation, monitoring and remediation environmental activities, and

    (F)    locating, operating and maintaining communication facilities and services (including wireless communication facilities); and

(d)    reserves to LNA the right, but not the obligation, to exclude from this Lease and the Agreement at any time or from time to time a portion of the Marketing Premises used for a Related Business if Franchise Dealer does not operate, stops operating, or is required by LNA under the Agreement or any related or supplemental agreement to stop operating, that Related Business at the Marketing Premises. Upon such exclusion:

    (i)    Franchise Dealer may use only nonexcluded portions of the Marketing Premises

including those structures or improvements on the Marketing Premises designated by LNA for Franchise Dealer's use in operating the remaining Businesses;

(ii)    LNA shall reduce the Rent by an amount determined by LNA to reflect the value of the excluded portion of the Marketing Premises;

(iii)    LNA, its Affiliates, any lessee or licensee of LNA or its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors may use the nonexcluded portion of the Marketing Premises for ingress and egress to the excluded portion of the Marketing Premises; and

(iv)    Franchise Dealer shall cooperate fully with LNA, its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors in operating any business or conducting any activities on the excluded portion of the Marketing Premises including reaching reasonable agreements on utility expenses and other matters of mutual interest.

LNA's rights under this Section 1.3(d) are in addition to other rights and remedies that LNA may have in connection with Franchise Dealer's failure to comply with provisions of the Agreement and any related or supplemental agreements including the right to terminate or nonrenew the Agreement, the Franchise and the Franchise Relationship.

1.4    Condition of Marketing Premises and Equipment. FRANCHISE DEALER ACCEPTS THE MARKETING PREMISES AND ALL EQUIPMENT LISTED IN THE LEASE SCHEDULE IN THEIR PRESENT CONDITION, AS IS, WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY AS TO THEIR CONDITION, INTERFERENCE, INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR ANY PURPOSE. LNA IS NOT RESPONSIBLE OR LIABLE TO FRANCHISE DEALER, ITS EMPLOYEES, AGENTS, CUSTOMERS, VENDORS OR CONTRACTORS FOR ANY DEFECT OR CHANGE IN THE CONDITION OF THE MARKETING PREMISES. Franchise Dealer also acknowledges that it has had the full and complete opportunity to inspect independently the Marketing Premises and the improvements thereon and the Equipment and that Franchise Dealer has done so to its complete satisfaction. Franchise Dealer also acknowledges that it has not received from LNA or from any other person any warranty, representation or assurance concerning or relating to the Marketing Premises, the improvements thereon or the Equipment, on which Franchise Dealer is relying in entering into this Lease, including but not limited to, any warranties, representations or assurances concerning compliance with Federal, State or Industrial Safety Codes or compliance with other applicable laws.

1.5    Subordination. This Lease and all rights of Franchise Dealer under this Lease, the Agreement and all related and supplemental agreements are subject and subordinate in all respects to all existing and future:

(a)    ground leases, overriding leases and underlying leases of all, or any portion of, the Marketing Premises now or hereafter existing;

(b)    mortgages, which may now or later affect the Marketing Premises, any equipment, fixtures, leases and leasehold estates, whether or not any mortgages also cover property other than the Marketing Premises or leases;

(c)    each and every advance made or to be made under any mortgages;

(d)    all renewals, modifications, replacements and extensions of any leases or mortgages; and

(e)    all spreaders, consolidations and correlations of any mortgages.

The term "mortgages" includes deeds of trust and other financing agreements. The provisions of this Section 1.5 are self-executing and do not require further documentation. Without limiting the preceding sentence, upon LNA's request, Franchise Dealer shall sign and deliver any and all documents and take such action, as LNA may request to evidence any subordination.

1.6    Holding Over. Any holding over by Franchise Dealer does not constitute a renewal or extension of this Lease or the Agreement. LNA, at its option, may elect to treat a holdover as either a trespass or a tenancy at will. If, under the laws of the state in which the Marketing Premises are located, holding over creates a periodic tenancy, the holding over will, notwithstanding anything in this Section 1.6, create a month-to-month tenancy.

1.7    Subletting.

(a)    Unless Franchise Dealer receives LNA's prior express written approval, which approval may be withheld in LNA's sole discretion, Franchise Dealer may not:

    (i)    sublet or license all or any part of the Marketing Premises;

    (ii)    grant any right to any person to establish or operate a Related Business or any other business at the Marketing Premises including a Co-Brand or Non-Lukoil Offering;

    (iii)    except in compliance with Articles XII and XIII of the Agreement, Transfer any Interest in this Lease;

    (iv)    grant any other person a possessory interest in the Marketing Premises;

    (v)    encumber or hypothecate the Marketing Premises; or

    (vi)    grant any person any easement or concession in the Marketing Premises.

(b)    Any attempt by Franchise Dealer to take any of the actions specified in Section 1.7(a) without LNA's prior written approval is a default under this Lease and the Agreement and shall be null and void. If LNA does approve any actions specified in Section 1.7(a), Franchise Dealer shall comply with all conditions and requirements imposed by LNA on Franchise Dealer in giving the approval.

## ARTICLE II
## RENT

2.1    Rent; LNA Rent Policy. Dealer shall pay to LNA rent, without offset or deduction of any sort, for the Marketing Premises determined in accordance with LNA's Rent Policy. "LNA's Rent Policy" means a written policy adopted by LNA in good faith and in the ordinary course of business governing the rent to be charged LNA's lessee franchise dealers, as that policy may be modified by LNA at any time and from time to time. Except as provided in Section 2.5 of this

Lease, changes to LNA's Rent Policy after the Effective Date will not affect the calculation of the Asset-Based Maximum Rent under this Lease during the Term. Upon any renewal of the Franchise and Franchise Relationship, the rent, including the Asset-Based Maximum Rent, will be determined in accordance with LNA's Rent Policy or any successor LNA policy or program in effect at the time of renewal.

2.2     Initial Rent. Franchise Dealer shall pay to LNA rent for the initial 12-month period during the Term (the "Initial Rental Period") as specified in the attachment entitled "Rent Schedule" which is attached and incorporated into this Lease (the "Initial Rent").

2.3     Subsequent Rent. The Initial Rent and the rent determined in accordance with this Section 2.3 are sometimes collectively referred to as the "Base Rent". Franchise Dealer shall pay to LNA Base Rent for each 12-month period during the Term after the Initial Rental Period ("Subsequent Rental Period") as specified in the Rent Schedule, subject to the following:

(a)     Unless the Base Rent for a Subsequent Rental Period is specified in the Rent Schedule, LNA shall notify Franchise Dealer of any Base Rent increases at least 90 days prior to the first Subsequent Rental Period to which the increase applies;

(b)     except as provided under Section 2.5, LNA may not increase Franchise Dealer's Base Rent for any Subsequent Rental Period by an amount that is more than 10% of the Base Rent for the immediately preceding Initial Rental Period or immediately preceding Subsequent Rental Period, whichever is applicable;

(c)     except as provided under Section 2.5, Franchise Dealer's Base Rent during any Subsequent Rental Period may not exceed the Asset-Based Maximum Rent;

(d)     the Base Rent will be prorated if the last Subsequent Rental Period during the Term is less than 12 months; and

(e)     notwithstanding any other provision of this Lease, the Asset-Based Maximum Rent payable by the Franchise Dealer to LNA for the Marketing Premises subject to one or more underlying leases held by LNA shall not be less than the fixed, base or minimum rent payable by LNA pursuant to those underlying leases.

2.4     Asset-Based Rent.

(a)     The "Asset-Based Maximum Rent" means Base Rent calculated by multiplying the Assessed Value by 10%. Subject to Section 2.4(c), "Assessed Value" means:

    (i)         for the land constituting the Marketing Premises, the Appraised Land
                Value as determined in Section 2.4(b), and

    (ii)        for improvements, fixtures and equipment located on the Marketing Premises
                ("Other Property"):

    (A)         if LNA completed the installation, construction, substantial rebuild or
                purchase of Other Property within 12 months prior to the Effective Date,
                LNA's estimated costs as indicated in LNA's Authorization for
                Expenditure covering the Other Property ("Authorization for
                Expenditure" means LNA's written estimate of the total cost and expense

5

required to purchase, design, install and construct the Other Property, which estimate is used by LNA from time to time in the ordinary course of its business to authorize the internal allocation of funds or otherwise approve the design, installation, purchase or construction of the Other Property), or

(B)    if LNA completed the installation, construction, substantial rebuild or purchase of Other Property more than 12 months prior to the Effective Date, the depreciated replacement value of property as determined by LNA or its designee using a method specified by LNA in writing from time to time and based on:

(1)    actual age for all Other Property located below ground, including underground storage tanks and lines, and

(2)    apparent age, as determined by LNA or its designee, for all Other Property located above ground.

(b)    The following provisions apply to LNA's determination of the Appraised Land Value:

(i)    "Appraised Land Value" means the value of the land using the sales-comparison method based on its continued use as a motor fuel service station, and regardless of the nature of the underlying estate, as determined by LNA or its designee in accordance with assumptions and procedures determined and specified in writing by LNA from time to time.

(ii)    If Franchise Dealer objects to an Appraised Land Value first received on or after the Effective Date of this Lease, Franchise Dealer may, within 10 days after receipt of the Appraised Land Value and determination of Base Rent, by written notice to LNA inform LNA of Franchise Dealer's request to submit for independent determination of the Appraised Land Value (the "Independent Land Appraisal"). Franchise Dealer, at its expense, must obtain, and furnish to LNA, the Independent Land Appraisal within 30 days after Franchise Dealer's notice of request to LNA. An Independent Land Appraisal is not considered furnished to LNA until LNA has received an Independent Land Appraisal meeting the requirements of Section 2.4(b)(iii) and all information and documentation requested under Section 2.4(b)(iv). Failure to timely furnish the notice of intent, or to timely submit to LNA the Independent Land Appraisal, constitutes a waiver of Franchise Dealer's right to submit an Independent Land Appraisal or otherwise challenge the Appraised Land Value.

(iii)    The Independent Land Appraisal must:

(A)    be based on the continued use of the land as a motor fuel station, regardless of the nature of the underlying estate,

(B)    use the assumptions and procedures specified by LNA under Section 2.4(b)(i), and

(C)     be performed by a certified appraiser who is a Member of the Appraisal Institute.

(iv)     Upon receipt of any appraisal intended by Franchise Dealer to meet the requirements of an Independent Land Appraisal, LNA may request, and Franchise Dealer shall promptly furnish, documentation and information requested by LNA to allow it to understand the basis of the appraisal or to confirm that the appraisal meets the requirements of this Section 2.4(b).  Upon timely receipt of an Independent Land Appraisal meeting the requirements of this Section 2.4(b), LNA shall either average the Appraised Land Value determined by LNA or its designee and the Independent Land Appraisal and the resulting value will be the Appraised Land Value for purposes of determining the Assessed Value, or shall submit both appraisals for a binding third appraisal,  to be conducted by a certified appraiser who is a Member of the Appraisal Institute, on the same bases, assumptions and procedures as set forth above, with the third appraisal's fees and expenses to be borne equally between LNA and Franchise Dealer, for a determination at or between the two other appraisals.. Franchise Dealer's right to submit an Independent Land Appraisal, or otherwise challenge the Assessed Value does not apply to LNA's assessment, appraisal or valuation of Other Property.

(c)     In lieu of calculating the Assessed Value as provided in Section 2.4 (a) and (b), LNA may, in its sole discretion, use as the Assessed Value the present Assessed Value, any other existing appraised or assessed value, or net book value, whether or not calculated on the basis described above, until an Appraised Land Value is determined on or after the effective date of this Lease.

2.5     Base Rent Adjustments.  LNA may adjust the Base Rent and the Asset-Based Maximum Rent as follows:

(a)     LNA may, in addition to adjusting the Asset-Based Maximum Rent under Section 2.5(e), increase the Base Rent during the Term in accordance with LNA's Rent Policy then in effect, if:

(i)     LNA redevelops the Marketing Premises under Section 7.1; and

(ii)     if either of the following applies:

(A)     the Term exceeds 3 years, or

(B)     the Effective Date is on or after March 1, 2010.

The increase in Base Rent under this Section 2.5(a) will take effect in the month immediately following substantial completion of the improvement or investment as determined by LNA.

(b)     Upon a Transfer, LNA may increase the Base Rent in accordance with LNA's Rent Policy then in effect.

(c)     If the Term exceeds 5 years, LNA may adjust the Asset-Based Maximum Rent during the Term, at any time following the fifth anniversary of the Effective Date, to conform it to the maximum

rent provided in LNA's Rental Policy then in effect.  LNA shall furnish Franchise Dealer with written notice of any adjustment to Base Rent advising Franchise Dealer of the effective date of the adjustment.

(d)     LNA may adjust the Asset-Based Maximum Rent or the Base Rent during the Term to conform to the Base Rent provided in LNA's then current Rental Policy, if at any time any Laws, or federal, state or local governmental action pursuant to Laws, has been taken, adopted or imposed that significantly alters LNA's reasonable expectations at the time of entering into this Agreement including:

    (i)     any governmental tax, fee, duty, charge or other imposition on, or measured by, rent collected pursuant to this Agreement; or

    (ii)    any Laws that affect Franchise Dealer's obligation to purchase the Products from LNA in accordance with Section 2.1 of the Agreement.

This Section 2.5(d) may not be construed to limit LNA's right to terminate or nonrenew the Agreement, the Franchise and the Franchise Relationship under Section 14.2 of the Agreement.

(e)     LNA may adjust the Asset-Based Maximum Rent or the Base Rent during the Term following any redetermination by LNA of the Assessed Value in connection with:

    (i)     a reassessment or re-evaluation following any LNA redevelopment of the Marketing Premises under Article VII of this Lease if:

        (A)     the Term exceeds  3 years, or

        (B)     the Effective Date is on or after March 1, 2010; or

    (ii)    any periodic reassessments or re-evaluations of the Assessed Value of the Marketing Premises as specified under LNA's Rental Policy.

(f)     If LNA adjusts the Base Rent or Asset-Based Maximum Rent under Section 2.5(a), (c), (d) or (e)(i), Franchise Dealer may terminate this Agreement by written notice furnished to LNA within 30 days following LNA's notice of Base Rent adjustment.  Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 2.5(f).  Upon termination and at LNA's request, Franchise Dealer shall sign and deliver to LNA a mutual termination agreement and other agreements or instruments as requested by LNA for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

(g)     Any adjustment to Base Rent under this Section 2.5 is:

    (i)     not subject to the 90-day notice requirement under Section 2.3(a); and

    (ii)    is in addition to any Base Rent adjustment under Section 2.3(b).

(h)     Nothing contained in this Section 2.5 may be construed to prevent the Parties from mutually agreeing to any other adjustment to the Base Rent or the Asset-Based Maximum Rent by separate written agreement.

(i)     Franchise Dealer acknowledges that LNA's Rent Policy may provide for variations based on, among other things, differences between markets, legal jurisdictions and geographic areas.

2.6     Payment of Rent.  Without offset, abatement, reduction or recoupment, Franchise Dealer shall pay Base Rent monthly in advance or upon other timing specified by LNA in writing.  Subject to applicable Laws, LNA may impose a late payment charge as designated by LNA from time to time for each Base Rent payment not received by LNA when due, which charge is in addition to other remedies available to LNA including termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship and the imposing of charges under Section 2.3 of the Agreement.  Franchise Dealer shall pay Base Rent in the manner as LNA may, in its sole discretion, specify in writing from time to time including any of the following, or combination of the following:

(a)     any manner specified by LNA under Section 2.3 of the Agreement;

(b)     one or more installments as specified by LNA; or

(c)     collection on a cents-per-gallon basis upon delivery of Products with monthly accountings for any deficiencies or overages of rent collected.

2.7     Rent and Maintenance Security.  Upon request by LNA, and in addition to any Product Security, Franchise Dealer shall provide and maintain security in a minimum amount equal to three months rental ("Rent and Maintenance Security").  LNA may use, without prior notice or demand, any or all of the Rent and Maintenance Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to LNA including, but not limited to indebtedness for failure to pay Base Rent, or Additional Rent (defined below) or perform Franchise Dealer's maintenance obligations.  If LNA uses any Rent and Maintenance Security to satisfy all or part of an indebtedness or obligation, Franchise Dealer immediately shall provide LNA with additional security, as directed by LNA, to replace the Rent and Maintenance Security.  Following nonrenewal or termination of the Franchise Relationship between LNA and Franchise Dealer, LNA shall return to Franchise Dealer, in accordance with LNA's procedures then in effect, any remaining portion of the Rent and Maintenance Security not required to satisfy all or any part of any indebtedness or other obligation of Franchise Dealer to LNA.

2.8     Modifications Upon Renewal.  No provision of this Lease or the Agreement may be construed to prevent or limit LNA's right to modify the terms or conditions of the Agreement, or offer additional or different terms to Franchise Dealer, upon a renewal of the Franchise and Franchise Relationship including LNA's right to make any modification or new terms relating to rent.

2.9     Personal Property.

(a)     All personal property and equipment listed on the Lease Schedule:

        (i)     is subject to the terms and condition of this Lease and the Agreement; and

        (ii)    is to be considered loaned personal property or equipment and, unless expressly specified in the Lease Schedule, is not to be allocated any portion of the Rent under this Article II.

(b)     Maintenance, repairs or replacement of loaned personal property or equipment by Franchise Dealer does not entitle Franchise Dealer to any abatement, set off or deduction of rent.  LNA may

at any time or from time to time alter, change, remove or add to the personal property or equipment loaned or leased to Franchise Dealer in LNA's sole discretion. Franchise Dealer shall not remove from the Marketing Premises any personal property or equipment loaned or leased by LNA to Franchise Dealer.

## ARTICLE III
## FRANCHISE DEALER OBLIGATIONS

3.1   Utilities, Taxes and Licenses. In addition to Base Rent under Article II, Franchise Dealer shall pay, as additional rent (the "Additional Rent", and together with the Base Rent, the Rent):

(a)   all utility charges and other expenses incurred in the operation of the Marketing Premises, except as may expressly be provided otherwise in this Lease; and

(b)   all taxes, levies, assessments and charges imposed by governmental authority on the Marketing Premises or its use including, but not limited to, business use taxes and license fees, real property taxes and personal property taxes on the land and buildings and on LNA's equipment (collectively, the "Taxes"). LNA will collect the actual or estimated Taxes in equal installments in advance with each payment Base Rent payment. Any overpayment or underpayment shall be paid by Franchise Dealer or credited by LNA upon LNA's determination of the actual Taxes.

3.2   Agreement Provisions. Franchise Dealer shall comply with all provisions of the Agreement including compliance with the Standards.

3.3   No Liens. Franchise Dealer shall keep the Marketing Premises and any LNA equipment or other property free of all liens, claims and encumbrances.

3.4   Condemnation. Without limiting any provisions of the Agreement, Franchise Dealer shall comply with all Laws governing condemnation or eminent domain awards. All sums payable by a condemning authority for a taking of any portion of the Marketing Premises, whether payable due to a purchase in lieu of condemnation, a settlement reached after the initiation of condemnation proceedings, a final judgment or otherwise, will be paid to LNA, and Franchise Dealer has no interest whatsoever in those sums; except that Franchise Dealer may receive any sum payable to Franchise Dealer by the condemning authority for loss of goodwill by Franchise Dealer. Franchise Dealer shall notify LNA promptly upon Franchise Dealer's receipt of any notice, or other communication, of a taking or proposed taking of any portion of the Marketing Premises from any condemning authority. LNA shall have the right to settle or dispute any condemnation proceedings in its sole discretion. Franchise Dealer may not independently participate in any condemnation proceedings affecting the Marketing Premises, but shall cooperate fully with LNA in any condemnation proceedings. Franchise Dealer shall sign and deliver any documents, and take other action, requested by LNA in connection with condemnation proceedings or any settlement of those proceedings.

3.5   Surrender in Good Condition.

(a)   Upon termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship:

(i)      Franchise Dealer immediately shall surrender the Marketing Premises to LNA in good order and condition; and

10

(ii)      in addition to any other rights or remedies of LNA, LNA may repossess the Marketing Premises and operate the Marketing Premises through LNA's employees, contractors or agents.

(b)    Upon exclusion of any portion of the Marketing Premises under Section 1.3(d), Franchise Dealer immediately shall surrender the excluded portion of the Marketing Premises to LNA in good order and condition.

3.6    <u>Business Records</u>.  Franchise Dealer shall maintain current, accurate and complete business records, including all records required under Articles IV and V of this Lease.

3.7    <u>Telephones; Devices</u>.

(a)    Unless Franchise Dealer obtains LNA's prior written consent (which consent LNA may withhold in its sole discretion), Franchise Dealer shall not place on the Marketing Premises, or permit the placement anywhere on the Marketing Premises of:

(i)      any pay telephones;

(ii)      pay air towers, pay toilets or token or coin-operated devices, including without limitation, amusement devices;

(iii)    dispensing devices;

(iv)    vending machines;

(v)     merchandising equipment for any products (including beverages, ice, candy or tobacco products);

(vi)    ice vending or storage machines; or

(vii)   trailers.

(b)    If LNA consents to the placement of any item under Section 3.7(a), Franchise Dealer shall comply with all conditions or requirements that LNA may impose in giving its consent.

3.8    <u>Storage; Parking</u>.  Franchise Dealer shall not use, or permit the use of, the Marketing Premises for the rental, storage or parking of any devices, vehicles or equipment.  Franchise Dealer shall not place on the Perimeter any property or improvements, including signs, vehicles or structures, without LNA's prior written consent.

3.9    <u>Equipment</u>.  Franchise Dealer shall provide and maintain at its sole cost all equipment and personal property necessary for Franchise Dealer's operation of the Businesses which equipment is not supplied by LNA.

3.10    <u>Use</u>.  Franchise Dealer shall use the Marketing Premises in compliance with all provisions of the Agreement (including this Lease) and only for operation of the Businesses specified in the Agreement.

## ARTICLE IV
## MAINTENANCE OBLIGATION

4.1     Allocation of Maintenance Obligations.  As provided in this Article IV, each Party shall maintain that equipment and property allocated to it in the schedule entitled "Maintenance Schedule" attached to and incorporated into this Lease.  Franchise Dealer also shall maintain any property or equipment located at the Marketing Premises or otherwise used in the Businesses which property or equipment is not specified in the Maintenance Schedule.  Franchise Dealer acquires no ownership interest in property or equipment belonging to LNA, but leased or loaned to Franchise Dealer, because of Franchise Dealer's compliance with Franchise Dealer's maintenance, repair and replacement obligations.

4.2     LNA Obligations.

(a)     Subject to this Section 4.2 and Section 4.4, LNA shall repair or replace the equipment and property allocated to it in the Maintenance Schedule as determined by LNA as necessary to keep them in good operating condition, if the need for any repair or replacement is due to ordinary wear and tear or damage by the elements.  LNA's obligation to repair or replace does not arise unless and until:

    (i)     Franchise Dealer notifies by telephone LNA's Maintenance Center or designated contractor that the equipment or property is not in good operating condition; and

    (ii)    LNA determines in its sole discretion (which determination shall be made within a reasonable period of time) that the repair is necessary and is due to ordinary wear and tear or damage by the elements.

(b)     Franchise Dealer shall:

    (i)     render any damaged or malfunctioning equipment or property harmless;

    (ii)    not use the equipment or property, or permit it to be used, until repaired or replaced; and

    (iii)   take action as may be necessary to make the area safe including posting warnings and preventing access.

(c)     If, within five business days following Franchise Dealer's telephone notification, LNA does not commence the repairs or replacement or notify Franchise Dealer that LNA will not make any repairs or replacement, Franchise Dealer shall furnish additional notice in writing to the Manager of Maintenance and Environmental or an authorized LNA representative of higher authority.  In lieu of any repairs, LNA may make replacements.

(d)     LNA is not obligated to make any repairs or replacements under this Article IV, if LNA has furnished to Franchise Dealer a notice of termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship, including termination or nonrenewal based on LNA's determination:

    (i)     to withdraw from a geographic market area;

    (ii)    to convert the Marketing Premises to a use other than the sale of motor fuel;

12

(d) implement a maintenance program in accordance with Section 4.4 and Franchise Dealer's obligations under the Maintenance Schedule; and

(e) keep accurate and updated records of all preventive maintenance inspections and of all maintenance performed by Franchise Dealer and show the records to LNA upon request.

**ARTICLE V**
**ENVIRONMENTAL PROTECTION**

5.1 Inventory Reconciliation.

(a) Franchise Dealer acknowledges that the Marketing Premises contain underground tanks for the storage of petroleum products and that the release of the Products into the environment can cause serious damage to property, soil and ground water. To detect tank or piping leaks in order to safeguard the environment and prevent loss to either Franchise Dealer or LNA, Franchise Dealer shall measure the inventory of all underground storage tanks daily by tank sticking or other LNA-supplied measurement techniques, and reconcile the measured inventory with meter readings daily. Franchise Dealer shall keep a daily log of all underground tank inventory readings at the Marketing Premises, which shall be available for inspection by LNA or government authorities as required by applicable Law.

(b) To the extent that other requirements relating to environmental protection, including sampling of monitoring wells, preparing records of reports, or complying with notification requirements, are communicated by LNA to Franchise Dealer and without limiting Franchise Dealer's obligation to comply with the provisions of this Article V, Franchise Dealer additionally shall fully comply with all such requirements including any environmental Standards.

(c) Franchise Dealer shall maintain all loss, inventory-reconciliation and other environmental records or reports on the Marketing Premises for a period of three years. Franchise Dealer shall also make available all such loss records or reports for inspection by LNA or by government authorities as required by applicable Laws.

(d) If Franchise Dealer fails to properly measure and reconcile inventory, maintain records and perform other environmental protection activities as required by applicable Law, this Lease, the Agreement or any related or supplemental agreements, or as specified by LNA from time to time, Franchise Dealer waives any and all rights that Franchise Dealer may have against LNA resulting from any environmental contamination or leakage including any claims for the value of lost Products. This waiver is in addition to other remedies and indemnities of LNA including termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship.

(e) Franchise Dealer shall permit LNA, its Affiliates and their respective employees, agents and contractors to enter the Marketing Premises at all times to inspect or test for contamination or leakage and conduct any excavation, remediation, monitoring or other activities in connection with any environmental contamination or leakage.

5.2 Notice; Remedy.

(a) Franchise Dealer shall notify LNA immediately by telephone, confirmed in writing, of any indication or suspicion of environmental contamination or leakage. As required by Laws, Franchise Dealer also shall notify all local governmental authorities of any contamination or leakage. If Franchise Dealer fails to notify LNA immediately of any indication or suspicion of

14

contamination or leakage, Franchise Dealer waives any and all rights that Franchise Dealer has, or may have, against LNA resulting from the contamination or leakage including, but not limited to, any claims for the value of lost Product. This waiver is in addition to other remedies or indemnities of LNA including termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship.

(b)    Upon receipt of Franchise Dealer's notice, LNA shall use reasonable efforts to repair or otherwise remedy the cause of the leakage and return the Marketing Premises to full operation. Where determined appropriate in its judgment, LNA shall reduce or eliminate Base Rent due LNA during any repair period. LNA is not liable for lost business or profits, or for incidental, punitive or consequential damages arising from or relating to repairs, removal of equipment from service or other actions taken in response to environmental contamination or leakage or for any delay in connection therewith.

5.3    Compliance With Laws. Franchise Dealer shall comply fully with all applicable Laws including those covering water, soil and air environmental protection and public health and nothing contained in this Lease may be construed to limit Franchise Dealer's obligation to comply with Laws. If Franchise Dealer does not dispose of waste in a proper manner or is not, in LNA's determination, complying with the requirements of these Laws, LNA may, but is not obligated to, enter upon the Marketing Premises and take such action as it deems necessary without liability to Franchise Dealer for business loss. Any cost incurred by LNA shall be paid by Franchise Dealer upon demand. This remedy is in addition to any remedies and indemnities of LNA including termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship.

5.4    Franchise Dealer's Acknowledgment. Franchise Dealer acknowledges that Franchise Dealer's failure to comply fully with this Article V constitutes a failure to comply with a reasonable and materially significant provision of the Agreement and the Franchise Relationship.

**ARTICLE VI**
**ADDITIONAL INDEMNITY AND INSURANCE**

6.1    Indemnity. In addition to the other indemnities provided in the Agreement, Franchise Dealer shall defend and indemnify the Indemnitees to the fullest extent permitted by Law for all Losses resulting or arising from:

(a)    any failure by Franchise Dealer to notify LNA of the need for repairs or any failure by Franchise Dealer to otherwise comply with Franchise Dealer's maintenance obligations as set forth in this Lease, the Agreement or any supplemental or related agreement; or

(b)    any default or breach of an underlying lease as a result of the acts or omissions of Franchise Dealer.

6.2    Types of Insurance Required. In addition to other insurance required by the Agreement, Franchise Dealer shall also obtain and maintain the following additional insurance coverage:

(a)    plate glass insurance, or security acceptable to LNA, in an amount sufficient to replace all plate glass and security glazing with like plate glass and security glazing in the event of loss or damage;

15

(b)     property insurance (all risk of physical damage or loss including the perils of flood or earthquake) insuring the building and all improvements now or hereinafter erected on the Marketing Premises for the full replacement value thereof;

(c)     fire and extended coverage insurance in an amount sufficient to cover Franchise Dealer's inventory and equipment, with a waiver of subrogation against LNA and its Affiliates; and

(d)     fire legal liability insurance in an amount sufficient to cover the value of the building and improvements at the Marketing Premises now or hereinafter erected and all equipment and personal property leased or loaned to Franchise Dealer by LNA.

6.3     Waiver of Subrogation; Notice of Cancellation or Change. Lessee shall assure that the insurance policies: (1) provide a waiver of subrogation in favor of Lessor where permissible by law; (2) allow for the separation of insureds; and (3) provide for written notice of cancellation or material change. Notice of cancellation or change will not affect the Insurance until 30 days after Lessor receives written notice. Any deductible or retention of insurable risks will be for the Lessee's account.

6.4.    Additional Insureds. Lessee shall assure the Insurance required in this article and evidence of the insurance issued to Lessee names Lessor, its parent, subsidiaries and affiliates and each of their respective successors and assigns, to the extent of their interests, and where applicable, Lessor's landlord and any mortgagee, as additional insureds, without regard to the allocation of liability provisions contained in this Lease, to the extent of any claim, loss, or liability within the scope of the required insurance. The parties intend that, to the extent of their interest, the status of Lessor and its parent, subsidiaries and affiliates, as additional insureds will not be limited by the indemnity obligations under this Lease or otherwise. Lessee shall secure from its insurance companies and provide to Lessor, for all required insurance, an additional insured endorsement without restriction.

6.5     Evidence of Insurance. At the time of execution of this Lease, and upon request during the term of this Lease, Lessee shall provide Lessor with evidence of insurance that Lessee is in compliance with Lessor's insurance requirements. Lessee's failure to provide evidence of the insurance, or to purchase insurance coverage in compliance with this Article VI, will not relieve Lessee of its obligations in this Article VI.

6.6     Agreement Provisions. The provisions of Article XI or XVIII of the Agreement apply to the insurance and indemnity requirements under this Article VI.

6.7     Use of Proceeds. LNA may in its sole discretion elect to keep any insurance proceeds in lieu of repairing, replacing or rebuilding the Marketing Premises or any personal property or equipment.

6.8     Insurance Proceeds. In the event that Franchise Dealer is paid insurance proceeds that are for the loss, replacement, or repair of equipment or property that is either (a) the responsibility of LNA to replace or repair or (b) that LNA has in fact replaced or repaired, then Franchise Dealer shall forward such proceeds to LNA promptly upon receipt thereof.

## ARTICLE VII
## REDEVELOPMENT OF MARKETING PREMISES

7.1     LNA's Redevelopment Right. LNA may, but shall not be obligated to, redevelop the Marketing Premises at any time and from time to time during the Term. Redevelopment may include

altering, reconstructing, remodeling, demolishing or adding to buildings, equipment and facilities, and changing configuration, which may include the elimination or conversion of the service bays or merchandise sales areas.  LNA is under no obligation to undertake any redevelopment.  The decision to redevelop, and the nature of any redevelopment, shall be within LNA's sole discretion.

7.2     Notice.  LNA shall notify Franchise Dealer verbally or in writing at least 30 days prior to the beginning of any demolition or construction.

7.3     Right of Entry.  Franchise Dealer shall permit LNA and its Affiliates and their respective employees, agents, vendors or contractors to enter upon the Marketing Premises for the purpose of making any proposed redevelopment.  Franchise Dealer shall fully cooperate with LNA in any redevelopment of the Marketing Premises.

7.4     LIMITATION OF LIABILITY.  LNA AND ITS AFFILIATES WILL NOT BE LIABLE TO FRANCHISE DEALER FOR LOSS, INCONVENIENCE OR ANNOYANCE TO FRANCHISE DEALER ARISING OUT OF OR IN CONNECTION WITH ANY REDEVELOPMENT INCLUDING ANY LOSS, DAMAGE TO OR REMOVAL OF ANY OR ALL ALTERATIONS OR IMPROVEMENTS PREVIOUSLY INSTALLED BY FRANCHISE DEALER, OR ANY CLAIM BY FRANCHISE DEALER FOR LOSS OF BUSINESS OR PROFITS ARISING OUT OF OR IN CONNECTION WITH THE REDEVELOPMENT OR ANY DELAY IN CONNECTION THEREWITH, WHETHER OR NOT CAUSED BY LNA OR ITS AFFILIATES.

7.5     Adjustments in Rental and Product Quantities.

(a)     During the period of demolition or construction, LNA shall reduce the Contract Volumes and the Base Rent by an amount that, in its sole judgment, will adequately compensate Franchise Dealer for the restrictions in use of the Marketing Premises resulting from the demolition or construction.  Upon completion of any redevelopment, LNA may, for the balance of the Term:

        (i)     increase the Contract Volume and minimum purchase requirements specified in Article II of the Agreement and LNA may amend the Purchase Schedule to reflect the increase; and

        (ii)    increase the Base Rent and the Asset-Based Maximum Rent in accordance with Section 2.5.

(b)     Within 30 days after receipt of notice from LNA of any Product quantity, minimum purchase or Base Rent increase under Section 7.5(a), Franchise Dealer may terminate this Agreement by providing written notice to LNA if the increase is not satisfactory to Franchise Dealer.  Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 7.5(b).  The effective date of termination shall be 30 days after the date of Franchise Dealer's notice to LNA.  Termination shall be conditioned upon Franchise Dealer signing and delivering to LNA within such 30-day period, unless waived in writing by LNA, a mutual termination agreement and other agreements or instruments deemed necessary or appropriate by LNA for orderly termination of the Agreement, the Franchise and the Franchise Relationship. No termination shall become effective unless and until such agreements and instruments as we may request have been executed by Lessee Dealer.

17

7.6     Franchise Dealer Improvements.  Franchise Dealer may not alter or improve all or any part of the Marketing Premises unless LNA has provided its prior written consent which LNA may withhold in its sole discretion.  If LNA consents to any improvement or alteration, Franchise Dealer shall comply with:

(a)     all provisions of this Lease, the Agreement and any underlying lease;

(b)     all restrictions, covenants and reservations applicable to the Marketing Premises;

(c)     all applicable Laws including building codes, permit requirements and zoning; and

(d)     any conditions or requirements imposed by LNA in giving its consent.

Permitted improvements or alterations to the extent paid or funded by Franchise Dealer during the Term and not reimbursed by LNA (whether by rent credit, rebate for purchases of Products or otherwise) will not be included by LNA in determining the Assessed Value for purposes of determining Base Rent during the Term if the inclusion would increase Base Rent above that paid by Franchise Dealer prior to the improvement or alteration.  Nothing in this Lease may be construed as preventing LNA upon any renewal of the Franchise or the Franchise Relationship from including any Franchise Dealer-funded improvements or alterations in determining the Assessed Value for purposes of determining Base Rent, even if inclusion would increase Base Rent.  Any Franchise Dealer-funded improvements or alterations to the Marketing Premises are the sole property of LNA.  Upon LNA's request, Franchise Dealer shall sign and deliver documentation, and take other action, requested by LNA to evidence LNA's ownership in any improvements or alterations.

## ARTICLE VIII
## CONTRACT VOLUME INCREASES

8.1     LNA's Right to Increase.  If the Term is more than 5 years, LNA may at any time after the fifth anniversary of the Effective Date increase the Contract Volumes and minimum purchase requirements under Section 2.1 of the Agreement to an amount that LNA determines to be appropriate for the Marketing Premises.  LNA shall furnish Franchise Dealer with at least 60 days prior written notice of any Contract Volume or minimum purchase requirement increase.  LNA's rights under this Section 8.1 are in addition to other rights of LNA (including those under Section 7.5) to increase the Contract Volume and minimum purchase requirements under this Lease.  Unless Franchise Dealer terminates the Agreement and the Franchise Relationship under Section 8.2, the increase will be effective on the date specified in LNA's notice of the increase.

8.2     Franchise Dealer's Right to Terminate.  If the Contract Volume or minimum purchase requirement increase is unacceptable to Franchise Dealer, Franchise Dealer may terminate the Agreement, the Franchise and the Franchise Relationship by furnishing LNA with written notice of termination within 30 days following LNA's notice of increase.  Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 8.2.  Upon LNA's request, Franchise Dealer shall sign and deliver to LNA a mutual termination agreement and other agreements or instruments as may be reasonably requested by LNA for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

**ARTICLE IX**
**EQUIPMENT LEASE**

9.1     Leased Equipment.  During the Term, LNA leases to Franchise Dealer, and Franchise Dealer leases from LNA, for use at the Marketing Premises the personal property and proprietary equipment (the "Leased Equipment") listed in the attachment entitled "Lease Schedule", which is incorporated into this Attachment.  Without offset or recoupment, Franchise Dealer shall pay rent for the Leased Equipment, to LNA at the times and in the amounts specified in the Lease Schedule.  Franchise Dealer shall pay the rent in any manner specified by LNA and permitted under Section 2.3 of the Agreement.  The lease under this Article IX terminates on the earliest to occur of the following:

(a)     termination or non-renewal of the Agreement and the Franchise Relationship;

(b)     expiration of the Term; or

(c)     Franchise Dealer's default under this Article IX.

9.2     Dealer's Obligations.

(a)     With respect to the Leased Equipment, Franchise Dealer shall:

        (i)         make no additions or alterations without LNA's prior written consent;

        (ii)        keep legible and visible all brand names, trademarks and signs of LNA;
        (iii)       comply with all Laws covering its use;

        (iv)        not do or permit to be done anything prejudicial to LNA's title to the Lease Equipment;

        (v)         not remove it or deliver it to anyone but LNA or LNA's designee;

        (vi)        subject to applicable law, use it solely for the receipt, storage and dispensing of Products at the Marketing Premises that are sold and delivered exclusively by LNA into the Leased Equipment;

        (vii)       exercise reasonable care to prevent damage;

        (viii)      comply with all provisions of the Agreement (including the Standards) and any related or supplemental agreements; and

        (ix)        keep Leased Equipment free from all liens and encumbrances.

(b)     Franchise Dealer, at Franchise Dealer's sole expense, shall:

        (i)         pay and discharge any and all taxes, fees and charges imposed by governmental authority on any Leased Equipment while in Franchise Dealer's possession, or upon its use or any business in which it is employed;

        (ii)        adequately insure the Leased Equipment in the amount of its replacement value while it is in Franchise Dealer's possession; and

19

(iii) maintain the Leased Equipment in good repair and condition and, if necessary, replace the Lease Equipment to ensure that it is fit for its intended use and in accordance with applicable Laws.  If Franchise Dealer fails to maintain, repair or replace the Leased Equipment:

 (A) LNA may, but is not obligated to, maintain, repair or replace it, as LNA determines, and

 (B) Franchise Dealer promptly shall reimburse LNA for the costs of any maintenance, repair or replacement performed by LNA.  In addition to any other rights or remedies of LNA including termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship, LNA may debit any account of Franchise Dealer or offset any security held by LNA, in the amount of the costs.

(c) Franchise Dealer acquires no ownership interest in the Leased Equipment because of Franchise Dealer's compliance with Franchise Dealer's maintenance, repair or replacement obligations.

9.3 Equipment Removal.  LNA reserves the right to remove any Leased Equipment at any time and to replace it with similar equipment.  Any replacement equipment will be subject to this Article IX.  LNA may discontinue leasing any Leased Equipment at any time without any obligation to replace it, and LNA has no obligation to reimburse Franchise Dealer rent paid in advance for discontinued items of Leased Equipment.  Upon termination of the lease under this Article IX:

(a) LNA may elect, in its sole discretion, to:

 (i) remove the Leased Equipment,

 (ii) have Franchise Dealer remove and return the Leased Equipment to LNA or LNA's designee, or

 (iii) direct Franchise Dealer to dispose of the Leased Equipment;

(b) Franchise Dealer shall bear all removal, site-restoration, transportation and disposal costs relating to the removal, return or disposal of the Leased Equipment;

(c) LNA has no obligation to reimburse Franchise Dealer for any rent paid in advance for the Leased Equipment; and

(d) LNA may abandon the Leased Equipment without liability or obligation to Franchise Dealer and without limiting any obligations of Franchise Dealer relating to the Proprietary Marks.

9.4 LNA's Rights in the Equipment.  The Leased Equipment at all times is the property of and owned by LNA, and title to the Leased Equipment is and will remain in LNA.  LNA's rights relating to the Leased Equipment (including its rights under Section 9.5) will survive any termination or nonrenewal of the Agreement, the Franchise and the Franchise Relationship.

9.5 Right of Entry.  In addition to any other right of entry under this Lease or the Agreement, LNA has the unrestricted right to enter upon the Marketing Premises at any time to inspect or to remove any and all of its property including the Leased Equipment.

9.6     Assignment.  Notwithstanding any contrary provision in the Agreement, Franchise Dealer may not assign its rights or delegate its duties under this Article IX, in whole or in part, without LNA's prior written consent which LNA may withhold in its sole discretion.

## ARTICLE X
## MISCELLANEOUS

10.1    Agreement Provisions.  Except as expressly provided otherwise in this Lease or in the Agreement, the provisions of the Agreement apply to this Lease. Neither the Agreement nor this Lease can be changed orally, but only by a written agreement signed by both LNA and Franchise Dealer. Any termination or nonrenewal of the Agreement, the Franchise and Franchise Relationship will automatically operate to terminate this Lease.

10.2    Definitions; Construction.

(a)     Terms used in this Lease have the meaning indicated in this Lease or the Agreement.

(b)     Unless expressly provided otherwise herein, any determination made by LNA under this Lease will be in LNA's sole discretion when acting in good faith and in the normal course of business.

(c)     All consents or approvals on behalf of LNA under this Lease must be by an authorized representative of LNA.

(d)     Unless indicated as a reference to provisions of the Agreement, references in this Lease to Sections and Articles are to those contained in this Lease.

10.3    Time of Essence.  Time is of the essence in the performance of Franchise Dealer's obligations (including payment of Rent), and the exercise of Franchise Dealer's rights, under this Lease.

10.4    LIMITATION OF LIABILITY.  LNA AND ITS AFFILIATES ARE NOT LIABLE TO FRANCHISE DEALER OR TO ANY OTHER PERSON FOR PROSPECTIVE PROFITS OR SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES IN ANY CIRCUMSTANCES ARISING OUT OF IN CONNECTION WITH THIS LEASE OR ITS SUBJECT MATTER OR WITH ANY ACTS, OMISSIONS OR DELAYS BY LNA AND ITS AFFILIATES RELATING TO THAT LEASE OR ITS SUBJECT MATTER, AND REGARDLESS OF WHETHER OR NOT LNA OR ITS AFFILIATES IS NEGLIGENT IN WHOLE OR IN PART.  Further, no payment or other obligation by Franchise Dealer under this Lease shall be suspended, reduced or abated, in whole or in part, regardless of whether or not LNA and its Affiliates are allegedly in violation of the Agreement or this Lease or any related or supplemental agreement or have allegedly been negligent.

10.5.   TERMINATION AND NON-RENEWAL.  Nothing in this Lease constitutes or shall be construed as a waiver, limitation or modification of LNA's rights to terminate or non-renew the Agreement, franchise, franchise relationship, under the Agreement or under applicable law, including but not limited to the Petroleum Marketing Practices Act.

10.6.   SIGNIFICANCE OF TERMS AND CONDITIONS.  Franchise Dealer acknowledges the significance of each term and condition in this Lease and that any breach of the terms and conditions is substantial.  Franchise Dealer also acknowledges that any failure to meet its obligations under this Lease constitutes a failure to comply with a reasonable and materially

21

significant provision of this Lease and Franchise Relationship.  Acknowledgements in this Lease of reasonable and materially significant provisions shall not be construed as intending that any provisions, which are not so acknowledged, are not reasonable and materially significant.

10.7    RECORDING OF LEASE.  Franchise Dealer will not record this Lease without the written consent of LNA, which consent may be withheld in LNA's sole and absolute discretion.

I acknowledge the receipt and applicability of these Lessee Dealer Lease Provisions:

**Kazmi Trading Corp.**

_____
**Syed Munir Kazmi, President**

# Environmental Compliance Documents
# Must be Maintained on Site

You have been provided with copies of the Underground Storage Tank documents for your facility, required by Federal Underground Storage Tank Regulations. These are very important documents that must be displayed permanently on-site.

In addition, for stations with electronic monitoring systems, you are required to check your monitoring system daily to ensure that it is operating correctly. If your system is not operating correctly or is in alarm, call your Maintenance Service Provider immediately.

Please retain one copy of this Monitoring Plan at your site so that it is accessible to all employees and agency personnel upon request. If desired, you may keep an additional copy with your lease. By executing the agreement you are certifying that the information is accurate.

If you have questions, please contact LNA's Environmental Specialist:

**Rebecca Herbert, Phone (856) 722-6455, Cell (215) 939-6375**

Kazmi Trading Corp. Site # 57254

Site #: 57254
Operator Name: Kazmi Trading Corp.
Address: 1497 Prospect Street, Trenton, NJ  08638

## UNDERGROUND STORAGE TANKS (UST) OWNER/OPERATOR AGREEMENT

Federal Underground Storage Tank Regulations (40 CFR part 280) require LUKOIL North America LLC ("LNA") (the tank owner) to instruct their dealers (the tank operators), to monitor the underground storage tanks (USTs) containing hazardous substances.

The law requires the operator of the USTs containing motor vehicle fuel to comply with the following standards:

1. A valid UST permit shall be maintained on site.

2. Any monitoring and maintenance records must be maintained.  This includes inventory and readings and reconciliation records, sampling and testing results, which must be maintained on site for at least 5 years or in an approved off-site location.  Said records must be made available upon request to the local implementing agency or the State agency.

3. Records must be kept in sufficient detail to enable the local implementing agency, at any time, to determine that the operator has undertaken all activities required by the UST Permit to Operate.

4. LNA must be notified of the detection of any unauthorized releases by the fastest means available (no later than 8 hours) or within the time frame mandated by the local implementing agency.  The operator must adhere to the procedures contained in the Spill Response Plan. LNA will notify the appropriate agency(s) and submit a written report as may be required by the agency(s).

Furthermore, LNA's policy under the Lessee Dealer Lease Provisions requires the Dealer to comply with the following procedures:

1. Daily gauging, recording and inventory reconciliation of each product is required.  These readings must be within the allowable variances established by the permit or lease agreement whichever is more stringent.  If not, please follow procedure #7 below.

2. Daily measurement and recording of any water layer in each tank is required.

3. Daily meter readings and recording of UST input and withdrawals is required.

4. Monitor and maintain any Aboveground Storage Tank(s) according to the Uniform Fire Codes and/or the Aboveground Petroleum Storage Act Guidelines, if any.

5. The inventory reconciliation records must be reviewed monthly.

6. Daily visual inspection of the spill buckets and dispenser pans must be conducted to ensure that all are free of debris, liquid, and holes.

7. The steps described herein will be implemented by the operator if inventory reconciliation indicates a loss of product (book volume to physical volume) greater than the allowable variance:

   a. Review the inventory reconciliation records within two hours to determine if an error exists which would explain the loss.
   b. Take a new inventory reconciliation at least 8 hours after the initial inventory reconciliation which triggered the evaluation.
   c. If loss is still indicated, the operator shall notify LNA within 8 hours of the completion of the daily reconciliation which verified the loss.
   d. A complete review of all inventory records from the last time a non-loss condition existed shall be performed. This analysis shall be completed within 24 hours after determination that suspected loss is not due to error by the two-hour review.

8. A current LNA Certificate of Financial Responsibility Statement shall be maintained on-site for agency reference.

9. A current Underground Storage Tank Owner/Operator Agreement shall be maintained on-site for agency reference.

10. LNA must be notified of any malfunctioning of the UST monitoring system (if present). The monitoring equipment shall be operated and maintained in accordance with the regulation.

11. Any unauthorized releases must be recorded. Such records shall be maintained on-site at all times.

Lessee Dealer Lease Provisions requires the Dealer to pay for all necessary permit fees, renewal fees and any surcharges. It is a customary practice for LNA to pay the appropriate fees and invoice the Dealer's account. However, Dealers are responsible for final payment of all fees.

The local UST regulatory agency may have more stringent monitoring procedures in place. The operator must take the necessary steps to ensure familiarity with the procedures and follow those regulatory guidelines as required.

LUKOIL NORTH AMERICA LLC

_____
Robert Ferluga, Chief Executive Officer

ACCEPTED AND AGREED TO THIS ___11___ DAY OF _SEPTEM._, 2017

Lessee Name: Kazmi Trading Corp.

_____                    9/6/17
**Syed Munir Kazmi, President**                    _____
Signature                                          Date Signed

Kazmi Trading Corp.  Site # 57254

**PURCHASE SCHEDULE (3 Year Term)**
**TO**
**PMPA FRANCHISE AGREEMENT**

Site # 57254

This Purchase Schedule is a part of, and incorporated into, the Lessee Dealer Lease Provisions of the PMPA Franchise Agreement between LUKOIL North America LLC and **Kazmi Trading Corp.** having a place of business at **1497 Prospect Street, Trenton, NJ  08638** ("Franchise Dealer") with a Term beginning on **September 15, 2017**   (the "Effective Date").

1.       Subject to the provisions of the Agreement, the monthly and yearly Contract Volume areas follows:

|  | GASOLINE | | |  | DIESEL* | | |
|---|---|---|---|---|---|---|---|
|  | Contract Year | | |  | Contract Year | | |
| Month | 1 | 2 | 3 | Month | 1 | 2 | 3 |

## REDACTED

\* If no Contract Volumes are specified for diesel, the Products covered by the Agreement do not include any diesel products.

2.       A "contract year" means a 12-month period beginning on the Effective Date or any anniversary of the Effective Date.

I acknowledge the receipt and applicability of this Purchase Schedule:

**Kazmi Trading Corp.**

**Syed Munir Kazmi, President**

LNA PURCHASE SCHEDULE                                                                 Site # 57254

**RENT SCHEDULE**
**TO**
**LESSEE DEALER LEASE PROVISIONS OF THE PMPA FRANCHISE AGREEMENT**

This Rent Schedule is a part of, and incorporated into, the Lessee Dealer Lease Provisions of the PMPA Franchise Agreement between LUKOIL North America LLC ("LNA") and **Kazmi Trading Corp.**, having a place of business at **1497 Prospect Street, Trenton, NJ 08638** ("Franchise Dealer") with a Term beginning on **September 15, 2017** (the "Effective Date").

2020 inclusive.

e Rent is as follows:

OUNT

ated

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

I acknowledge the receipt and applicability of this Rent Schedule:

Kazmi Trading Corp.

Syed Munir Kazmi, President

**LEASE SCHEDULE**
**TO**
**LESSEE DEALER LEASE PROVISIONS**
**OF PMPA FRANCHISE AGREEMENT**

This Lease Schedule is a part of, and incorporated into, the Lessee Dealer Lease Provisions of the PMPA Franchise Agreement between LUKOIL North America LLC ("LNA") and **Kazmi Trading Corp.,** having a place of business at **1497 Prospect Street, Trenton, NJ  08638** ("Franchise Dealer") with a Term beginning on **September 15, 2017** ("the "Effective Date").

Pursuant to Section 1.1 of the Lease Provisions to the PMPA Franchise Agreement, dated **March 17, 2017**, the Marketing Premises leased by LNA to Dealer include the improvements and equipment listed on the attached or below, for which Dealer acknowledges receipt. DEALER ACCEPTS THE IMPROVEMENTS AND EQUIPMENT IN THEIR PRESENT CONDITION, AS IS, WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THEIR CONDITION OR FITNESS FOR ANY PURPOSE.

| Quantity | Item Description |
|---|---|
| 3 | UNDER GROUND STORAGE TANKS - 10,000 GAL |
| 6 | MULTIPLE PRODUCT DISPENSER |
| 3 | SUBMERSIBLE PUMP |
| 1 | RUBY SAPPHIRE CONSOLE |
| 1 | UNDERGROUND TANK MONITORING SYSTEM |
| 1 | WALK IN COOLER |
| 1 | FOOD SERVICE COUNTER |
| 1 | SALES COUNTER |
| | GONDOLA SHELVING |
| | LED LIGHTING |
| | 5 TON HVAC CONDESING UNIT |

I acknowledge the receipt and applicability of this Lease Schedule:

Kazmi Trading Corp.

Syed Munir Kazmi President

## MAINTENANCE AND INFORMATION SERVICES AGREEMENT
### For Electronic Point of Sale Terminal and Related Equipment

This maintenance and information service agreement ("Agreement") dated **September 15, 2017** ("Effective Date") is by and between LUKOIL North America LLC ("LNA"), having an office at 505 Fifth Avenue, 9th Floor, New York, NY 10017 and **Kazmi Trading Corp.** ("SYSTEM USER") having a place of business at **1497 Prospect Street, Trenton, NJ 08638** ("Marketing Premises").

### ARTICLE I-DEFINITIONS

The following terms, when capitalized in this Agreement, have the meanings set forth below:

1.1      "**Equipment**" includes the Electronic Point-of-Sale ("EPOS") Terminals, OMNI Terminals and Customer Activated Terminals ("CATS") set forth in **Attachment A** of this Agreement.

1.2      "**EPOS Program**" means Electronic Point of Sale system designed to process credit, debit and prepaid cash transactions which has been made available to LNA, and it's branded dealers, resellers, jobbers, and commission operators.

### ARTICLE II-PARTICIPATION

2.1      **Acknowledgment**.  SYSTEM USER acknowledges that LNA has fully described to SYSTEM USER LNA's EPOS Program, which will enable SYSTEM USER to electronically authorize and process credit, debit and prepaid card transactions under LNA's Retail Credit Card Program in accordance with LNA's Credit Card Instructions as modified from time to time ("Instructions").  As a participant in the EPOS Program, SYSTEM USER understands that SYSTEM USER must comply with these Instructions.

2.2      **Discontinuance of EPOS Program**.  SYSTEM USER agrees that from time to time LNA may modify, amend or discontinue its EPOS Program or any portion of the EPOS Program at LNA's sole discretion.

2.3      **Warranties**.  LNA does not warrant or guarantee the Equipment.

### ARTICLE III-MAINTENANCE, INSTALLATION & TRAINING

3.1      **Maintained Equipment-Lease Locations**.  LNA agrees to maintain the LNA authorized Equipment set forth in **Attachment A** for use by SYSTEM USER to access the LNA EPOS Program at the Marketing Premises.  SYSTEM USER shall pay for the services at rate set forth in Section 3.3 and **Attachment A.** SYSTEM USER agrees that **Attachment A** may be amended from time to time by LNA.

3.2      **Maintained Equipment- Non-Lease Location**.  For Marketing Premises where LNA does not own or does not have a long term lease interest, SYSTEM USER agrees to maintain the Equipment if SYSTEM USER furnishes LNA with written evidence on or before the Effective Date that SYSTEM USER or its designated contractor is certified and qualified by the original Equipment Vendor to perform such service during the term of this Agreement.  SYSTEM USER shall provide such evidence to LNA on the Effective Date of this Agreement.  If SYSTEM USER fails to furnish the evidence on or before the Effective Date, LNA shall perform the maintenance services and SYSTEM USER shall pay for such services at the rates set forth in Section 3.3 and **Attachment A**.

3.3      **Maintenance and Information Services**.  As payment for LNA providing satellite and telephone line access and maintaining the Equipment, SYSTEM USER agrees to pay LNA monthly Maintenance and Information Services fees for the Equipment as set forth in **Attachment A**.  All fees and charges are payable monthly and in advance.  LNA may, at any time during the term of this Agreement, increase Maintenance and Information Services Fees by giving SYSTEM USER not less than 30 days' prior written notice.  If LNA exercises its option to increase fees, SYSTEM USER may terminate this Agreement by providing LNA with written notice prior to the effective date of the increase in fees.

3.4      **LNA's Obligations**.  LNA will repair and maintain all Equipment covered by this Agreement.  LNA's maintenance and repair obligations do not include the cost of providing or paying for appropriate electric current.  LNA's repair and maintenance obligations arise only when a repair is required as a result of ordinary wear and tear or defect in material or workmanship and if SYSTEM USER notifies LNA that the Equipment is not in good operating condition.  SYSTEM USER shall pay for any repair or maintenance, which is determined by LNA, in its sole discretion, to be required as the result of (i) damage by accident, negligence, abuse or misuse; (ii) operation for which the Equipment was not intended; or (iii) any alteration or modification of the dedicated power source, telephone connecting line, or satellite equipment.

3.5      **SYSTEM USER's Specific Maintenance Obligations**.  SYSTEM USER agrees to replace at its expense and

as required, Terminal ribbons, batteries, battery charger and paper except for CO-65 forms. SYSTEM USER agrees to pay for recurring local electric charges.  SYSTEM USER shall allow LNA to make such changes LNA deems necessary in both SYSTEM USER-owned and LNA-owned Equipment and software.

3.6   **Installation Obligations and Telephone Line and Satellite Expenses**.

A.    **LNA-Owned Lease Line or Satellite EPOS Equipment**.  LNA will arrange for the installation and connection of the required telephone line or satellite equipment to the Equipment located at the Marketing Premises, and ensure that the Equipment is in operable condition.  LNA will pay for installation of EPOS Terminal(s) and for site preparation, including an appropriate dedicated A/C power outlet at locations where LNA owns or has a long term Lease interest in the Marketing Premises.  SYSTEM USER shall bear the expense for site preparation at all other locations. LNA will pay for recurring charges for the telephone or satellite line connecting the Equipment to LNA's system.

B.    **LNA-Owned Auto-dial Equipment**.  SYSTEM USER agrees to arrange for and pay the costs of installation of the telephone line necessary for operating the Equipment.  LNA will connect the telephone lines to the Equipment located at the Marketing Premises and ensure the Equipment is in operable condition.  LNA will pay for site preparation, including an appropriate dedicated A/C power outlet at Marketing Premises which LNA owns or has a long term lease interest.  SYSTEM USER shall bear the expense for site preparation at all other locations.  SYSTEM USER will pay for the recurring local telephone line expense.

C.    **SYSTEM USER-Owned EPOS Equipment**.  LNA will arrange for installation of the necessary telephone line or satellite equipment and connect the Terminal(s) to the lines to enable access to LNA's EPOS Program. SYSTEM USER will pay all installation costs of the EPOS equipment.  LNA will pay for site preparation, including an appropriate dedicated A/C power outlet at Marketing Premises which LNA owns or has a long term lease interest. SYSTEM USER will pay all site preparation expenses at any other location.  LNA will pay for recurring charges for the telephone line or satellite connecting the Terminal(s).  Only SYSTEM USER-owned equipment which has been previously approved by LNA may be connected to and access the LNA's EPOS Program.  SYSTEM USER will be responsible for acquiring any necessary PIN Pads.

3.7   **Training**.  Prior to installation of the CATs System, SYSTEM USER will receive operating instructions from LNA and will have to complete all necessary training programs approved by LNA.  SYSTEM USER shall pay for all lodging, meals and transportation expenses to and from the training site.  LNA and/or its vendor(s) will maintain a "Help Desk" to answer any day-to-day questions regarding the operation of the LNA's EPOS Program.

## ARTICLE IV-SYSTEM USER'S GENERAL OBLIGATIONS

4.1   **General Obligations**.  With respect to the Equipment, SYSTEM USER shall (a) make no additions or alterations; (b) make no movement or rearrangement of the Terminal(s); (c) comply with all applicable credit/debit card policies covering use of the Terminal(s); (d) comply with all laws and regulations applicable to the use of the Terminal(s); (e) do or permit to be done nothing prejudicial to any title or ownership interest LNA may have in the Terminal(s) or equipment; (f) not remove the LNA-owned Terminal(s) or deliver LNA-owned Terminal(s) to anyone but LNA or LNA's representative; (g) not sell a SYSTEM USER-owned Terminal(s) without first removing and returning to LNA any LNA-owned software contained in said Terminal(s); and (h) exercise the degree of care necessary to prevent damage to the Equipment.

4.2   **Indemnity**.  SYSTEM USER agrees to indemnify and hold LNA harmless against all losses and claims (including those of the parties, their agents and employees) for death, personal injury or property damage arising out of the use of or conditions of the Equipment.

## ARTICLE V-TERM AND TERMINATION

5.1   **Term**.  The term of this Agreement shall begin on **September 15, 2017**, or the date the Equipment is installed and operational and shall end on **July 31, 2020** unless terminated earlier as provided in this Agreement.

5.2   **Termination by LNA.**  Notwithstanding Section 5.1 of this Agreement, this Agreement shall automatically terminate (a) on the Effective Date of any termination or nonrenewal of any PMPA Franchise Agreement, or PMPA Distributor Franchise Agreement, or Commission Contract, as applicable, between the parties; (b) in the event SYSTEM USER elects not to participate in the LNA EPOS Program at the Marketing Premises;  (c) in the event that SYSTEM USER's participation in the LNA EPOS Program is terminated by LNA; (d) in the event that LNA withdraws from electronic point-of-sale credit/debit card processing in SYSTEM USER's area; or (e) LNA discontinues the EPOS Program as outlined herein.  In addition, LNA reserves the right to terminate this Agreement, in the event of any default by SYSTEM USER or failure of SYSTEM USER to meet any performance criteria established by LNA from time to time or for any other reason if LNA gives SYSTEM USER ninety (90) days' advance written notice of termination.  In the event of termination of the Agreement, LNA may terminate SYSTEM USER's access to LNA's EPOS Program.  On

the Effective Date of any termination of the Agreement, LNA may also remove LNA-owned Equipment and software without liability and without obligation for any restoration of the Marketing Premises or damage incidental to such removal.

5.3     **Performance Criteria**.  Notwithstanding any other provision in this Agreement, LNA reserves the right to remove any LNA-owned Equipment, at any time and cancel this Agreement under the terms of Section 5.2 in the event that the SYSTEM USER processes fewer than the following minimum numbers of credit and debit transaction through LNA's EPOS Program in any given calendar month during the Term of this Agreement:

CATS
Other lease line or satellite terminals                    REDACTED
Auto-dial terminals

or in the event that the SYSTEM USER processes fewer than 80% of all credit and debit card transactions initiated in connection with the operation of the Marketing Premises in any given calendar month during the Term of this Agreement.

## ARTICLE VI-MISCELLANEOUS

6.1     **Replacement of LNA-owned Equipment**.  LNA reserves the right to remove LNA-owned Equipment at any time and to replace same with similar or different Equipment.

6.2     **Force Majeure**.  LNA shall not be responsible for or liable to SYSTEM USER for any loss or damage due to down-time of the Equipment because of repair or maintenance or due to failure of telephone connections to the Equipment.

6.3     **Assignments**.  Any assignment of this Agreement without LNA's express written consent shall be void.

6.4     **Notices**.  All notices shall be in writing and shall be sent as follows:

a.   if to LNA, posted by registered or certified mail, return receipt requested, to the following address and directed to the attention of:

LUKOIL North America LLC
302 Harper Drive
Moorestown, NJ  08057
Attn: Contract Administration

b.   if to SYSTEM USER, delivered to the Marketing Premises or posted by registered or certified mail, return receipt
requested, to the address specified in the preamble to this Agreement

Notice by mail shall be deemed given on the date such notice is deposited in the United States mail, postage prepaid and properly addressed.

6.5     **Entire Agreement; Amendments**.  This instrument contains the entire agreement covering the subject matter and supersedes any and all prior understandings or dealings between the parties relative to this subject matter.  No modification of the Agreement shall be binding on LNA unless in writing and signed by LNA's authorized representative.

*SIGNATURE PAGE OF*
*Maintenance and Information Services Agreement*
*For Electronic Point of Sale Terminal and Related Equipment*
*LNA Location # 57254*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

WITNESS:

_____

LUKOIL NORTH AMERICA LLC

By: _____
      Robert Ferluga
Title:    Chief Executive Officer

WITNESS:

_____
John Pihdynski, TSM Signature

SYSTEM USER: Kazmi Trading Corp.

By: _____
      Syed Munir Kazmi
Title:    President

ATTACHMENT A

### POS MONTHLY FEE SCHEDULE
Effective September 15, 2017
Site # 57254

**POS Network Access with POS Monthly Maintenance**

| POS System | Quantity | Monthly Fee | Extended Cost |
|---|---|---|---|
| VeriFone Ruby System | 1 | REDACTED | |
| Additional Ruby Console | | | |
| CRIND (per dispenser) | 6 | | |
| Omni terminal | | | |
| **Total Monthly POS Fee** | | | |

1. Lessee Dealers and Commission Lessees are required to pay POS Monthly Maintenance Fees.
2. Participation in POS Monthly Maintenance Fee program is optional for resellers only.
3. POS Monthly Maintenance participants should call Verifone/Ruby 24-hour Technical Support at 1-800-519-7225 for equipment maintenance requests.

**POS Network Access WITHOUT POS Monthly Maintenance (RESELLERS ONLY)**

| | Quantity | Monthly Fee | Extended Cost |
|---|---|---|---|
| **Total Monthly POS Fee** | | REDACTED | |

All System Users should call Bank of America Merchant Services at 1-800-347-8224 for Network Access and Credit Card Processing requests.

LUKOIL North America LLC

Robert Ferluga, Chief Executive Officer

Kazmi Trading Corp.

Syed Munir Kazmi, President

**MAINTENANCE SCHEDULE**
**TO THE LESSEE DEALER LEASE PROVISIONS**
**TO THE PMPA FRANCHISE AGREEMENT**
Site #: 57254

This Maintenance Schedule is a part of, and incorporated into, the Lessee Dealer Lease Provisions to the PMPA Franchise Agreement ("Lease Provisions") between LUKOIL North America LLC ("LNA") and **Kazmi Trading Corp.** ("DEALER") with a Term beginning on **September 15, 2017** (the "Effective Date").  Pursuant to Section 4.1 of the Lease Provisions, the allocation of maintenance obligations is as follows:

Legend:
D     DEALER responsibility
L     LNA responsibility

| | REPAIR RESP. | REPLACE RESP. | FOOT-NOTES |
|---|---|---|---|
| **I.   BUILDINGS AND CANOPY** | | | |
| **A.   STRUCTURE** | | | |
| Canopy | L | L | 1 |
| Roof | D | L | |
| Doors | | | 2 |
|    Overhead | D | L | |
|    Walkthrough | D | D | |
| Locks (incl. manual and electric on all doors) | D | D | |
| Windows, window frames, glass | D | D | |
| Electrical | | | |
|    Above ground (incl. interior light fixtures, bulbs, and ballasts) | D | D | |
|    Below ground (req. excavation) | L | L | |
|    Panels/upgrades | D | L or D | 3 |
| Flooring and floor mats | D | D | |
| Walls | | | |
|    Non-structural repairs | D | D | |
|    Structural repairs | L | L | |
| Gutters & downspouts on buildings (incl. clean-outs) | D | D | |
| Painting & Power washing | D | L or D | 4 |
| Pass-through drawer | D | D | |
| Island kiosk | D | L | |
| Trash enclosure | D | L | |
| Plumbing | | | |
|    Backflow devices (incl. certification) | D | D | |
|    Grease traps (DEALER resp. for clean-outs) | L | L | |
|    Fixtures (Sink, toilets, urinals, faucets, flush mechanisms, floats, valves, etc.) | D | D | |
|    Floor drains (DEALER resp. for clean-outs) | L | L | |
| Water and air piping | | | |
|    Above ground (incl. faucets and bibs) | D | D | |
|    Below ground (req. excavation) | L | L | |

1   DEALER is responsible for preventative maintenance including, but not limited to, gutter/drain clean-outs.  DEALER is responsible for notifying LNA of excessive bird droppings, and LNA is responsible for removal of bird droppings.

2   DEALER is responsible for the replacement of weather stripping on overhead and walk-through doors.

3   Upgrades to the electrical service and replacement of existing services will fall into the following schedule of responsibility:
a) LNA is responsible for upgrading the service at stations where LNA performed a capital project and failed to update the service accordingly.   LNA is responsible for replacing worn out electrical services.
b) If the need for upgrade is the result of the DEALER having increased the electrical demands at the location, the DEALER is responsible for updating the service.
c) Unusual circumstances will be investigated with LNA making the final decision.

4   DEALER is responsible for all painting and power washing, however in the event that the canopy decking cannot be power washed satisfactorily then LNA may paint the canopy decking at LNA's option.   In addition, LNA may (within its full discretion) from time to time paint and/or power wash the facility at LNA's choice.

| | REPAIR RESP. | REPLACE RESP. | FOOT-NOTES |
|---|---|---|---|
| Sewer system | | | |
| Holding tanks (LNA resp. for pump-outs) | L | L | |
| Main sewer line (DEALER resp. for blockages) | L | L | |
| Septic System (DEALER resp. for pump-outs) | L | L | |
| Extermination | D | D | |
| **B. EQUIPMENT** | | | |
| Air conditioner unit/condenser (DEALER resp. for filter replacement) | D | L | |
| Furnace, heat pumps (DEALER resp. for filter replacements) | D | L | |
| Duct work | D | D | |
| Water heater | D | D | |
| Car wash equipment | D | D | |
| Car wash reclaim pits (DEALER resp. for clean-outs) | L | L | |
| Fire extinguishers (incl. recharging & inspection) | D | D | |
| Fire suppression systems (DEALER resp. for inspection) | L | L | |
| Lockbox | D | D | |
| Chest freezer, reach-in cooler | | | |
| LNA owned | D | L | |
| DEALER owned | D | D | |
| Ice maker and ice dispenser | D | D | |
| Walk-in cooler/condenser | D | L | |
| Restroom equipment (Exhaust fan, coat hooks, mirrors, shelves, soap dispensers, toilet tissue dispensers, towel dispensers, etc.) | D | D | |
| Safes and autobanks (incl. recombination and lock changes) | D | D | |
| Intercom systems | L | L | |
| Security equipment (cameras, mirrors, etc.) | D | D | |
| Store equipment (Coffee makers, juice and soda dispensers, cup dispensers, ice dispensers, microwaves, etc.) | D | D | |
| Fixtures/Accessories (Customer service desk, coffee bar, overhead and portable tire racks, salesroom back wall, work benches, tables and chairs, shelving, gondolas, cabinetry, cigarette racks and back bar,etc.) | D | D | |
| Trash receptacles and windshield washer units | D | D | |
| Water cooler/fountain | D | D | |
| **II. SERVICE & DISPENSING EQUIPMENT** | | | |
| EPOS system and printer | L | L | |
| Manual credit card imprinter | D | D | |
| Product dispensers (incl. filter replacement) | L | L | |
| CATS/CRINDS | L | L | |
| Containment pans | L | L | |
| Calibration | L | L | |
| Hanging hardware (Hoses, nozzles, swivels, retractors, breakaways, etc.) | D | D | 5 |
| Test cans for dispenser calibration | D | D | |
| Lifts (DEALER resp. for maint./repl. of oil) | D | D | |
| Alignment Rack | D | D | |
| Lube equipment | | | |
| Piping in front of walls (visible) | D | D | |
| Piping behind walls | L | L | |
| Express Lube drain | D | D | |

---

5  LNA is responsible for first time purchase if dispensers are replaced.

| | REPAIR RESP. | REPLACE RESP. | FOOT-NOTES |
|---|---|---|---|
| Tanks: motor fuel, waste oil, and heating oil | L | L | 6 |
| Tank fills including covers, caps, tags, painting (Dealer responsible for keeping spill buckets free of water and debris) | L | L | |
| Fill locks | D | D | |
| Overfill containment including ball floats, flapper valves, and alarms | L | L | |
| Piping (lines) | L | L | |
| Submersible pumps and containment sumps | L | L | |
| Test tanks/lines (Compliance testing) | | L | |
| Water/sludge pump out | | L | |
| UST monitoring and automatic tank gauge systems | L | L | |
| Mechanical leak detectors | L | L | |
| Tank gauge sticks and water finding paste | L | L | |
| Environmental monitoring wells | L | L | |
| Air Compressor | D | D | |
| Air/water tower (incl. hoses, chucks, nozzles, and bibs) | D | D | |
| Vacuums | D | D | |

**III. SIGNAGE**

| | REPAIR RESP. | REPLACE RESP. | |
|---|---|---|---|
| Dealer-owned signs and frames (Pump-top price, snap-lock, IMU, POS, restroom, traffic, etc.) | D | D | |
| LNA-owned signs (LUKOIL sign, internally illuminated price sign, building/canopy legends) | L | L | |

**IV. ISLAND AND YARD**

| | REPAIR RESP. | REPLACE RESP. | FOOT-NOTES |
|---|---|---|---|
| Asphalt (DEALER resp. for sealcoating/line striping) | | | |
| Potholes | D | | |
| Repaving, skin coat, major repairs | | L | |
| Concrete drive mats/tank pads | L | L | |
| Islands | L | L | |
| Curbing (metal formed) | L | L | |
| Curbing (not metal formed) | D | L | |
| Concrete sidewalks/ walkways | D | L | |
| Driveway signal system and hoses | D | D | |
| Exterior light fixtures, poles, bulbs, and ballasts | L | L | |
| Fencing | D | L | |
| Landscaping and plantings | D | D | 7 |
| Sprinklers (incl. winterizing) | D | D | |
| Water well and pump | L | L | |
| Yard drain (DEALER resp. for clean-outs) | L | L | |

**I acknowledge the receipt and applicability of this Maintenance Schedule:**

Kazmi Trading Corp.

_____     9/6/17
Syed Munir Kazmi, President              Date

---

6 Dealer is responsible for pumpouts, clog removal, and cleaning of waste oil tanks
7 LNA is responsible for trimming and removal of trees taller than 25 feet.

## FORM OF ORGANIZATION POLICY

Preamble

This policy is adopted pursuant to LUKOIL North America LLC's ("Franchisor's") franchise form dealer PMPA Franchise Agreement (the "Dealer Franchise Agreement") and PMPA Distributor Franchise Agreement ("Distributor Agreement", and collectively with the Dealer Franchise Agreement, "Franchise Agreement") and applies to FRANCHISOR's dealers and distributors governed by those agreements ("Franchisees"). It is intended to provide additional flexibility regarding the form and ownership of Franchisee business organizations consistent with FRANCHISOR's requirements and developments in the law and in the relevant business environment.

A.    LLC Policy.

1.    This Paragraph A is adopted in accordance with Section 4.4(a)(ii) of the Dealer Franchise Agreement or Section 16(d)(i)(B) of the Distributor Franchise Agreement.

2.    A dealer or distributor governed by a Franchise Agreement and meeting the requirements of this policy may take the form of a limited liability company ("LLC").

3.    The LLC Franchisee must meet each of the following requirements:

a.    must be validly organized and existing under one of the following: (i) the laws of the state in which the franchised service station is located, if a dealer; (ii) the laws of the state in which the Franchisee has its principal place of business, if a distributor; or (iii) the laws of another state, if such LLCs in that state are recognized, and the Franchisee has qualified to do business, under the laws of a state referred to in Paragraph 3.a.(i) or (ii).

b.    must have a date of dissolution on or after the expiration date of the Franchise Agreement.

c.    must provide FRANCHISOR with a current copy of its Articles of Organization and its most recent annual state filing (or equivalent documentation acceptable to FRANCHISOR) certified by the Secretary of State or other relevant authority of the state in which the LLC is organized. These documents must confirm the LLC's status consistent with the matters specified in Paragraphs 3.a. and b. above and must also demonstrate consistency with the following: (i) the person or persons signing the Franchise Agreement, representation letters and other documents on behalf of the Franchisee have the requisite authority to bind the Franchisee; and (ii) the Key Individual has the authority and responsibility required under the Franchise Agreement.

4.    The Franchisee and its Key Individual and members must meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, among others, providing personal guarantees, representation letters and other documentation as FRANCHISOR may specify.

B.    Key Individual Ownership Requirements for Multi-Unit Franchise Dealers.

1.    This Paragraph B is adopted in accordance with Sections 4.3(a)(i) and 4.4(b)(i)(A) of the dealer Franchise Agreement.

2.    If a Franchise Dealer has applied for and been qualified by FRANCHISOR as a Multi-Unit Dealer under FRANCHISOR's Multi-Unit Policy, the Key Individual for that Franchise Dealer will not be required to have any ownership interest in the Franchisee Dealer.

C.    Dealer Guarantee Cap.

1.    The liability to FRANCHISOR of a person furnishing FRANCHISOR with a written guarantee pursuant to Article IV of the Dealer Franchise Agreement for any single occurrence giving rise to private third party claims and related Losses will be limited to $5 million. This limit is subject to that person or the Franchisee having obtained and maintained in full force insurance that has minimum limits of $5 million per occurrence that meets the requirements of Article XI of the Dealer Franchise Agreement (including, but not limited to, naming Franchisor Petroleum Marketing Inc., a Maryland corporation, it's subsidiaries, affiliates and assigns as an additional insured) and actually covers and provides compensation for such claims and related Losses up to that limit.

2.      This limitation of liability does not apply to liability or other Losses other than those arising from private third party claims and, without limitation, expressly excludes: (a) any Losses that FRANCHISOR or an Indemnitee may incur arising out of the Franchisee's or a guarantor's breach of the Dealer Franchise Agreement or a guarantee; (b) any Losses that FRANCHISOR may suffer arising out of any tortious act or omission committed by a Franchisee, its employees, agents or contractors, or its guarantor against FRANCHISOR or any Indemnitee; (c) any Losses of FRANCHISOR or any Indemnitee related to damage to, or destruction or loss of, the property of FRANCHISOR or an Indemnitee; or (d) any fines, penalties, clean-up costs, payments or liability to or assessed or ordered by any governmental authority.  This limitation of liability also does not apply to any Losses resulting from the Franchisee's gross negligence or willful misconduct.

3.      This Paragraph C does not apply to guarantees requested or required by FRANCHISOR for purposes other than meeting the requirements of Article IV of the Dealer Franchise Agreement including, but not limited to, guarantees required by FRANCHISOR as security for product or equipment purchases, Conversion Costs, Improvement Funds or FRANCHISOR or third-party loans.

D.      General Provisions.

1.      Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2.      This policy is effective July 12, 2004, and applies only to Franchisees under a franchise form PMPA Franchise Agreement.  To take advantage of this policy, franchisees under other FRANCHISOR form agreements must enter into a franchise form Franchise Agreement.

3.      FRANCHISOR may change this policy at any time.  Any changes to Paragraph A of this policy will not affect the status of any LLC Franchisee that enters into a PMPA franchise relationship with FRANCHISOR in accordance with this policy prior to the change, except FRANCHISOR may impose additional requirements or conditions relating to such LLC Franchisees.

DEALER acknowledges the receipt and applicability of this Policy:

**Kazmi Trading Corp.**

**Syed Munir Kazmi, President**

**Key Individual Guaranty**
**Site 57254**

This Guaranty is given by Syed Munir Kazmi ("GUARANTOR"), whose address is

*14 Blossom Dr  Ewing  NJ 68638*, on *SEP - 6*, 2017.
(home address)

RECITALS

A.     LUKOIL North America LLC ("LNA") has entered into a PMPA Franchise Agreement, and certain related or supplemental agreements (collectively, the "Franchise Agreement") with **Kazmi Trading Corp.** (the "Franchise Dealer") with respect to certain marketing premises located at **1497 Prospect Street, Trenton, NJ 08638.**

B.     Under the Franchise Agreement, if the Franchise Dealer is not an individual, then the Franchise Dealer must designate a Key Individual who must, among other things, provide LNA, and maintain in full force and effect during the term of the Franchise Agreement, a continuing, unconditional personal guarantee of all of the Franchise Dealer's payment and performance obligations under the Franchise Agreement.

C.     The Franchise Dealer has designated GUARANTOR as the Key Individual under the Franchise Agreement.  GUARANTOR is willing to serve as the Key Individual and to guarantee all of the Franchise Dealer's payment and performance obligations under the Franchise Agreement according to the terms set forth below.

D.     This Guaranty is given in consideration of LNA's continued financial accommodations to the Franchise Dealer under the Franchise Agreement.

In consideration of the Recitals set forth above, and other good and valuable consideration, the receipt and sufficiency of which GUARANTOR acknowledges, GUARANTOR gives LNA the following guaranty:

1.     **Statement of Guaranty; Indemnity**
       A.     GUARANTOR unconditionally guarantees the full, prompt, complete and satisfactory performance of all of the terms, conditions and obligations existing or hereinafter existing (whether they are obligations of payment or performance) of the Franchise Dealer under the Franchise Agreement (the "Franchise Dealer's Obligations"), as that agreement and all related and supplemental agreements may be amended, extended or renewed from time to time.  If LNA and Franchise Dealer renew the Franchise Agreement or their Franchise Relationship, this Guaranty will be a continuing guaranty of the Franchise Dealer's Obligations under the renewed agreement, as it is renewed in each instance, and a separate guaranty for the renewed agreement will not be necessary.

       B.     GUARANTOR also agrees to indemnify and defend LNA, its affiliates and their respective successors and assigns from any and all liability, damages, loss and other expenses (including court costs and attorneys' fees) that arise from: (i) the Franchise Dealer's failure to perform the Franchise Dealer's Obligations; (ii) the Franchise Dealer's breach of its representations and warranties under the Franchise Agreement; and (iii) GUARANTOR's default under, or failure to comply promptly with, any of the provisions of this Guaranty.

       C.     The Guarantor agrees to pay on demand all reasonable and documented expenses of the LNA (including reasonable and documented fees and expenses of LNA's counsel) in any way relating to the enforcement or protection of the rights of LNA under this Guaranty but only to the extent that such expenses are incurred after the LNA's demand for payment under this Guaranty has not been honored in a timely manner and, provided that the Guarantor shall not be liable for any expenses of the LNA, if no payment under this Guaranty was due at the time such demand was made.

       D.     This Guaranty is made without limitation as to amount.  GUARANTOR's obligations and liabilities under this Guaranty are not affected by:
              (i)     the genuineness, validity, regularity or enforcement of any of the Franchise Dealer's Obligations;

              (ii)     the existence, validity, enforceability, perfection, or extent of any collateral for the Franchise Dealer's Obligations;

KIG52112                                      1

(iii)     the exchange, surrender, release or substitution of any collateral for the Franchise Dealer's Obligations; or,

(iv)     any other circumstance relating to any of the Franchise Dealer's Obligations that may vary the risk of GUARANTOR or that might otherwise constitute a defense to this Guaranty.

E.     The liability of the GUARANTOR under this Guaranty is absolute and direct, and not conditional or contingent. Without limiting the generality of the immediately preceding sentence, LNA has no obligation, as a condition to exercising its rights under this Guaranty, to first: (i) pursue or enforce any remedies it has, whether against the Franchise Dealer, or any other person or entity, arising under the Franchise Agreement, or otherwise; or (ii) pursue, execute, foreclose or take other action against any collateral for any of the Franchise Dealer's Obligations including, without limitation, any deed of trust, mortgage, security or deposits held by or on behalf of LNA.

F.     To the extent that the Franchise Dealer's Obligations are for the payment of money, this Guaranty is a guaranty of payment, not one of collection.

## 2.     Duration

This Guaranty is irrevocable and will continue in force until all of the Franchise Dealer's Obligations (including, without limitation, indebtedness) have been satisfied and until the Franchise Dealer's liability to LNA under the Franchise Agreement has been completely discharged. This Guaranty will be reinstated if at any time any payment by the Franchise Dealer is rescinded or must otherwise be returned by LNA for any reason including, but not limited to, the bankruptcy, insolvency or reorganization of the Franchise Dealer. GUARANTOR is not discharged from liability under this Guaranty as long as any claim by LNA against the Franchise Dealer remains outstanding.

## 3.     Modification of Franchise Agreement or Changes in Status

A.     If LNA and the Franchise Dealer modify the Franchise Agreement according to its terms, or if LNA unilaterally modifies the Franchise Agreement according to its terms, such modification will not release GUARANTOR from GUARANTOR's liability under this Guaranty and this Guaranty will apply to any additional obligations of the Franchise Dealer under such modifications.

B.     This Guaranty will not be affected or impaired by any change in the relationship between GUARANTOR and the Franchise Dealer or by any voluntary or involuntary liquidation, dissolution, sale of assets, insolvency, reorganization, bankruptcy or filing for bankruptcy by the Franchise Dealer.

C.     GUARANTOR's liability under this Guaranty will not be affected or impaired by any course of dealing or negotiations between LNA and the Franchise Dealer during the term of the Franchise Agreement or by any waiver, compromise, forbearance, extension or release that is either granted or deemed to be granted by LNA to the Franchise Dealer under the Franchise Agreement (except for those that are covered by paragraph 3.A. above). Without limiting the generality of the immediately preceding sentence, GUARANTOR agrees that LNA may, from time to time without notice to or consent by GUARANTOR:

(i)     extend the time of payment or performance of any or all of the Franchise Dealer's Obligations;

(ii)     extend the time of exchange, surrender or deposit of any collateral for the Franchise Dealer's Obligations;

(iii)     renew any of Franchise Dealer's Obligations and receive and accept any instruments for the payment of money, including, but not limited to, notes, bills, checks, and trade acceptances made, accepted, extended, renewed or delivered by Franchise Dealer; and,

(iv)     accelerate the maturity or time for performance of the Franchise Dealer's Obligations, without in any way releasing or discharging GUARANTOR from GUARANTOR's obligations under this Guaranty.

## 4.     Waiver of Notices

GUARANTOR waives any and all notices that are actually required or are deemed to be required under the Franchise Agreement or this Guaranty, including, but not limited to:

A.     Notice of LNA's acceptance of or reliance on this Guaranty;

B.      Notice of any extension of time for the payment or performance of any of the Franchise Dealer's Obligations;

C.      Notice of acceleration of the maturity or time for performance of the Franchise Dealer's Obligations;

D.      Notice of presentment, demand for payment or performance, notice of dishonor, notice of nonpayment or nonperformance, protest, notice of protest, notice of any sale of collateral, and all other forms of notice whatsoever concerning the Franchise Dealer's Obligations; and

E.      Notice of any defaults by or disputes with the Franchise Dealer concerning the Franchise Agreement or the Franchise Dealer's Obligations.

5.      **Enforcement of Franchise Agreement and Guaranty**
A.      LNA may (but is not required to) join GUARANTOR in any action or proceeding that LNA commences against the Franchise Dealer concerning the Franchise Agreement.  LNA may recover against GUARANTOR in such action or proceeding or in any independent action or proceeding against GUARANTOR, without any requirement that LNA first assert, prosecute or exhaust any remedy or claim against the Franchise Dealer.

B.      LNA may enforce its rights under this Guaranty in such proceedings and in such manner as LNA considers necessary or desirable.

C.      No waiver of LNA's rights under this Guaranty is effective unless it is in writing and signed by LNA.  Any such waiver is effective only with respect to the specific matter involved and does not impair the rights of LNA or the obligations of GUARANTOR to LNA in any other respect or at any other time.

D.      To the extent permitted by law, each remedy of LNA is cumulative and is in addition to any other remedy given under this Guaranty or the Franchise Agreement, or that either now exists or will exist at law or in equity.

6.      **Subrogation Rights and Waiver of Suretyship Defenses**
GUARANTOR will not exercise any rights that GUARANTOR may acquire by way of subrogation until all of the Franchise Dealer's Obligations, whether actual or contingent, and GUARANTOR's obligations and liabilities to LNA have been paid in full.  If GUARANTOR receives any amount in violation of the preceding sentence, GUARANTOR must hold such amount in trust for the benefit of LNA and must pay such amount to LNA at the earliest opportunity.   GUARANTOR waives any and all suretyship defenses to its obligations under this Guaranty.

7.      **Assignment**
A.      GUARANTOR must not assign this Guaranty or delegate GUARANTOR's obligations under this Guaranty without the prior written consent of LNA.  Any attempted assignment or delegation that does not comply with the provisions of this paragraph is void and of no legal effect.

B.      LNA may assign, in whole or in part, this Guaranty (as part of an assignment of the Franchise Agreement or otherwise) and any of its rights under this Guaranty to one or more assignees.  Any assignee may enforce the provisions of this Guaranty, to the extent transferred, as though the assignee were a party to this Guaranty.

C.      Any assignment of the Franchise Agreement by the Franchise Dealer will not affect GUARANTOR's obligations under this Guaranty.

8.      **Miscellaneous**
A.      Definitions - Unless they are otherwise defined in this Guaranty, capitalized terms have the meanings given to them in the Franchise Agreement.

B.      Headings - the headings of the numbered paragraphs of this Guaranty are for convenience of reference only and do not affect the meaning or construction of any provision of this Guaranty.

C.     Severability - If any provision of this Guaranty is finally determined to be inconsistent with, contrary to or unenforceable under applicable law, such provision will be deemed amended or omitted to conform to such applicable law without affecting any other provision or the validity or enforceability of this Guaranty.

D.     Successors - This Guaranty is binding on the heirs, representatives, successors and permitted assigns of GUARANTOR.

By signing below, GUARANTOR consents to be legally bound by the terms and conditions of this Guaranty.

_____
Syed Munir Kazmi, Guarantor

Witness:

_____
John Pindynski, TSM

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF  NEW JERSEY          )
                              )  SS.:
COUNTY OF  BURLINGTON         )

I, TATYANA ROVKIN _____, a Notary Public in and for the State of NEW JERSEY, County of BURLINGTON, do hereby certify that on this 6TH day of SEPTEMBER, 2017, before me personally appeared SYED MUNIR KAZMI, to me known to be the identical individual described in and who executed the forgoing instrument, and acknowledged that he/she signed, and delivered the same as his or her free and voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year of this certificate above written.

_____
Notary Public
My Commission Expires:

TATYANA ROVKIN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 1/5/2020

KIG52112                                    4

## KEY PERSON PROVISIONS

### TO PMPA FRANCHISE AGREEMENT

These Key Person Provisions are incorporated into and made part of each of the following agreements between LUKOIL North America LLC ("LNA") with offices at 302 Harper Drive, Ste. 303, Moorestown, NJ 08057 and **Kazmi Trading Corp.** ("Operator") pertaining to location # **57254** located at **1497 Prospect Street, Trenton, NJ  08638,** as the case may be and as amended from time to time:

> the PMPA Franchise Agreement, dated **March 17, 2017**
> and all documents ancillary thereto (each individually an "Agreement" and collectively the "Agreements").

1.  If Operator is an individual or sole proprietorship, Operator represents that he or she is the individual or the sole proprietor designated as the Key Person under Paragraph 4 below.

2.  If Operator is not an individual, Operator represents and warrants, as of the date of these Key Person Provisions, that it is

    _X_  a corporation, or
    _    a limited liability company

    duly organized, validly existing and in good standing under and by virtue of the laws of the jurisdiction of its incorporation, and that:

    (a)  Operator has __C__ shares of stock (**if corporation**) issued and outstanding;

    (b)  The shares of Operator's issued and outstanding stock/membership interests are held in the following amount by the following persons (each an "Owner" and collectively the "**Owners**"):

| Number of Shares (corp)/ Percentage of Interest (LLC) Owned* | Name of Owner | Address of Owner |
|---|---|---|
| 100% | Syed M Kazmi | 1497 Prospect St Trenton NJ 08638 |
|  |  |  |
|  |  |  |

> \* Number of Shares must add up to the number of shares listed in (a)
> Percentage of Interest must add up to 100%

(continued on next page)

(c) the only **officers/managers** of the corporation/LLC are as follows:

| Office | Name of Officer | Address of Officer |
|---|---|---|
| President | Syad M Kazmi | 1497 Prospect St Trenton NJ 08638 |
| Vice President | | |
| Treasurer | | |
| Secretary | | |
| | | |
| | | |

and

(d) all the **directors** of the corporation are:

| Name of Director | Address of Director |
|---|---|
| Syad M Kazmi | 1497 Prospect St Trenton NJ 08638 |
| | |
| | |
| | |
| | |

Operator shall, at LNA's request, provide to LNA the Operator's secretary/member's certificate in a form reasonably satisfactory to LNA confirming the representations and warranties made in Paragraph 2 (a) through (d) above as of the date of LNA's request.

3.      Operator shall notify LNA in writing immediately upon the occurrence of any of the following events: (i) the list or relative holdings of the Owners change in any way; (ii) any stock/membership interests of the foregoing Owners is leased, mortgaged, pledged, assigned, sold, or transferred in any way; (iii) there occurs a transfer of any of Operator's stock/interests by levy, attachment, or bankruptcy; (iv) there occurs a transfer of any Operator's stock/interests by operation of law or death; (v) any new officer or director is appointed or elected; or (vi) any current officer and director is removed.  The parties agree that, subject to Paragraph 7 below, upon occurrence of any event enumerated in this Paragraph 3, LNA may terminate or not renew the Agreements in its sole and absolute discretion.

4.      **It is understood and agreed that** Syed Munir Kazmi **is designated the "Key Person" ("Key Person") under the Agreements.**  The Key Person shall operate personally on a daily basis the retail motor fuel business subject of the Agreements.  The phrase "operate personally on a daily basis the retail motor fuel business" means that the Key Person is engaged in daily management of the retail motor fuel business and has the authority to represent and bind the Operator in all matters arising under the Agreements, in particular and not to the exclusion of subjects not set out herein, the authority on behalf of Operator to buy and sell service station equipment, motor fuel, motor oil and associated goods and services; to enter into agreements to lease, finance and/or purchase service station equipment, motor fuel, motor oil and associated goods and services; and to participate in merchandising and/or advertising programs.  Operator represents and warrants that the Key Person has and covenants that the Key Person shall have at all times the

authority to operate personally on a daily basis the retail motor fuel business on behalf of Operator. Operator shall, at LNA's request, provide evidence of this authority by documents reasonably satisfactory to LNA.

5.     Subject to Paragraph 7 below, the Agreements may be terminated or not renewed by LNA if an act or event occurs concerning or involving any person named in these Key Person Provisions as a Owner, officer, director or Key Person which would permit termination or nonrenewal of any Agreement under any applicable law if such act or event concerned or involved a sole proprietor franchisee. Subject to Paragraph 7 below, any act with respect to any matter arising under the Agreements of any person named in these Key Person Provisions as a Owner, officer, director or Key Person shall be imputed to Operator and be deemed performed with full knowledge of and authority from Operator.

6.     **LNA'S FRANCHISE OR CONTRACTUAL RELATIONSHIP, AS THE CASE MAY BE, UNDER THE AGREEMENTS IS EXCLUSIVELY WITH OPERATOR. NOTHING IN THESE KEY PERSON PROVISIONS MAY BE CONSTRUED AS CREATING ANY FRANCHISE, CONTRACT OR FRANCHISING RELATIONSHIP WITH THE KEY PERSON WHO IS NOT THE OPERATOR OR ANY PERSON WHO IS A OWNER, OFFICER OR DIRECTOR OF OPERATOR.**

7.     If any of the acts or events described in Paragraphs 3 or 5 above as grounds for termination or nonrenewal of the Agreements occur, Operator may seek LNA's agreement to change or delete, by amendment, one or more of the names listed above. LNA shall be entitled to withhold its agreement to the proposed change or deletion if, in its sole discretion and judgment, the proposed change or deletion would not be acceptable. Without limiting LNA's discretion in determining the acceptability of any proposed change or deletion, any such request for change may and usually will be denied if the act or event in question affects or pertains in any way to the operation of the retail motor fuel business. Any such request shall be in writing and shall include such information as LNA may designate as reasonably necessary to determine acceptability. LNA will notify Operator of its determination within thirty (30) days following receipt of Operator's complying written request.

8.     In the event of conflict between these Key Person Provisions and the provisions of the Agreements, these Key Person Provisions shall control.

**I acknowledge the receipt and applicability of these Key Person Provisions.**

**OPERATOR:**
Kazmi Trading Corp.

Witnessed by:

_____                    _____
Syed Munir Kazmi, President                    John Pindynski, Territory Sales Manager

Date: _____9/6/17_____

**ADDITIONAL C-STORE PROVISIONS**
**TO**
**PMPA FRANCHISE AGREEMENT**

These Additional C-Store Provisions ("Attachment") are part of and incorporated into, the PMPA Franchise Agreement ("Agreement") between LUKOIL North America LLC ("LNA") and **Kazmi Trading Corp.** ("DEALER") located at **1497 Prospect Street, Trenton, NJ 08638** ("Marketing Premises") with a Term beginning on **September 15, 2017** ("Effective Date").

**ARTICLE I.**
**COMPLIANCE WITH AGREEMENTS AND PROGRAMS**

1.1. <u>Applicability</u>. If LNA grants DEALER the right to operate a Lukoil Mini-Mart under Section 1.3 of the Agreement as a permitted Related Business, this Attachment applies. A "Lukoil Mini-Mart" means a convenience store operated by DEALER under the System at the Marketing Premises under the designation "Mini-Mart".

1.2. <u>Compliance with Agreements</u>.

    (a)    Subject to Section 1.2(c), DEALER shall conduct the Lukoil Mini-Mart business ("Lukoil Mini-Mart Business") in compliance with all applicable agreements including:

        (i)    any agreement relating to the Lukoil Mini-Mart Business between DEALER and LNA or a LNA Affiliate for

            (A)    the construction, alteration or improvement of all or a portion of the Marketing Premises for use as a Lukoil Mini-Mart,

            (B)    the purchase or lease of related equipment, fixtures or other property for use in the Lukoil Mini-Mart Business, or

            (C)    any services provided by LNA, its Affiliate or its designee in connection with the Lukoil Mini-Mart Business; and

        (ii)    any agreement

            (A)    that is:

                (1)    between DEALER and LNA or a LNA Affiliate, or

                (2)    between DEALER and a financial institution or other person pursuant to an arrangement under which LNA or a LNA Affiliate furnished consideration including any inducement, guarantee or credit enhancement, and

            (B)    under which:

                (1)    DEALER has borrowed funds for

                    (a)    the construction, improvement or alteration of all or part of the Marketing Premises for use as a Lukoil Mini-Mart , or

                    (b)    the purchase of equipment, fixtures or other property for use in the operation of the Lukoil Mini-Mart Business; or

   (2)  DEALER has leased any equipment, fixtures or other property for use in the Lukoil Mini-Mart Business;

 (b)  DEALER shall operate the Lukoil Mini-Mart Business at the Marketing Premises and may not delegate operation, or Transfer any rights in the Lukoil Mini-Mart Business, to any other person except in compliance with Articles XII and XIII of the Agreement. DEALER may not Transfer its rights under this Attachment except in connection with a Transfer of its Interests in the Agreement.

 (c)  DEALER shall operate the Lukoil Mini-Mart Business in compliance with all provisions of the Agreement and all related and supplemental agreements. Unless expressly agreed otherwise in writing by LNA, the provisions of the Agreement control over any contrary provision in any agreement relating to the Lukoil Mini-Mart Business.

### ARTICLE II.
### BUSINESS OPERATIONS

2.1. Operation of Lukoil Mini-Mart.  In accordance with the Agreement and this Attachment, DEALER shall operate at the Marketing Premises a Lukoil Mini-Mart.  DEALER shall use advertising and signs using those Proprietary Marks designated by LNA from time to time for use in the Lukoil Mini-Mart Business. LNA, in its sole discretion, may determine the color, size and design of all signs and promotional materials for the Lukoil Mini-Mart Business.

2.2. Compliance with Standards.  DEALER acknowledges that the operation of the Lukoil Mini-Mart Business impacts customers' buying experiences at the Marketing Premises and customers' perceptions and acceptance of LNA-branded products, the System and the Proprietary Marks.  Accordingly, DEALER's operation of the Lukoil Mini-Mart Business is subject to DEALER complying with all requirements contained in this Attachment and the Agreement including but not limited to Section 9.15 of the Agreement.

2.3. Failure to Comply.

 (a)  DEALER acknowledges that the failure to meet its obligations under this Attachment constitutes a failure to comply with a reasonable and materially significant provision of the Agreement and the Franchise Relationship. If DEALER fails to comply with any requirements for the Lukoil Mini-Mart Business under this Attachment or the Agreement, without limiting LNA's other rights or remedies under applicable Law or under the Agreement, any related or supplemental agreement or any other agreement relating to the Lukoil Mini-Mart Business, LNA may, by written notice, require DEALER to stop operating the Lukoil Mini-Mart Business.

 (b)  If LNA requires DEALER to stop operating the Lukoil Mini-Mart Business under this Section 2.3 or if DEALER's rights under this Attachment terminate under Section 2.7 of this Attachment, in addition to any other obligations under the Agreement, DEALER shall:

  (i)  immediately stop operating the Lukoil Mini-Mart Business at the Marketing Premises;

  (ii)  immediately, and permanently stop using, in any manner whatsoever, any Confidential Information, the Lukoil Mini-Mart trade dress and Proprietary Marks and all signs, logos, slogans, advertising, materials, displays, stationery and forms containing those Proprietary Marks or relating to the Lukoil Mini-Mart Business;

  (iii)  immediately pay:

(A)    all sums owing to LNA, any LNA Affiliates and any financial institution or other person that has loaned money or leased property to DEALER in connection with an arrangement under which LNA or a LNA Affiliate furnished any consideration including but not limited to any agreement referred to under Sections 1.2 of this Attachment. Without limiting the preceding general requirements of this Section 2.3(b), DEALER shall immediately pay all the outstanding principal balance and all interest and other charges under LNA-backed loan programs, direct LNA loans and LNA reimbursement agreements relating to the Lukoil Mini-Mart Business, and

(B)    if DEALER leases the Marketing Premises from LNA, all indebtedness to contractors or vendors that have furnished goods or services in connection with the Lukoil Mini-Mart Business; and

(iv)    immediately return to LNA all LNA signs and other personal property of LNA relating to the Lukoil Mini-Mart Business. DEALER grants, and shall cause any other person in possession of the Marketing Premises to grant, to LNA a non-revocable license to enter the Marketing Premises to remove LNA signs and property relating to the Lukoil Mini-Mart Business. DEALER shall bear all removal, site-restoration and transportation costs relating to the removal of these LNA signs and equipment.

2.4.    <u>No Property Interests</u>.  DEALER's right to operate the Lukoil Mini-Mart Business neither creates for, nor conveys to, DEALER any ownership, leasehold or possessory interest in the Marketing Premises. If DEALER leases the Marketing Premises from LNA, DEALER's right to occupy the Marketing Premises, or any portion of the Marketing Premises, arises only out of and is subject to the "Lessee Dealer Lease Provisions" attachment to the Agreement.  If DEALER does not lease the Marketing Premises from LNA, DEALER's right to occupy the Marketing Premises arises out of the DEALER's ownership of the underlying premises or out of leasehold or contractual arrangements between DEALER and the owner of the premises.

2.5.    <u>Licenses, Permits, Approvals, Certificates</u>.  DEALER at DEALER'S sole cost and expense, shall secure, prior to the opening of the convenience store, and maintain all required licenses, approvals, permits and certificates relating to the convenience store and its operation, and shall operate the convenience store in full compliance with all applicable laws, ordinances and regulations including, without limitation, all government regulations relating to occupational hazards and health, dispensing of food products, consumer protection, trade regulation, workers' compensation, unemployment insurance and withholding, payment of federal and state income taxes, social security taxes and sales, use and property taxes.

2.6.    <u>Location: Relationship to System</u>.  DEALER acknowledges that:

(a)    the Agreement and this Attachment do not confer any right to operate the Lukoil Mini-Mart Business at any location other than the Marketing Premises;

(b)    the Lukoil Mini-Mart Business is part of the System and is designed to be operated only in connection with a Motor-Fuels Business and not as an independent business; and

(c)    The Agreement, including but not limited to, Sections 7.2 and 7.3 of the Agreement, apply to the Attachment.

## ARTICLE III.
### MISCELLANEOUS

3.1.    Agreement Provisions. Except as expressly provided otherwise in this Attachment or in the Agreement, the provisions of the Agreement apply to this Attachment. Any termination or nonrenewal of the Franchise and Franchise Relationship will automatically operate to terminate DEALER's rights under this Attachment and any right to conduct the Lukoil Mini-Mart Business at the Marketing Premises.

3.2.    Definitions.

    (a)    Terms used in this Attachment have the meaning indicated in this Attachment or the Agreement.

    (b)    Unless indicated as a reference to provisions of the Agreement, references in this Attachment to Sections and Articles are to those contained in this Attachment.


I acknowledge the receipt and applicability of these Additional C-Store Provisions:


**Kazmi Trading Corp.**

_____

**Syed Munir Kazmi, Managing Member**


The undersigned designated Key Individual, intending to be legally bound, acknowledges and agrees that this Attachment is a supplemental agreement subject to the terms and conditions of the Key Individual Guaranty.

_____       9/6/17

**Syed Munir Kazmi, Key Individual**          **Date**


- 4 -          Rev. 91224

## TRANSFER AND SURVIVORSHIP POLICY

Preamble

This policy is adopted pursuant to Articles XII and XIII of the Franchise 2000 form dealer and distributor PMPA Franchise Agreements (the "Franchise Agreement") and applies to LUKOIL dealers and distributors governed by those agreements ("Franchisees"). Consistent with LUKOIL NORTH AMERICA LLC ("LNA") requirements and developments in the law and in the relevant business environment, this policy is intended to provide additional flexibility to individual Franchisees and the owners of Franchisee business organizations to support estate and business-continuity planning.

A.   Designation of Successors.

1.   This Paragraph A is adopted in accordance with Section 12.5(c) of the Franchise Agreements.

2.   If a Franchisee is an individual, the Franchisee may designate, as the successor or alternate successor upon the Franchisee's death under Section 12.5(a), an individual who is qualified and meets the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors. Subject to the following provisions, a designated successor of an individual Franchisee need not be a spouse or adult child.

3.   Subject to minimum ownership requirements applicable to OG&L Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may designate, as a successor or a alternate successor upon the death of such individual under Section 12.5(b), one or more individuals who meet the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors and, if a successor is to become the Key Individual, meets the qualifications and conditions and requirements provided or contemplated by the Franchise Agreement applicable to a of a Key Individual. Except with respect to OG&L Franchisees to which minimum ownership requirements apply, 51% ownership interest in a non-individual Franchisee will not be a condition to a Key Individual's designation of a successor or to a transfer to that designated successor under Sections 12.5(b) and 13.2 (b) of the Franchise Agreement. Subject to the following provisions, a designated successor of a Key Individual owning an Interest in a non-individual Franchisee need not be a spouse or adult child under Sections 12.5 (b) and 13.2 (b).

4.   As a condition to any Transfer to a designated successor, an individual Franchisee, Key Individual or other Transferor must comply with all applicable laws governing or affecting survivorship or succession. Upon designating a successor, an individual Franchisee, Key Individual or other Transfer must obtain all consents, assignments of rights, releases or waivers from any persons having rights or claims under such laws including, but not limited to, state community property and succession laws. An individual Franchisee, Key Individual or other Transferor must indemnify and defend LNA against any such rights or claims (and, upon LNA's request, must furnish LNA with a written indemnification agreement in form and substance specified by LNA) and, upon LNA's request, also must provide documentation sufficient in LNA's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained including, without limitation, providing an opinion of counsel acceptable to LNA.

5.   Subject to Paragraph A.4 above and all conditions and requirements provided or contemplated by the Franchise Agreement and subject to prior written notice to LNA:

(a)   an individual Franchisee may assign the Franchise Agreement during the Franchisee's lifetime to that individual properly designated as the Franchisee's successor under the preceding provisions of this Paragraph A; and

(b)   subject to minimum ownership requirements applicable to OG&L Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may transfer the Interest during their lifetime to that individual or those individuals properly designated as

their successor or successors under the preceding provisions of this Paragraph A. Except with respect to OG&L Franchisees to which minimum ownership requirements apply, the requirement in Section 12.2(d) of the Franchise Agreement that a Key Individual not transfer less than 51% ownership in a non-individual Franchisee will not apply.

6.      A transferee, whether as a successor upon the death of any Franchisee, Key Individual or other Transferor or as a transferee under Paragraph A.5 above, must meet all conditions and requirements of this policy and all conditions and requirements provided or contemplated by the Franchise Agreement at the time of such succession or other Transfer. Such conditions and requirements include, among others, providing personal guarantees, demonstrating that the successor or other transferee meets all then required applicable Key Individual or Franchise Dealer qualifications, attending training and signing any applicable agreement or agreements. To be effective, all designations must be in writing on such forms as LNA may designate from time to time and must be furnished to LNA, Contract Administration, 302 Harper Drive, Suite 303, Moorestown, NJ 08057.

B.      <u>Transfers to Trusts</u>.

1.      This Paragraph B is adopted in accordance with Section 12.5(c) of the Franchise Agreement and applies only to those Franchisees that are corporations.

2.      An individual who owns shares in a corporate Franchisee may transfer those shares to a trust subject to the following:

   a.      The trust must be established and maintained primarily for estate planning purposes.

   b.      The Franchisee corporation must continue to meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, without limitation, those relating to the appointment of a qualified Key Individual acceptable to LNA.

   c.      On behalf of the trust (but not in their personal capacities), its trustee or trustees (if more than one) must furnish LNA, and maintain in full force and effect, a continuing, unconditional guarantee in accordance with Article IV of the Franchise Agreement.

   d.      If the trust is a revocable living trust, the grantor of the trust must be a trustee of the trust.

   e.      If the shares are those of a Key Individual of a Franchisee subject to minimum ownership requirements applicable to OG&L Franchisees, at least 51% of the Franchisee's shares must be held by one or more trusts, one of the trustees of each of which must be the Key Individual.

   f.      Upon distribution of the shares to the trust's beneficiaries, the distribution must meet all conditions and requirements provided in or contemplated by the Franchise Agreement relating to transferees including, without limitation, meeting Key Individual ownership requirements applicable to OG&L Franchisees and providing required guarantees.

   g.      As a condition to transferring shares to a trust, the Transferor must comply with all applicable laws governing or affecting survivorship or succession and must obtain all consents, assignments of rights, releases or waivers from any person having rights or claims under such laws including, but not limited to, state community property and succession laws. The Key Individual or other Transferor must indemnify and defend LNA against any such rights or claims (and, upon request by LNA, must furnish LNA with a written indemnification agreement in form and substance specified by LNA) and, upon LNA's request, also must furnish LNA with documentation sufficient in LNA's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained, including, but not limited to, providing an opinion of counsel acceptable to LNA.

7.    h.    Prior to any Transfer to a trust, the Franchisee must notify LNA in writing of the proposed transfer at the following address:   LNA, Contract Administration, 302 Harper Drive, Suite 303, Moorestown, NJ 08057.

3.    Subject to the conditions and requirements of Paragraph B.2. above, a Key Individual or other individual owning shares in a corporate Franchisee may designate a testamentary trust as a successor under Section 12.5(b) of the Franchise Agreement.

4.    Nothing contained in this policy is intended to allow any Franchisee to Transfer to a trust any Interest in a Franchise Agreement or in the franchise relationship established by such agreement.

C.    <u>Employee Incentive Transfers</u>.

1.    This Paragraph C applies to those Franchisees that are corporations.

2.    Pursuant to a formal written employee incentive compensation plan of which the Franchisee has furnished LNA with a copy and subject to minimum ownership requirements applicable to OG&L Franchisees, a corporate Franchisee may issue its shares to its employees, provided that the shares issued under such plan may not exceed in the aggregate 20% of the Franchisee's total outstanding shares.

D.    <u>General Provisions</u>.

1.    Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2.    Transfers pursuant to and complying with this policy and made for the purposes contemplated by this policy will not be subject to LNA's prior consent or its right of first refusal under the Franchise Agreement.

3.    This policy is effective April 1, 1998, and applies only to Franchisees under a Franchise 2000 form Franchise Agreement.   To take advantage of this policy, Franchisees under other LNA form agreements must enter into a Franchise 2000 form Franchise Agreement.

4.    LNA may change this policy at any time.  Any change to this policy will not invalidate Transfers of shares made in accordance with this policy prior to the change. LNA, however, may impose additional or different requirements or conditions applicable to shares of corporate Franchisees transferred to a trust under this policy.

| Form **W-9** (Rev. November 2005) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | Give form to the requester. Do not send to the IRS. |

**Print or type See Specific Instructions on page 2.**

Name (as shown on your income tax return)
**Syed Munir Kazmi**

Business name, if different from above
**Kazmi Trading Corp.**

Check appropriate box: ☐ Individual/ Sole proprietor  ☑ Corporation  ☐ Partnership  ☐ Other ▶ ..................  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**1497 Prospect Street**

Requester's name and address (optional)

City, state, and ZIP code
**Trenton, NJ 08638**

List account number(s) here (optional)

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

┌─┬─┬─┐ ┬ ┌─┐ ┬ ┌─┬─┬─┐
└─┴─┴─┘   └─┘   └─┴─┴─┘

or

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**  Signature of U.S. person ▶ *(signature)*   Date ▶ 9/6/17

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                Form **W-9** (Rev. 11-2005)

Form W-9 (Rev. 11-2005)

• The U.S. grantor or other owner of a grantor trust and not the trust, and

• The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules regarding partnerships* on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

**Exempt payees.** Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
| --- | --- |
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter your SSN or EIN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.socialsecurity.gov.* You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.